## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Xtreme Power Inc., *et al*; | § | Case No.:  14-10096 |
| | § | |
| Debtors. | § | Motion for Joint Administration Pending |

### DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL
### ORDERS AUTHORIZING (I)  POST-PETITION SECURED FINANCING
### PURSUANT TO 11 U.S.C. §§ 105(a), 362, 364(c), 364(d), 503, AND 507; (II) GRANTING
### ADEQUATE PROTECTION; AND (III) SCHEDULING A FINAL <u>HEARING</u>
### <u>PURSUANT TO BANKRUPTCY RULE 4001</u>

Xtreme Power Inc. ("**<u>XPI</u>**"), Xtreme Power Systems, LLC ("**<u>XPS</u>**"), and Xtreme Power

Grove, LLC ("**<u>XPG</u>**") (collectively, the "**<u>Debtors</u>**" or the "**<u>Company</u>**"), file this Motion (the

"**<u>DIP Financing Motion</u>**") pursuant to sections 105(a), 362, 364(c), 364(d), 503, and 507 of title

11 of the United States Code (the "**<u>Bankruptcy Code</u>**") requesting (i) entry of interim and final

orders authorizing the Debtors to obtain secured post-petition financing; (ii) granting liens and

super-priority claims; and (iii) a final hearing pursuant to Rule 4001 of the Federal Rules of

Bankruptcy Procedure (the "**<u>Bankruptcy Rules</u>**").  In support of the motion, the Debtors rely

upon the *Declaration of Ken Hashman in Support of Chapter 11 Petitions and First Day*

*Motions*, filed with the Court concurrently herewith and fully incorporated herein (the

"**<u>Hashman Declaration</u>**").  In further support, the Debtors, by and through their undersign

counsel, respectfully represent:

### I.
### Executive Summary[1]

1.       The Debtors began exploring a sale process that would maximize the Debtors'

value months before the chapter 11 filing.  As explained further below, the Debtors' operations

---

[1] All capitalized terms in this Executive Summary not defined shall have the means provided to them elsewhere in this motion.

were stymied by a liquidity crisis, which in turn made an out of court sale process unworkable. In fact, the Debtors' lack of liquidity threatened the viability of any sale process, in or out of court.  Accordingly, the Debtors' Board of Directors authorized the Gordian Group to solicit bids for in or out of court financing.  The Debtors' solicitation of financing yielded two prospective lenders.  After a series of vigorous negotiations, the Debtors determined that the structure and terms of Horizon's ultimate proposal best served the Debtors' goal of providing liquidity for a sale process.  The other proposed lender acknowledged that it could not improve on the terms of its original proposal.

2.     Under the terms of the DIP Credit Facility, Horizon will provide an initial advance of up to $1.3 million in weekly advances consistent with the Approved Budget (as defined in the DIP Term Sheet) (the "**Initial DIP Availability**") on a senior secured basis that will, based on the Debtors' projections, fund the Debtors' operations while in chapter 11 through the end of February.  In connection with the Initial DIP Availability, Horizon will serve as the Initial Stalking Horse (the "**Back Up Sale Transaction**") while the Debtors and the Gordian Group actively search for a Substitute Stalking Horse.  If the Debtors obtain a Substitute Stalking Horse by February 24, 2014, Horizon will advance an additional $1.2 million in weekly advances consistent with the Approved Budget (together with the Initial DIP Availability, the "**DIP Availability**") to the Debtors on a senior secured basis to permit the Debtors to conduct a competitive bidding process with the Substitute Stalking Horse in hand.  If no Substitute Stalking Horse is obtained by February 24, 2014, then Horizon shall have no further funding obligation under the terms of the DIP Loan after February 28, 2014.

3.     The proposed DIP financing and related sale framework is the best option to maximize the value of the Debtors' estates under the circumstances.  It provides the needed

liquidity for the Debtors to obtain a Substitute Stalking Horse.  If a Substitute Stalking Horse is located, the bid will be at a value sufficient to pay the Debtors' senior-most secured lenders: Silicon Valley Bank ("**SVB**") and Horizon.  Moreover, locating a Substitute Stalking Horse triggers Horizon's obligation to fund the second tranche of the DIP Credit Facility that will provide further needed liquidity for a competitive sale process.  Further, the DIP Credit Facility provides another layer of flexibility for the sale process.  In the event that the Debtors do not obtain a Substitute Stalking Horse by February 24, 2014, the Debtors may nonetheless continue its sale process for an extended period (subject to deadlines) if it obtains a financing commitment from another lender (whose claims and liens will be junior to the claims and liens securing SVB's prepetition indebtedness and Horizon's pre and post-petition indebtedness) (the "**Substitute DIP Lender**") on or before February 24, 2014 that closes no later than February 28, 2014. For the avoidance of doubt, Horizon will have no further funding obligation with respect to the extended process and its collateral may not be surcharged under 11 U.S.C. § 506(c) for any expenses incurred after February 28, 2014 if the process is extended in the manner described in this paragraph.

4.     In the event that the Debtors do not locate a Substitute Stalking Horse or a Substitute DIP Lender by February 24, 2014, the Debtors will sell substantially all of their assets to Horizon under the Back Up Sale Transaction with a February 28, 2014 closing.  The Back Up Sale Transaction is not the Debtors' desired transaction, nor, upon information and belief, does Horizon desire to acquire the Debtors' assets as a consequence of the Back Up Transaction.

## II.
## Jurisdiction and Venue

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtors' chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(1).

## III.
## Factual Background

6.      On January 22, 2014 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code. Contemporaneously herewith, the Debtors are seeking joint administration of these chapter 11 cases.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No trustee, examiner, or creditors' committee has been appointed in these cases however, as set out below, notice of this Motion has been given to the 20 largest unsecured creditors of each of the Debtors, parties in interest that will likely form the official committee of unsecured creditors to be appointed by the United States Trustee in this case.

### A.      Company History[2] and Events Leading to Chapter 11

8.      XPI (a Delaware Corporation) is 100% owner of XPS (a Texas Limited Liability Company) and XPG (a Delaware Limited Liability Company).  XPI also owns 25% of XDT, LLC (a Delaware Limited Liability Company), which is a non-operating company and is not a Debtor.  XPI is headquartered in Kyle, Texas, with operations throughout the U.S. and several foreign jurisdictions.

9.      Founded in November 2004, XPI designs, engineers, installs, and monitors integrated energy storage and power management systems for Independent Power Producers,

---

[2] For more information, please visit http://www.xtremepower.com.

Transmission and Distribution Utilities, and Commercial & Industrial End Users, among others. XPI's technology delivers on its promise to solve complex grid challenges and its customers rely upon its staff of power systems engineers and professionals to design and implement a solution specific to each customer's need.

10.    The Debtors are established and experienced leaders in the energy storage industry with over 240,000 hours of field operation and more than 5 GWh charged and discharged across its 60 MW of grid-scale installations.  The Debtors specialize in more than ensuring the battery and energy storage source seamlessly operates with the Power Conversion System – they are systems specialists, well-versed in ensuring integrated systems respond to and communicate with the grid and other external inputs as required by their customers.  These operations have enabled the Debtors to become one of the world's leading grid-scale power control technology provider capable of integrating the full spectrum of energy generation sources and battery technologies.

11.    XPI is a privately held company.  From 2009 through 2011 the Company experienced rapid growth, securing several large contracts for new systems.  It was ranked number 15 on Inc. Magazine's 500|5000 list of the fastest-growing private companies in the United States in 2012—the company's second year in a row making the prestigious list—based on XPI's three-year growth rate of 8,423 percent and 2011 revenues of $22.2 million.  In 2011, XPI had ranked 704th with a three-year growth rate of 450 percent.

12.    However, at about this time, slow bookings and lower gross margins began impacting the 2012 outlook, and although the Company remained a competitive bidder for a number of proposed projects, GAAP revenues for 2012 were eventually reported at -19%.  Then on August 1, 2012, a fire occurred at the Kahuku Wind Farm in Hawaii in the building housing

the battery energy storage system manufactured by the Company. The building and the energy storage system were destroyed by the fire. The root cause of that fire remains under investigation. Until such time as the root cause is determined, it is not possible to determine what, if any, liability the Company may have as a result of this loss, for which the Company has insurance coverage. In any event, the Company believes publicity related to the fire has negatively impacted project bookings.

13.     The Company revised its business plan to reflect revenue and expense reductions consistent with market conditions and began to look at restructuring its costs. At about the same time, the Company was pursuing its proposed Series D equity financing but was unable to generate sufficient interest. Thus, to support the Company's operational cash needs, the Company engaged in a series of bridge financings with convertible notes. Since 2011, the company has raised approximately $50 million in this manner.

14.     By October 2013, various debt and lease agreements were in default and the Company was in default with its secured lenders on revenue and other operating covenants. The defaults were addressed with a round of bridge financing, but the Company continued to forecast negative cash flow from operations. The Company's management and board of directors, who have closely monitored the impact of these conditions, determined to address potential alternatives with the assistance of various professionals and outside advisors, including Gordian Group, LLC ("**Gordian Group**"). Several offers for purchase and financing arrangements were considered, including a potential transaction with a large public company. The Company believed that the transaction would yield a favorable result, but the proposed purchaser withdrew from negotiations for reasons unknown to the Company. Attempts to obtain further bridge financing fell through in late December.

15.     In early January, the Company's Board of Directors authorized the Gordian Group to seek financing for an in or out of court sale process.  Gordian diligently canvassed the relevant market and, as a result, two initial proposals from two prepetition lenders emerged.  In connection with its consideration of the proposals, the Board of Directors determined that filing Chapter 11 to effect a sale of the Company was its best course of action.  After a series of negotiations and refinement of the two proposals, the Board of Directors determined that Horizon Technology Finance Corporation's ("**Horizon**") proposal was the best proposal to implement a sale process that would maximize the value of the Debtors and their stakeholders.

16.     As mentioned in the Executive Summary above, and as described more fully in the Debtors' motion to sell substantially all of their assets filed contemporaneously with this Motion, Horizon will serve as the Initial Stalking Horse Bidder.  Horizon's bid is a credit bid of its pre and post-petition financing plus payment in cash of the amount outstanding to SVB.  The Sale Procedures Motion permits a substitute stalking horse bidder to replace Horizon, followed by a competitive bidding process.  Further, if the Debtors are able to obtain substitute debtor in possession financing (on terms in acceptable under the DIP Credit Facility), the Company can proceed in an extended sale process (subject to certain deadlines).

17.     As of the bankruptcy filing, the Company is virtually out of cash.  However, it has $5.4 million of booking on current projects in the pipeline, as well as one contract pending in Puerto Rico that if secured will result in bookings of $17 million, one in the US that would result in bookings of $0.9 million  and one in the UK that would result in bookings of $7 million.

### B.     Prepetition Secured Indebtedness

18.     Prior to the Debtors' bankruptcy filing, one or more of the Debtors were parties to various debt instruments with lenders and investment groups (collectively, the "**Prepetition**

**Secured Lenders**").[3]  Below is a summary of the Debtors' secured prepetition indebtedness.

Except for Horizon, which the Debtors will release in connection with the DIP Financing

proposed hereby, the Debtors are not waiving their right to challenge the validity or priority of

any lien with respect to any of the lenders listed in the chart below.

| Debtor(s) | Lender(s) | Debt Instrument | Outstanding Amount |
|---|---|---|---|
| XPI, XPS, XPG | Silicon Valley Bank | Loan and Security Agreement dated April 18, 2011 | $494,861 |
| XPI, XPS, XPG | Horizon Technology Finance Corporation | Secured Promissory Note dated September 28, 2012 | $6,660,000 |
| XPI | Michael D. Breen | Promissory Note dated April 29, 2011 | $1,123,200 |
| XPI | • SAIL Venture Partners II, L.P.<br>• SAIL 2010 Co-Investment Partners, L.P.<br>• SAIL 2011 Co-Investment Partners, L.P.<br>• SAIL Xtreme SB Co-Investment Partners, LP<br>• SAIL Xtreme APRS Fund LP<br>• SAIL Holdings, LLC<br>• Bessemer Venture Partners VII L.P.<br>• Bessemer Venture Partners VII Institutional, L.P.<br>• BVP VII Special Opportunity Fund L.P.<br>• Austin Police Retirement System<br>• Spring Ventures, LLC<br>• Dominion Energy Technologies II, Inc.<br>• The Dow Chemical Company<br>• BP Alternative Energy International Limited | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated June 24, 2011 | $22,141,437 |
| XPI | • Louisiana Sustainability Fund, LP<br>• SAIL Holdings LLC<br>• Bessemer Venture Partners VII L.P.<br>• Bessemer Venture Partners VII Institutional, L.P.<br>• BVP VII Special Opportunity Fund L.P.<br>• The Dow Chemical Company<br>• BP Alternative Energy International Limited<br>• Dominion Energy Technologies II, Inc.<br>• Langara Capital Partners Ltd | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated May 25, 2012 | $9,155,687 |
| XPS | Zuniga Investment Partners, Ltd. | Real Estate Lien Note dated June 27, 2012 | $580,629 |

---

[3] The amounts outstanding to the Prepetition Secured Lenders shall be referred to as the "Existing Indebtedness."

| Debtor(s) | Lender(s) | Debt Instrument | Outstanding Amount |
|---|---|---|---|
| XPI | • SAIL 2011 Co-Investment Partners, L.P.<br>• SAIL Sustainable Louisiana I, L.P.<br>• SAIL Sustainable Louisiana II, L.P.<br>• Amabro Investments Ltd.<br>• Forever 7, LLC<br>• Pendleton Capital Partners, LLC<br>• Wild Rose Irrevocable Trust<br>• James P. Farwell | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated August 28, 2012 | $4,897,391 |
| XPI | • Sail Venture Partners II, L.P.<br>• Bessemer Venture Partners VII L.P.<br>• Bessemer Venture Partners VII Institutional, L.P.<br>• BVP VII Special Opportunity Fund L.P.<br>• The Dow Chemical Company<br>• SAIL Pre-Exit Acceleration Fund, LP<br>• SAIL Pre-Exit Acceleration Fund, LP<br>• BP Alternative Energy International Limited<br>• SKYLAKEUSA-THREE, LLC<br>• Louisiana Sustainability Fund, LP<br>• SAIL Holdings LLC<br>• Bessemer Venture Partners VII L.P.<br>• Bessemer Venture Partners VII Institutional, L.P.<br>• BVP VII Special Opportunity Fund L.P.<br>• The Dow Chemical Company<br>• Arnel Investments III L.P.<br>• Christensen Limited Liability Limited Partnership | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated February 6, 2013 | $10,899,726 |
| XPI | • SAIL Pre-Exit Acceleration Fund, LP<br>• BP Alternative Energy International Limited<br>• The Dow Chemical Company<br>• Forever 7, LLC<br>• Pendleton Capital Partners, LLC<br>• Wild Rose Irrevocable Trust<br>• BP Alternative Energy International Limited<br>• Sail Defense Fund, LLC | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated July 23, 2013 | $3,146,663 |
| XPI | • SVP II Xtreme Power Joint Venture, LP<br>• Christopher Ryan<br>• The Moelis Family Trust<br>• Jared Joseph Dermont<br>• Yadin Rozov<br>• Trust of Sashi and Cindy Rentala<br>• Steven and Joan Panagos | Promissory Notes pursuant to the Promissory Note and Warrant Purchase Agreement, dated November 8, 2013 | $3,396,367 |

| Debtor(s) | Lender(s) | Debt Instrument | Outstanding Amount |
|-----------|-----------|-----------------|--------------------|
|  | • Barak Klein<br>• Vincent Lima<br>• Mahmoodzadegan - Gappy Trust<br>• Greg Share<br>• Raich Trust<br>• Richard Harding<br>• ISP Holdings, Inc. |  |  |

19.     In connection with the Debtors' execution of these various prepetition loan documents, the Debtors granted liens and security interests in substantially all of their property, including but not limited to, its accounts, real property (including leasehold interests), equipment and inventory, general intangibles (including intellectual property), investment securities, and the products and proceeds thereof (the "**Prepetition Collateral**") in two distinct categories of:

A.     **XPI Collateral** – this collateral consists primarily of (i) cash in the form of a $7 million letter of credit security fund for the purpose of any shortfalls in an executory contract with Duke Energy; (ii) the 100% membership interests in the subsidiary Debtors **XPS** and **XPG**; and (iii) the inter-corporate accounts receivables due by these two subsidiaries to XPI in the amount of approximately $95 million[4]; and (iv) certain patent and IP properties.

B.     **XPS Collateral** – this collateral consists of all of the operating assets of the ongoing business of the Debtors – including all of the IP owned, all contracts for power services, all accounts and accounts receivable due for the contracts and power services, and all equipment forming the XPS operating locations.

---

[4] XPI does not have a lien or security interest in any assets of XPS or XPG to secure it in collection of the inter-corporate account receivable.  Accordingly, XPI would likely not have any priority over any other creditor of XPS or XPG in a liquidation of XPS or XPG.

20.     It appears that only SVB and Horizon (on account of its prepetition indebtedness) have liens, security agreements, and perfected security interests in XPS in an approximately aggregate amount of $7.2 million.

**IV.**
**Relief Requested**

21.     The Debtors seek authority to obtain post-petition financing in the aggregate amount of up to $2.5 million (the "**DIP Availability**" or "**DIP Credit Facility**"), subject to the terms and conditions of the Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**" and collectively with all agreements, documents, and instruments delivered or executed in connection therewith, the "**Financing Documents**") between the Debtors and Horizon Technology Finance Corporation ("**Horizon**" or the "**DIP Lender**").

22.     XPS's payroll is due on Thursday, January 24, 2014, and it cannot be made absent the Initial DIP Availability funding.  **Thus, the Debtors request that the Court schedule the Interim Hearing to consider this motion on January 23, 2014.**  It is anticipated that the proposed the Initial DIP Credit Facility will enable the Debtors to pay their ongoing operating expenses and the administrative claims of the estates through the end of February.  If applicable, the remaining DIP Availability or financing provided by the Substitute DIP Lender will provide sufficient funds to conduct a competitive § 363 sale process.

23.     The terms and conditions of the DIP Credit Facility shall be embodied in a final order and the DIP Credit Agreement.  In accordance with Bankruptcy Rule 4001, below is a summary of the terms of the proposed DIP Credit Facility:

| Borrowers: | XPI, XPS, XPG |
|---|---|
| Lender: | Horizon Technology Finance Corporation |

| | |
|---|---|
| Use of Proceeds: | To (i) fund working capital and other expenses of Borrowers in accordance with the Approved Budget, and (ii) provide financing to facilitate the sale of all or portions of the Borrowers' business on a going concern basis, or in the alternative, the orderly liquidation of the Borrowers' assets, or a combination thereof depending upon the facts and circumstances.<br><br>    (a) For the period from the entry of the Interim Financing Order until the date of the Final Hearing on the Financing Motion, the Borrowers may borrow from the Lender up to $903,300 and no additional amounts shall be available until the Final Financing Order has been entered; and<br><br>    (b) Upon the entry of the Final Financing Order and the timely designation of the Substitute Stalking Horse Bidder, the Borrowers may borrow from the Lender up to the remaining DIP Availability pursuant to the terms of the DIP Loan Documents.<br><br>    (c) Borrowers shall use any funds advanced under the DIP Credit Facility only for the purposes and in the amounts set forth in the Approved Budget. |
| Loan Amount: | A debtor-in-possession credit facility (the "DIP Credit Facility") to Borrowers in an initial amount of up to $1,300,000 to cover the period from the Petition Date through the Horizon Sale Date (the "Initial DIP Availability") and upon the conditions set forth below, for an additional amount up to $1,200,000 to cover the period from the Horizon Sale Date (February 28, 2014) through April 14, 2014 (the "Sale Date") for a total amount of up to $2,500,000 (the "DIP Availability"), in connection with financing the Borrowers during their bankruptcy proceedings. The Borrowers shall be limited to weekly draws against the amount established under the terms of the Approved Budget. Any advances under the DIP Credit Facility are expressly conditioned upon entry of an Interim Financing Order (which has not been stayed) and entry of a Final Financing Order (which has not been stayed), as the case may be, each in a form and substance acceptable to the Lender. |
| Interest Rate: | Interest shall accrue in respect of all Obligations (as defined in the Loan Agreement) at the Interest Rate of fifteen percent (15%) and, following the occurrence of an Event of Default, eighteen percent (18%). |
| Term/Maturity: | The DIP Loan shall mature and be immediately due and payable in full, and the Lender shall have no further obligation to make advances under the DIP Credit Facility and the Borrowers shall have no further use of Cash Collateral or the DIP Credit Facility or any funds previously advanced thereunder, upon the earliest to occur of the following events, at Lender's sole election: |

(a)     the occurrence of a Default or an Event of Default (as defined in the DIP Loan Documents);

(b)     the indefeasible payment in full of the Obligations owing to the Lender;

(c)     the failure of the Debtor to obtain the approval of the Back Up Sale Transaction (as defined below) on or before 21 days after the Petition Date;

(d)     the Horizon Sale Date, unless, on or before February 24, 2014, the Debtor shall have obtained an order from the Bankruptcy Court (i) approving procedures for a sale of the Debtors' assets to a specifically identified third party other than the Lender (the "Substitute Stalking Horse Bidder") for a cash purchase price greater than the sum of all pre and post bankruptcy indebtedness owed to Lender and amounts owed to Silicon Valley Bank ("SVB") and otherwise upon terms and conditions acceptable to Lender, (ii) establishing rules for an auction of substantially all of the assets of the Debtors to occur no later than March 31, 2014 (the "Auction"), (iii) setting a Final Sale Hearing (as defined below)  to approve the results of such Auction not later than April 4, 2014, (iv) requiring an outside closing date of not later than April 14, 2014;

(e)     March 31, 2014, if no Auction shall have occurred prior to that date;

(f)     April 4, 2014, if no Final Sale Hearing (as defined below) shall have occurred on or prior to that date;

(g)     the sale of Borrowers, collectively or individually, to any purchaser; or

(h)     April 14, 2014.

Upon the expiration of the Term, all outstanding principal and interest incurred or advanced post-petition and pre-petition shall be due and payable.

Notwithstanding (d) - (h) above, and notwithstanding anything to the contrary in the Term Sheet, the DIP Loan shall not mature if the Borrowers obtain a financing commitment from a third party lender (the "Substitute DIP Lender") that is junior to the DIP Loan and Collateral (defined below), junior to the SVB Loan and liens, and junior to the pre-petition loan and liens of Lender on or before February 24, 2014 that closes no later than February 28, 2014.  In the event that the Debtors obtain a Substitute DIP Lender and, thereafter, a Substitute Stalking Horse Bidder no later than March 31, 2014, the dates in paragraphs (d) - (h) above shall be extended by 30 days, but the Lender shall have no

| | |
|---|---|
| | obligation to advance funds after February 28, 2014. |
| General Covenants: | Covenants governing the DIP Credit Facility will include customary performance, loan and reporting covenants and will also include, without limitation, the following:<br><br>(a)    The Borrowers shall be in compliance with the following financial covenant:  (i) Borrowers' <u>actual</u> cash receipts for any period are not less than ninety percent (90%) of the <u>projected</u> cash receipts for such period, as set forth in the then-current Approved Budget; (ii) Borrowers' <u>actual</u> disbursements for any period on the Approved Budget are not more than one hundred ten percent (110%) of the <u>projected</u> disbursements for such period as set forth in the then-current Approved Budget.  The foregoing calculation shall be tested weekly beginning two (2) weeks following the Petition Date, which date shall be the date on which Borrowers, collectively or individually, file any petition under the Bankruptcy Code (the "<u>Petition Date</u>") and measured on a cumulative basis for the period beginning on the date hereof through any date of determination.<br><br>(b)    Cash receipts shall be swept to the Lender's blocked account on a daily basis. |
| Sale Covenants: | Borrowers agree that they will continue to use best efforts to conduct a going concern sale of their assets in accordance with the Interim Financing Order and applicable Interim Sale Order, and as summarized below:<br><br>(a)    On or within 1 day of the Petition Date, Borrowers shall file, in addition to the emergency motion seeking approval of the DIP Credit Facility, an emergency motion seeking approval of a  proposed sale of substantially all of the Borrower's Assets  (the "<u>Back Up Sale Transaction</u>") to Lender or its nominee (the "<u>Initial Stalking Horse Bidder</u>"), pursuant to which Lender will forgo seeking any customary "break-up fees" and bidder protections, but  providing for (i) a purchase price in an amount equal to a credit bid of (A) all amounts advanced under the DIP Credit Facility plus (B) all of its pre-petition indebtedness, plus  (C) the payment of cash sufficient to pay secured indebtedness owed to SVB (in the approximate amount of $500,0000 at closing), and (ii) a closing date of February 28, 2014.  The asset purchase agreement, other agreements, and all pleadings related to the Back Up Sale Transaction shall be in a form and substance acceptable to Lender.<br><br>(b)    On or before 21 days after the Petition Date, the Bankruptcy Court shall have approved and shall have entered an order or orders ("<u>Initial Sale Order</u>") (i) approving the Back Up Sale Transaction, (ii) approving the Lender as the Initial Stalking Horse Bidder; (iii) |

|  | establishing the Horizon Sale Date as the closing date for the Back Up Sale Transaction, (iv) establishing a procedure pursuant to which a third party purchaser may be designated and disclosed by the Debtor, and thereafter approved by the Court, as the Substitute Stalking Horse Bidder on not more than 72 hours' notice, (v) scheduling the Auction on or before March 31, 2014 in the event of the emergence of an approved Substitute Stalking Horse Bidder, (vi) scheduling a sale hearing to approve the results of such Auction ("Sale Transaction") for not later than April 4, 2014 (the "Final Sale Hearing"); and (vii) establishing an outside closing date for such sale of not later than April 14, 2014, such order or orders in a form and substance satisfactory to and approved by Lender.<br><br>(c)  By the Horizon Sale Date, the Borrowers shall complete the Back Up Sale Transaction unless a Substitute Stalking Horse Bidder shall have been selected by the Debtor and approved by the Court as provided above or the Borrowers close on financing with the Substitute DIP Lender;<br><br>(d)  On or before March 31, 2014, the Borrowers shall complete the Auction, if applicable.<br><br>(e)  On or before the Final Hearing Date of April 4, 2014, the Borrowers shall receive the approval of the Bankruptcy Court for the Sale Transaction to a Substitute Stalking Horse (or higher and better) Bidder and the order approving such Sale Transaction shall be in form and substance agreed to by the Lender ("Sale Order"), including providing for the payment at closing of the sales proceeds to the Lender in reduction of all outstanding pre and post-bankruptcy indebtedness owed by Borrowers to Lender. |
| Fees and Expenses: | Borrowers shall pay to Lender a fee in an amount equal to the lesser of (i) $75,000.00; or (ii) the maximum amount which, when aggregated with all other amounts constituting interest on the Obligations, does not exceed the amount of interest that would be allowed on the Obligations if interest were calculated at the Maximum Legal Rate. Fifty percent (50%) of the foregoing commitment fee shall be earned and paid upon the entry of the Interim Financing Order, and fifty percent (50%) of the foregoing commitment fee shall be earned and paid upon the entry of the Final Financing Order.<br><br>All costs incurred by the Lender in connection with examinations of the Collateral and the Borrowers' books and records pertaining thereto; all of Lender's out-of-pocket expenses associated with the Loan, including, but not limited to, the reasonable fees and expenses of its financial advisor Sherwood Partners, LLC, legal fees and expenses of its counsel K&L Gates LLP, and all costs associated with an appraisal, report or review. |

| | |
|---|---|
| | To the extent Lender provides any of these services internally, Borrowers will reimburse Lender for these costs at market rates. Payment by Borrower of such expenses shall be made regardless of whether the Loan closes. |
| Liens/Security: | Subject to the Carve Out (defined below), notwithstanding existing, valid, prior, and otherwise unavoidable, perfected consensual liens and security interests (and valid, prior ad valorem liens of taxing authorities), Section 364(d) first priority, priming, and post-petition security interests in and liens on all of the properties and assets of the Borrowers, real and personal, including, but not limited to, the "Collateral" and all other assets described in the Loan Documents, the Interim Financing Order, and hereafter acquired real and personal property of the Borrowers, and their bankruptcy estates (exclusive of Chapter 5 avoidance causes of action), whether acquired prior to or after the Petition Date, whether now owned and existing or hereafter acquired, created or arising, and all products and proceeds thereof (including without limitation, claims of the Borrowers against third parties for loss or damage to such property), including all accessions thereto, substitutions and replacements thereof, and wherever located. |
| Carve-Out: | The term "Carve Out" shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6), and (b) allowed fees and expenses incurred by Court-approved estate professionals retained pursuant to sections 327 and 1103 of the Bankruptcy Code; provided, however, for each weekly advance by the Lender under the DIP Credit Facility, the Carve-Out for professional fees shall be reduced (dollar for dollar) by the amount of legal and professional fees and expenses funded pursuant to the amounts set forth in the Approved Budget for the week corresponding to such advance.  Nothing herein shall be construed to affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described above.  Following an Event of Default, the Lender shall advance up to $100,000.00 for professional fees incurred by Court-approved estate professionals retained pursuant to sections 327 and 1103 of the Bankruptcy Code after such Event of Default, but only to the extent that amounts previously advanced by Lender for the purpose of paying budgeted legal or professional fees together with retainers previously paid are insufficient to satisfy the allowed amount of such post default fees.

In addition, notwithstanding anything to the contrary contained in the DIP Order, and irrespective of existing retainers, in no event shall Lender be obligated to fund any budgeted expense, including any claim to surcharge the collateral under 11 U.S.C. § 506(c) and including legal or other professional fees except at such time and in such amounts as are set |

| | |
|---|---|
| | forth in the Approved Budget, provided that in no event shall Lender be obligated to fund any expense if doing so would, when combined with the amounts advanced by the Lender under the DIP Credit Facility, exceed the aggregate principal amount of the DIP Credit Facility. |
| Events of Default: | Each of the following shall be an "Event of Default" under the Loan Agreement and other documents set forth above, and the other documents to be executed to effect the transactions described herein (collectively, the "<u>DIP Loan Documents</u>"):<br><br>(a)   failure by the Borrowers to pay any amount as and when due under the DIP Loan Documents;<br><br>(b)   failure by the Borrowers to perform or comply with the covenants contained in the DIP Loan Documents, the Interim Financing Order, the Final Financing Order, the Initial Sale Order, or the Sale Order;<br><br>(c)   the entry of an order that stays, modifies, or reverses the Interim Financing Order, the Final Financing Order, the Initial Sale Order or the Sale Order or that appoints either (i) a trustee under Chapter 11 of the Bankruptcy Code in a Chapter 11 case for the Borrowers, collectively or individually, or (ii) an examiner having expanded powers to operate all or any part of Borrowers' business, which powers exceed those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code;<br><br>(d)   the conversion of any Chapter 11 case of any Borrower to a case under Chapter 7 of the Bankruptcy Code;<br><br>(e)   the Borrowers' breach of their obligations to comply with the financial covenants set forth above;  or<br><br>(f)   the Borrowers' failure to meet their obligations with respect to the sale and/or orderly liquidation of the Borrowers' assets as set forth above. |
| Remedies | Upon the occurrence of an Event of Default,<br><br>(1)   the Lender has no further obligation to make advances under the DIP Credit Facility and the Borrowers shall have no use of Horizon's Cash Collateral or the DIP Credit Facility or any funds previously advanced thereunder;<br><br>(2)   after five (5) business days' notice, served by overnight delivery service or email upon the Borrowers, the Borrowers' counsel, any official committee (or, if applicable, their counsel), and the United States Trustee (the "<u>Required Notice</u>"), all of the indebtedness (including without limitation, the Pre-Petition Lender Debt and the amount of the |

|  | DIP Availability advanced to the Debtors) to the Lender shall become immediately due and payable;

(3)    after the Required Notice, the Automatic Stay of Section 362 of the Code shall be automatically and completely vacated as to the Lender without further order of the Bankruptcy Court, and

(4)    after the Required Notice, the Lender, without further notice, hearing, or approval of the Bankruptcy Court, shall be authorized, at its option, to take any and all actions, and remedies that the Lender may deem appropriate to proceed against, take possession of, protect, and realize upon the collateral and any other property of the estates of the Borrowers upon which the Lender has been or may hereafter be granted liens and security interests to obtain repayment of the indebtedness to the Lender.

The Lender shall have the relief set forth above unless the Borrowers, or other party in interest, contest the occurrence of an Event of Default and the Bankruptcy Court determines the same prior to the expiration of the five (5) business days after the Required Notice. |
|---|---|

## V.
## Legal Authority

24.    Section 364 of the Bankruptcy Code allows debtors to obtain unsecured credit in or out of the ordinary course of business.  11 U.S.C. § 364(a), (b).  However, if a debtor cannot obtain post-petition credit on an unsecured basis, a bankruptcy court may authorize the obtaining of credit or the incurring of debt, the repayment of which is secured by a lien on unencumbered property (11 U.S.C. § 364(c)) or by a lien that is senior to or equal to existing liens.  11 U.S.C. § 364(d).

25.    <u>11 U.S.C. § 364(c)</u>:  The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under § 503(b)(1) of the [Bankruptcy Code]."  11 U.S.C. § 364(c).  In other words, such financing is appropriate when the debtor is unable to obtain unsecured credit allowable as an ordinary administrative claim.  *See In re*

*Crouse Group, Inc.*, 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Additionally, courts will generally accord deference to the necessity of the debtor obtaining post-petition financing to remain viable.  *See Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

26.     11 U.S.C. § 364(d):  If a debtor cannot obtain credit on any other bases, the debtor may obtain post-petition financing secured by a lien on property of the estate that is senior to or equal with an existing lien on the property, provided that the lienholder is adequately protected. Thus, section 364(d) permits a debtor to prime an existing secured lender notwithstanding loan covenants or non-bankruptcy law preventing such priming.  *In re Mosello*, 195 B.R. 277 (Bankr. S.D.N.Y. 1996).

27.     A debtor seeking financing under section 364(c) or (d) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit available but "is not required to seek credit from every possible source," and is granted considerable deference in acting in accordance with his business judgment.  *See Ames Dep't Stores,* 115 B.R. at 40; *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); *In re Vander Vegt*, 499 B.R. 631, 636 (Bankr. N.D. Iowa 2013).

**VI.**
**Argument**

**A.     Inability to Secure Unsecured Credit**

28.     The Debtors are unable to procure the credit required to fund the administration of their estates in the form of unsecured credit or unsecured credit with an administrative expense

priority under section 503(b)(1) of the Bankruptcy Code on better terms than those offered by the DIP Lender. The Debtors, therefore, have no choice but to seek credit on a secured basis in exchange for the granting of liens on the DIP Collateral.

29. Since prior to the commencement of these cases, the Debtors have been confronted with the significant challenge of securing funding to pay for the expenses of the operation of their businesses as well as for the administration of their estates. If the Debtors cannot secure funding to pay payroll taxes, salaries, and other estate expenses, then the Debtors cannot reasonably accomplish a sale of their business or otherwise successfully reorganize.

30. The Debtors have negotiated the terms of this DIP Credit Facility at arm's-length to fund the administrative expenses of the Debtors' estates (i) through the end of February if the Debtors do not obtain a Substitute Stalking Horse Bidder or (ii) through the end of the section 363 sale process (subject to certain deadlines) if the Debtors do obtain a Substitute Stalking Horse Bidder. The proposed post-petition financing will ensure that the Debtors have the funds necessary to pay taxes and salaries, and to the extent possible, to preserve the Debtors' going concern value through the sale process. The Debtors' regular cash flow is not sufficient to pay the ongoing operating and administrative expenses. Accordingly, the Debtor cannot obtain funds on an unsecured basis.

31. Furthermore, the Debtors have diligently sought financing from sources other than the DIP Lender. The Debtors believe that in today's market, debtor-in-possession or "DIP" financing on the same or similar terms of the DIP Credit Facility would not be available from traditional third-party institutional lenders. The terms of the only other prospective lender's financing proposal was not, in the Debtors' business judgment, on better terms. After diligent

efforts, the Debtors' best business judgment is that the DIP Lender is the best source of financing and the DIP Credit Facility is on the best terms for these Debtors.

**B.      Silicon Valley Bank is Adequately Protected**

32.      Prior to the bankruptcy filing, SVB was the senior-most secured lender of the Debtors.   In fact, it is the only other secured lender at the XPS and XPG level other than Horizon's approximate $6.7 million secured prepetition indebtedness.   As of the bankruptcy filing, the total amount outstanding under the SVB loan is $494,861.

33.      SVB's lien is adequately protected under the DIP Credit Facility.   Horizon's Initial Stalking Horse Bid includes a credit bit of its prepetition indebtedness, the Initial DIP Availability, and the payment of cash sufficient to pay SVB's secured indebtedness.   Further, to be a qualified Substitute Stalking Horse Bid, the bid must be at least a cash price sufficient to pay SVB's and Horizon's indebtedness.   Thus, SVB is receiving the indubitable equivalent of tis interest in the Debtors' property, which constitutes adequate protection.  11 U.S.C. § 361(3).

**C.      Finding of Sound Business Judgment**

34.      The Debtors negotiated the DIP Credit Facility at arms' length and in accordance with their sound business judgment.  In negotiating post-petition financing arrangements, courts permit debtors "to exercise their basic business judgment consistent with their fiduciary duties." *Ames Dep't Stores,* 115 B.R. at 38 (citations omitted).   Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining financing, so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code.   *See, e.g., Snowshoe,* 789 F.2d at 1088 (upholding post-petition financing necessary to sustain seasonal business); *Ames Dep't Stores,* 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under § 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that

leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

35.     Courts generally will not override a debtor's prudent and responsible exercise of business judgment consistent with its fiduciary duties to the bankruptcy estate and its creditors in negotiating an appropriate financing package.  *See Ames Dep't Stores,* 115 B.R. at 38 (in examining requests by a trustee for interim financing, courts apply the same business judgment standard applicable to other business decisions)*; In re Simasko Prod. Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (noting that business judgment should be left to the boardroom and not to the bankruptcy courts); *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny will slow the administration of the debtors' estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

36.     Specifically, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *See In re Curlew Valley Assocs.*, 14 B.R. 507, 513 n.11a (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Id.* at 513-14 (footnotes omitted).

37.     The Debtors have exercised sound business judgment and have satisfied the legal prerequisites to borrow under the terms and conditions of the DIP Credit Facility.  The financing contemplated by the DIP Credit Facility benefits these estates.  With the credit provided under the DIP Credit Facility, the Debtors can preserve the enterprise value of the estates.  Without the

financing furnished by the DIP Credit Facility, the entire reorganization, refinancing, and/or sale effort will be jeopardized. Accordingly, this Court should authorize the Debtors to obtain secured, post-petition financing consistent with the terms and provisions contained in the DIP Credit Facility.

### D. Finding Good Faith

38. Section 364(e) of the Bankruptcy Code was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *See In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of § 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."). *See also In re N. Atl. Millwork Corp.,* 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of § 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities.") (citations omitted).

39. The terms and conditions of the DIP Credit Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's length, with all parties represented by counsel.

### VII.
### Request for Immediate Interim Relief

40. Bankruptcy Rule 4001(c) that governs the procedures for obtaining postpetition financing, provides in relevant part:

> (2) *Hearing*. The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the

motion.  If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

41.     Accordingly, this Court is authorized to permit the Debtors to borrow funds on an interim basis postpetition under the DIP Credit Facility.  Pending the Final Hearing, the Debtors will require interim and immediate use of the financing provided by the DIP Credit Facility.  It is essential that the Debtors immediately stabilize their operations and pay for ordinary, post-petition operating expenses.  It is anticipated that the estates will need $1.3 million to finance its operations in chapter 11 through the end of February, and the Debtors seek authority to borrow on an interim basis the Initial DIP Availability.

42.     Absent immediate use of the Initial DIP Availability, the Debtors will be unable to pay ongoing operational expenses.  Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of the Debtors' estates, their creditors and other parties in interest.

43.     Accordingly, the Debtors requests that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to obtain interim credit in the amount of $1.3 million under the DIP Credit Facility, in accordance with and pursuant to the terms and conditions contained in the DIP Credit Agreement.  **The Debtors request that the Court schedule the Interim Hearing to consider this Motion on January 23, 2014.**

44.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the Debtors' business.  A debtor is entitled to

borrow those amounts that it believes prudent in the operation of its business.  *See, e.g.*, *In re Simasko Prod. Co.,* 47 B.R. at 449; *In re Ames Dep't Stores, Inc.,* 115 B.R. at 36.

45.      Following such Interim Hearing, the Debtors would respectfully request that this court set a Final Hearing, subject to the Court's calendar, for the next available setting after the expiration of the 14-day notice period required by the Federal Rules of Bankruptcy Procedure. At such Final Hearing the Debtors would seek final approval of the DIP Credit Facility and DIP Credit Agreement.

46.      In other chapter 11 cases where, as here, the circumstances presented warranted immediate advances to the Debtor, courts have authorized interim borrowings under proposed debtor in possession financing agreements to repay prepetition indebtedness and fund essential working capital requirements. *See, e.g., In re Doctors Hospital, LLP*, Case No. 05-35291 [Dkt. No. 141], (Bankr. S.D. Tex. June 1, 2005); *In re International Industrial Services, Inc*., Case No. 03-48272 [Dkt. No. 178], (Bankr. S.D. Tex. March 9, 2004); *In re Sterling Chemicals Holdings, Inc*., Case No. 0137805-H4-11 (WRG) (Bankr. S.D. Tex. July 18, 2001); *In re Agrifos Fertilizer, L.P*., Case No. 01-35520-H2-11 (WWS) (Bankr. S.D. Tex. May 22, 2001); *In re First Wave Marine, Inc*., Case No. 01-31161-H2-11 (WWS) (Bankr. S.D. Tex. Feb. 6, 2001).

## VIII.
## Notice

47.      Notice of this Motion has been provided by facsimile, e-mail, overnight delivery and/or hand delivery in compliance with the Local Rules of the Western District of Texas, including:

(a)      all Prepetition Secured Lenders;

(b)      20 largest unsecured creditors of each of the Debtors;

(c)      Horizon;

(d)     the U.S. Trustee's Office;

(e)     the Securities and Exchange Commission;

(f)     the Internal Revenue Service; and

(g)     other government agencies, national, state and local, to the extent required by the Bankruptcy Code, Bankruptcy Rules or Local Rules.

48.     The Debtors believe that the notice provided for herein is fair and adequate and no other or further notice is necessary.

## IX.
## Prayer

The Debtors respectfully request that the Court set this matter for Interim Hearing, that upon such Interim Hearing the Court enter the proposed form of Interim Order: (a) granting the Debtors the authority to enter into the DIP Credit Facility and to execute the DIP Credit Agreement and all other Financing Documents attendant thereto; (b) granting perfected security interests in and liens of the highest available priority on the DIP Collateral to the DIP Lender pursuant to sections 364(c) and (d) of the Bankruptcy Code; (c) approving all of the terms and conditions of the DIP Credit Facility on an interim basis; (d) setting this motion for Final Hearing at the Court's earliest convenience after not less than 14 days from the date of filing hereof; and (e) granting the Debtors such other legal and equitable relief to which they are entitled.

Dated:  January 22, 2014
       Austin, Texas

Respectfully submitted,

By: /s/ *Shelby A. Jordan*                    
Shelby A. Jordan
St. Bar No. 11016700; S.D. No. 2195
Nathaniel Peter Holzer
St. Bar No. 00793971
Antonio Ortiz
St. Bar No.  24074839;  SD. No. 1127322

***JORDAN, HYDEN, WOMBLE, CULBRETH, &
HOLZER, P.C.***

500 North Shoreline Drive, Suite 900
Corpus Christi, TX 78401
Telephone:  361.884.5678
Facsimile:   361.888.5555
Email: sjordan@jhwclaw.com
       hwomble@jhwclaw.com
       pholzer@jhwclaw.com
       aortiz@jhwclaw.com

**PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION**