**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| **XTREME POWER INC.,** *et al.* | § | Case No. 14-10096 |
| | § | |
| **Debtors.** | § | **Joint Administration** |
| | § | **Requested** |
| | § | |

**AFFIDAVIT OF KEN HASHMAN**
**IN SUPPORT OF DEBTORS' FIRST DAY PLEADINGS**

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOWN ALL MEN BY THESE PRESENTS: |
| TRAVIS COUNTY | § | |

**A.     INTRODUCTION AND OVERVIEW OF THE PROPOSED SALE PROCESS**

1.     "My name is Ken Hashman.  I am the Chief Financial Officer ("CFO") of the Debtors Xtreme Power Inc. ("**XPI**"), Xtreme Power Systems, LLC ("**XPS**"), and Xtreme Power Grove, LLC ("**XPG**") (collectively referred to as "**Debtors**" or "**Xtreme Power**"), the Debtors and Debtors-in-Possession in the above referenced recently filed Chapter 11 bankruptcy cases.

2.     Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

3.      The Debtors commenced these chapter 11 cases to try and maximize the value of the Company through a sale process that commenced several months before the bankruptcy filing.  The Debtors believe the process is designed to maximize the value of the Company.  The Debtors began exploring a sale process that would maximize the Debtors' value months before the chapter 11 filing.  As explained further below, the Debtors' operations were stymied by a liquidity crisis, which in turn made an out of court sale process unworkable.  In fact, the Debtors' lack of liquidity threatened the viability of any sale process, in or out of court.  Accordingly, the Debtors' Board of Directors authorized its financial advisors the Gordian Group to solicit bids for in or out of court financing.

4.      The Debtors' solicitation of financing yielded two prospective lenders.  After a series of vigorous negotiations, the Debtors determined that the structure and terms of Horizon Technology Finance Corporation's ("Horizon") ultimate proposal for a DIP Credit Facility best served the Debtors' goal of providing liquidity for the proposed sale process.  The other proposed lender acknowledged that it could not improve on the terms of its original proposal.  There is no other available financing, secured or unsecured, known available to the Debtors.

5.       Under the terms of the DIP Credit Facility, Horizon will provide an initial advance of up to $1.3 million[1] in weekly advances consistent with the Approved Budget (as defined in the DIP Term Sheet) (the "Initial DIP Availability") on a senior secured basis that will, based on the Debtors' projections, fund the Debtors' operations while in chapter 11 through the end of February.  In connection with the Initial DIP Availability, Horizon will serve as the Initial Stalking Horse (the "Back Up Sale Transaction") while the Debtors and the Gordian Group actively search for a Substitute Stalking Horse.  If the Debtors obtain a Substitute Stalking Horse

---

[1] This amount may be increased by the SVB cure payment of approximately $90,000.00, which will be announced at the hearing.

by February 24, 2014 (date to be verified), Horizon will advance an additional $1.2 million in weekly advances consistent with the Approved Budget (together with the Initial DIP Availability, the "DIP Availability") to the Debtors on a senior secured basis to permit the Debtors to conduct a competitive bidding process with the Substitute Stalking Horse in hand.  If no Substitute Stalking Horse or Substitute DIP Lender (as defined in the DIP Credit Facility) is obtained by February 24, 2014 (date to be verified), then Horizon shall have no further funding obligation under the terms of the DIP Loan after February 28, 2014 and the Back Up Sale Transaction will close.

6.     The proposed DIP financing and related sale framework is the best option to maximize the value of the Debtors' estates under the circumstances.  It provides the needed liquidity for the Debtors to obtain a Substitute Stalking Horse or a Substitute DIP Lender, either of which events will extend the sale process.  If a Substitute Stalking Horse is located, the bid will be at a value sufficient to pay the Debtors' senior-most secured lenders:  Silicon Valley Bank ("SVB") and Horizon.[2]  Moreover, locating a Substitute Stalking Horse triggers Horizon's obligation to fund the second tranche of the DIP Credit Facility that will provide further needed liquidity for a competitive sale process.  Further, the DIP Credit Facility provides another layer of flexibility for the sale process.  In the event that the Debtors do not obtain a Substitute Stalking Horse by February 24, 2014, the Debtors may nonetheless continue its sale process for an extended period (subject to deadlines) if it obtains a financing commitment from another lender (whose liens will be junior to the liens securing SVB's prepetition indebtedness and Horizon's pre and post-petition indebtedness) (the "Substitute DIP Lender") on or before

---

[2] SVB's debt is approximately $500,000.00 and although primed by the Horizon DIP Facility, the Debtor's DIP budget was just revised to provide for cure of the principal and interest default of approximately $90,000.00.  Also, the Horizon DIP Facility does not prime SBV's lien on a $7 million CD it holds as security for a letter of credit that is described in more detail below.

February 24, 2014 (date to be verified) that closes no later than February 28, 2014. Horizon will have no further funding obligation with respect to the extended process and its collateral may not be surcharged under 11 U.S.C. § 506(c) for any expenses incurred after February 28, 2014 if the process is extended by the Substitute DIP Lender process.

7.    If in the event that the Debtors do not locate a Substitute Stalking Horse or a Substitute DIP Lender by February 24, 2014 (date to be verified), the Debtors will sell substantially all of their assets to Horizon under the Back Up Sale Transaction with a February 28, 2014 closing. The Back Up Sale Transaction is not the Debtors' desired transaction, nor, upon information and belief, does Horizon desire to acquire the Debtors' assets as a consequence of the Back Up Sale Transaction.

8.    The Debtors goal in these cases is to utilize the liquidity provided by the DIP loans to maintain the going concern value of the Company while they seek a higher and better offer from a strategic investor. A vigorous marketing process has been initiated by Gordian and the Debtors believe that most if not all of their secured lenders fully support this process, which they expect will take somewhere from 60 – 90 days, and which includes a motion to approve bid procedures that contemplates further marketing, a bidding process and an auction. The Debtors expect to file the bid procedures motion shortly and will request a hearing on the bid procedures motion and will seek entry of the Back Up Sale Transaction Order within 21 days of the Petition Date.

9.    The Debtors have filed several First Day Pleadings that seek relief necessary to avoid immediate and irreparable harm to the Debtors as they pursue their overall financial restructuring by allowing them to continue their operations and minimize disruptions to their business that could otherwise result from the commencement of the chapter 11 cases.

Specifically, the First Day Pleadings seek relief allowing the Debtors to: (a) stabilize and maintain their business operations through, among other things, the use of post-petition financing and cash collateral; (b) limit disruption to the Debtors' business by continuing the use of their prepetition cash management system; (c) preserve their going concern value by obtaining approval to pay wages and salaries earned in the pre petition period, and (d) establish certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, the chapter 11 process.

## B.    PERSONAL BACKGROUND

10.    I had more than 20 years of finance and operations experience prior to assuming my role as CFO at Xtreme Power.  Prior to joining Xtreme Power, I spent one year as CFO and COO at Open Labs, Inc. Prior to that, I spent 17 years at Dell Inc., serving in finance and operations roles.  Prior to joining Dell, I served five years at Price Waterhouse Houston in the audit practice.  I assumed my duties as CFO of the Xtreme Power Companies on November 17, 2010.

## C.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

11.    The Debtors are Xtreme Power Inc. ("**XPI**"), Xtreme Power Systems, LLC ("**XPS**"), and Xtreme Power Grove, LLC ("**XPG**") (collectively referred to as "**Debtors**" or "**Xtreme Power**").  XPI (a Delaware Corporation) is 100% owner of XPS (a Texas Limited Liability Company), and XPG (a Delaware Limited Liability Company).  XPI also owns 25% of XDT, LLC (a Delaware Limited Liability Company), which is a non operating company and is not a Debtor.

## D.    THE DEBTORS' BUSINESS

12.      Founded in November 2006, Xtreme Power designs, installs, and monitors energy storage and power management systems.[3]  The Debtors are leaders in the energy storage industry. Xtreme Power is headquartered in Kyle, Texas, with operations throughout the U.S.   The powerpoint presentation attached hereto as <u>Exhibit A</u> was prepared by the Company to provide a general overview of its business.

13.      XPS has a staff of engineers and professionals who design and implement storage and power management systems specific to each customer's need.  Its customers are Independent Power Producers, Transmission and Distribution Utilities, and Commercial & Industrial End Users, among others.

14.      XPS's dedicated staff is arguably its single most valuable asset, but unfortunately, the Debtor's financial difficulties have mandated a series of staffing cutbacks, including reduced hours, salary cuts, layoffs, and furloughs. As part of the cutbacks, upper management has been working without pay.

15.      The Debtors manufacture and install battery and energy storage systems, and they also monitor and control the systems remotely from XPS's facility in Kyle.  XPS's expertise allows it to ensure its systems integrate seamlessly with the power grids to which they are connected, and that the systems respond to and communicate with the grid and other external inputs as required by their customers.

16.      XPS implements its services with a wholly-owned software platform that it developed in-house called Xtreme Active Control Technology – "XACT[TM]."  XACT is a flexible and robust control platform capable of seamlessly integrating any battery technology with a

---

[3] For more information, please visit  http://www.xtremepower.com.

variety of electric power systems to command, monitor, and operate energy storage systems of any combination of power and duration.  The XACT platform offers the following customer advantages, distinguishing it from all of its competitors: (a) provides multiple applications simultaneously; (b) prioritizes applications based on customer needs; (c) utilizes a distributed topology to command each system independently; (d) intelligent re-distribution of charge/discharge commands to optimize system performance; (e) full system response in less than 50 milliseconds.  XACT includes various supported products, including RAMP, RPM, PEAK, and BOOST, each of which is designed to satisfy a particular customer need.  Importantly, XACT also allows XPS to remotely operate its storage installations from Kyle.

17.    XACT is proprietary and confidential, and while there is no patent for the overall XACT system, certain sub units of XACT may be protected by patent issued or pending.  XACT, along with the Company's engineers that write, maintain, and operate it, is the Company's core competency and most valuable asset; however, because the XACT system was internally developed and the costs were not capitalized, it does not appear on the Company's books as an asset, just as the value of the Company's expert staff is not captured by normal accounting methods.

18.    XPG holds a license from Horizon Batteries, LLC to manufacture an advanced lead acid battery that Xtreme Power previously used in some of its energy storage systems and also sold to third parties.  However, XPG shut down its battery manufacturing operations in early 2013 and no longer manufactures or sells them.  XPG had manufactured the batteries at a leased facility near the city of Grove, Oklahoma.  There are several pending disputes between the Debtors and Horizon Batteries, which disputes, and potential for their resolution, are part of the reason for the Debtors' bankruptcy cases.

19. XPI is primarily a holding company for XPS and XPG but also owns by way of assignment a portfolio of patents that were generated primarily by XPS, and is the owner of a $7 million CD that is currently pledged to secure a letter of credit that stands as security for XPS's performance with one of its customers. XPI is also owed inter-company accounts receivables by XPS and XPG of approximately $95 million. XPI has a fairly complex capital structure, having issued common stock, preferred stock, and convertible notes with warrants, all in private placements to sophisticated venture capital investors. XPI's capital structure is explained in more detail below.

## E. FINANCING HISTORY

20. Prior to the Debtors' bankruptcy filing, one or more of the Debtors were parties to various debt instruments with lenders and investment groups (collectively, the "Prepetition Secured Lenders"). Below is a summary of the Debtors' secured prepetition indebtedness. The Debtors are not waiving their right to challenge the validity or priority of any lien with respect to any of the lenders listed in the chart below.

| Debtor(s) | Lender(s) | Debt Instrument | Outstanding Principal Amount |
|---|---|---|---|
| XPI, XPS, XPG | Silicon Valley Bank | Loan and Security Agreement dated April 18, 2011 | $469,845 |
| XPI, XPS, XPG | Horizon Technology Finance Corporation | Secured Promissory Note dated September 28, 2012 | $6,000,000 |
| XPI | • SAIL Venture Partners II, L.P.<br>• SAIL 2010 Co-Investment Partners, L.P.<br>• SAIL 2011 Co-Investment Partners, L.P.<br>• SAIL Xtreme SB Co-Investment Partners, LP<br>• SAIL Xtreme APRS Fund LP<br>• SAIL Holdings, LLC<br>• Bessemer Venture Partners VII L.P.<br>• Bessemer Venture Partners VII Institutional, L.P. | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated June 24, 2011 | $19,843,879 |

| Debtor(s) | Lender(s) | Debt Instrument | Outstanding Principal Amount |
|---|---|---|---|
|  | • BVP VII Special Opportunity Fund L.P.<br>• Austin Police Retirement System<br>• Spring Ventures, LLC<br>• Dominion Energy Technologies II, Inc.<br>• The Dow Chemical Company<br>• BP Alternative Energy International Limited |  |  |
| XPI | • Louisiana Sustainability Fund, LP<br>• SAIL Holdings LLC<br>• Bessemer Venture Partners VII L.P.<br>• Bessemer Venture Partners VII Institutional, L.P.<br>• BVP VII Special Opportunity Fund L.P.<br>• The Dow Chemical Company<br>• BP Alternative Energy International Limited<br>• Dominion Energy Technologies II, Inc.<br>• Langara Capital Partners Ltd | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated May 25, 2012 | $9,155,687 |
| XPS | Zuniga Investment Partners, Ltd. | Real Estate Lien Note dated June 27, 2012 | $580,629 |
| XPI | • SAIL 2011 Co-Investment Partners, L.P.<br>• SAIL Sustainable Louisiana I, L.P.<br>• SAIL Sustainable Louisiana II, L.P.<br>• Amabro Investments Ltd.<br>• Forever 7, LLC<br>• Pendleton Capital Partners, LLC<br>• Wild Rose Irrevocable Trust<br>• James P. Farwell | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated August 28, 2012 | $4,897,391 |

| Debtor(s) | Lender(s) | Debt Instrument | Outstanding Principal Amount |
|---|---|---|---|
| XPI | • Sail Venture Partners II, L.P.<br>• Bessemer Venture Partners VII L.P.<br>• Bessemer Venture Partners VII Institutional, L.P.<br>• BVP VII Special Opportunity Fund L.P.<br>• The Dow Chemical Company<br>• SAIL Pre-Exit Acceleration Fund, LP<br>• SAIL Pre-Exit Acceleration Fund, LP<br>• BP Alternative Energy International Limited<br>• SKYLAKEUSA-THREE, LLC<br>• Louisiana Sustainability Fund, LP<br>• SAIL Holdings LLC<br>• Bessemer Venture Partners VII L.P.<br>• Bessemer Venture Partners VII Institutional, L.P.<br>• BVP VII Special Opportunity Fund L.P.<br>• The Dow Chemical Company<br>• Arnel Investments III L.P.<br>• Christensen Limited Liability Limited Partnership | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated February 6, 2013 | $10,100,000 |
| XPI | • SAIL Pre-Exit Acceleration Fund, LP<br>• BP Alternative Energy International Limited<br>• The Dow Chemical Company<br>• SAIL Pre-Exit Acceleration Fund, LP<br>• Forever 7, LLC<br>• Pendleton Capital Partners, LLC<br>• Wild Rose Irrevocable Trust<br>• BP Alternative Energy International Limited<br>• Sail Defense Fund, LLC | Promissory Notes pursuant to the Convertible Promissory Note and Warrant Purchase Agreement, dated July 23, 2013 | $3,200,000 |
| XPI | • SVP II Xtreme Power Joint Venture, LP<br>• Christopher Ryan<br>• The Moelis Family Trust<br>• Jared Joseph Dermont<br>• Yadin Rozov<br>• Trust of Sashi and Cindy Rentala<br>• Steven and Joan Panagos<br>• Barak Klein<br>• Vincent Lima<br>• Mahmoodzadegan - Gappy Trust<br>• Greg Share | Promissory Notes pursuant to the Promissory Note and Warrant Purchase Agreement, dated November 8, 2013 | $3,250,000 |

| Debtor(s) | Lender(s) | Debt Instrument | Outstanding Principal Amount |
|---|---|---|---|
| | • Raich Trust<br>• Richard Harding<br>• ISP Holdings, Inc. | | |

In connection with the Debtors' execution of these various prepetition loan documents, the Debtors granted liens and security interests in substantially all of their property, including but not limited to, its accounts, real property (including leasehold interests), equipment and inventory, investment securities, and the products and proceeds thereof (the "Prepetition Collateral") in two distinct categories of:

    a.    **XPI Collateral** – this collateral consists primarily of (i) cash in the form of a $7 million letter of credit security fund for the purpose of any shortfalls in an executory contract with Duke Energy; (ii) the 100% membership interests in the subsidiary Debtors **XPS** and **XPG**; and (iii) the inter-corporate accounts receivables due by these two subsidiaries to XPI in the amount of approximately $95 million[4]; and (iv) certain patent and IP properties.

    b.    **XPS Collateral** – this collateral consists of all of the operating assets of the ongoing business of the Debtors – including all of the IP owned, all contracts for power services, all accounts and accounts receivable due for the contracts and power services, and all equipment forming the XPS operating locations.

---

[4] XPI does not have a lien or security interest in any assets of XPS or XPG to secure it in collection of the inter-corporate account receivable.  Accordingly, XPI would likely not have any priority over any other creditor of XPS or XPG in a liquidation of XPS or XPG.

21.     It appears that only SVB and Horizon (on account of its prepetition indebtedness) have liens, security agreements, and perfected security interests in XPS in an approximately aggregate amount of $7.2 million.

## F.     EVENTS LEADINGS TO THESE CHAPTER 11 CASES

22.     XPI is a privately held company.  From 2009 through 2011 the Company experienced rapid growth, securing several large contracts for new systems.  Xtreme Power was ranked number 15 on Inc. Magazine's 500|5000 list of the fastest-growing private companies in the United States in 2012—the company's second year in a row making the prestigious list—based on Xtreme Power's rapid three-year growth rate and 2011 revenues of $22.2 million.  In 2011, Xtreme Power had ranked 704th on the Inc. Magazine list.

23.     However, a slowdown in bookings and lower gross margins began impacting the 2012 outlook, and although the Company remained a competitive bidder for a number of proposed projects, GAAP revenues for 2012 were eventually reported at -19%.

24.     Then on August 1, 2012, a fire occurred at the Kahuku Wind Farm in Hawaii in the building housing the battery energy storage system manufactured by the Company.  The building and the energy storage system were destroyed by the fire.  The root cause of that fire remains under investigation.  Until such time as root cause is determined, it is not possible to determine what, if any, liability the Company may have as a result of this loss, for which the Company has insurance coverage.  In any event, the Company believes publicity related to the fire has negatively impacted project bookings.

25.     The Company revised its business plan to reflect revenue and expense reductions consistent with market conditions, and began to look at restructuring its costs.  At about the same time, the Company was pursuing its proposed Series D round of equity financing, but was unable

to generate sufficient interest, and so, to support the Company's operational cash needs, the Company engaged in a series of bridge financings with convertible notes. Since 2011, the Company has raised approximately $50 million in this manner.

26.  By October 2013, various debt and lease agreements were in default and the Company was in default with its secured lenders on revenue and other operating covenants. The defaults were dealt with by another round of bridge financing, but the Company continued to forecast negative cash flow from operations, and the Company's management and board of directors, who have closely monitored the impact of these conditions, determined to address potential alternatives with the assistance of various professionals and outside advisors, including Gordian Group, LLC ("Gordian Group") and Roth Capital Partners, LLC.

27.  Several offers for purchase and financing arrangements were considered, and the Company was working with a large public company towards a transaction that the Company believed had potential to be a favorable, when the proposed purchaser withdrew from negotiations for reason unknown to the Company. Another large public company that had expressed interest in a transaction also notified the Company in December that it would not be pursuing the transaction.

28.  An attempt to obtain further bridge financing fell through in late December, and so in early January the Company's Board determined that serious consideration must now be given to filing a Chapter 11 to protect the Company's going concern value for a period of time long enough to effect a sale of the Company, an option that the board had been considering for several months.

29.  A number of lenders were approached for interim financing, and financing packages with two leading candidates were negotiated in earnest on a competitive basis. The

board chose to proceed with what it believes is the clearly superior proposal, which was a proposed interim financing that would permit the Company to continue its marketing efforts prior to a bankruptcy filing.  However, the Company was informed late last week that the proposed lender would not proceed outside of bankruptcy.  The Company went back to both potential lenders and after additional intensive negotiations arrived at the DIP lender/stalking horse arrangements with Horizon Financial that is being presented to the Court for approval.

30.     In the meantime, Gordian Group continued its efforts to secure a purchaser for the Company.  According to Gordian Group, as of January 16 they had identified a universe of 81 potential buyers, had contacted 43 and heard back from 32, sent out 28 "teasers", have 15 parties signed up on confidentiality agreements to review company data, and have confirmed at least 5 of those parties have already accessed the Company's virtual data room.

31.     Several other events contributed to the Company's decision to seek protection in Chapter 11.  Many of the Company's secured debt obligations had matured on December 31, 2013.  In early January, the Company received a demand letter from the lawyers for an investor for payment in full of the obligation that matured December 31.  The Company's two most senior secured lenders, Silicon Valley Bank and Horizon Financial, asked the Company to submit itself to an assignment for the benefit of Creditors in California, which management opposed.  The Company's operations team had become concerned about the Company's ability to deliver project milestones on the Company's currently booked projects.  One of the Company's production partners refused to commit to support that was needed for an ongoing project because of their expressed fears that the Company was facing financial difficulties and would be unable to meet its obligations.

32.     On January 14, the Company received a notice of default from the lawyers for its landlord at its leased building at 1400 Goforth Road, although the landlord has given the Company verbal assurance that it does not intend to proceed in a manner damaging to the Company

## G.    CURRENT FINANCIAL SITUATION

33.     As of the bankruptcy filing the Company is virtually out of cash. However, it has $4.8 million of awarded contracts in development, as well as one contract pending in Puerto Rico that if secured will result in bookings of $16 million, one in the US that would result in bookings of approximately $900 thousand, and one in the UK that would result in bookings of approximately $7 million.   Debtors believe their bankruptcy filings and the processes contemplated will help them realize the potential for these contracts and thus enhance their going concern value.

34.     Over the last month, management has drastically reduced the employee head count, in incremental steps, to preserve capital, along with implementing pay cuts to regular employees an total deferment of compensation for senior management.   After paying the retainers to bankruptcy and special counsel that they require to file the Company in Chapter 11 and assist a sale transaction, the Company has only about $34,000 in cash.

## H.    NEED FOR FIRST DAY RELIEF

35.     Contemporaneously herewith, the Debtors filed a number of motions, all described below (the "**First Day Pleadings**"), seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of the chapter 11 cases, and which are necessary to avoid the immediate and irreparable harm to the Debtors.   I believe that the relief requested in each of the First Day Pleadings is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that all should be approved.

### (a)    Complex Case Treatment

36.    The Debtors have total debts of more than $10 million and there are more than fifty (50) parties in interest in these cases.

### (b)    Joint Administration

37.    The Debtors request entry of orders in each of their cases directing the joint administration of these cases.  The Debtors believe that many, if not most, of the motions, applications, and other pleadings filed in these chapter 11 cases will relate to relief sought jointly by all of the Debtors.  For example, virtually all of the relief sought by the Debtors in the First Day Pleadings is sought on behalf of all of the Debtors.  Counsel has explained to me that joint administration of the Debtors' chapter 11 cases, for procedural purposes only, on a single docket, will ease the administrative burdens on the Court, and reduce the cost of prosecuting these cases, by allowing the Debtors' cases to be administered as a single joint proceeding instead of 3 independent chapter 11 cases.

### (c)    Cash Collateral

38.    Debtor XPS has only a small amount of cash collateral and the other Debtors have virtually none.  The Debtors' operations in Chapter 11 will be financed primarily through the DIP loan from Horizon.  The only other entity with an interest in XPS's cash collateral is SVB. Debtors believe that SVB will consent to its use of its cash collateral, but if it will not, requests that the Court permit it to use such cash collateral.

39.     The Debtor requires the ability to use cash and the proceeds of existing accounts receivable to maintain the operation of its businesses and preserve its value as a going concern. These essential items, however, constitute part of the collateral for the loans made to the Debtor under the Prepetition Loan Documents with SVB, and, therefore, may not be used in support of the Debtor's ongoing business activities absent compliance with Section 363 of the Bankruptcy Code. The Debtors have no other source of secured or unsecured borrowing that could replace the need for the use of this cash collateral.  Without authorization to use the Cash Collateral under Section 363(c)(2)(B) of the Bankruptcy Code, the Debtor would be left without a small, but important, source of working capital.

### (d)     Bank Accounts And Cash Management

40.     Debtors have a total of six bank accounts as follows:

| Debtor | Bank | Acct. Name | Acct. Number | Function | Current Balance |
|--------|------|-----------|--------------|----------|-----------------|
| XPS | Silicon Valley Bank | XPS Operating Account | 3300576401 | Daily operating account for XPS | 34,407.40 |
| XPS | Silicon Valley Bank | XPS Cash Collateral Account | 3300786532 | Lockbox account for receiving customer payments | 0 |
| XPS | Wells Fargo | XPS Checking Account | 1710469568 | Local checking account for XPS | 1,089.38 |
| XPG | Silicon Valley Bank | XPG Operating Account | 3300545981 | Daily operating account for XPG | 2,075.36 |
| XPI | Silicon Valley Bank | SAM Pledge Account | 19-SV849A | Duke Letter of Credit / Performance Guarantee | $7,004,915.27 |

41.     XPS typically receive payments from its customers into the XPS Cash Collateral Account, and then transfers those funds to the XPS Operating Account, which is then used to make payments to creditors, for payroll, taxes, and the like.

42.     Debtor is aware of only four outstanding checks and will issue stop pay requests to the bank.

43.     XPI's SAM Pledge Account is used solely as a holding account for a CD owned by XPI, which CD is pledged as collateral to SVB to secure a Letter of Credit ("LC") in the amount of $7 million that the Bank issued on behalf of XPS to secure a contract obligation of XPS to Duke Energy.  It is possible that XPS's contract obligations to Duke Energy could exceed the face amount of the LC and the CD, although the eventual result depends on energy prices.  Thus the Debtors reserve all their rights to further investigate the amount of the potential obligations and whether or not the CD may eventually be redeemed.  However, because the LC is in place until December of 2017, and the CD is pledged as security for the LC and is in the possession of the Bank that issued the LC, the value of the CD is not currently available to the Debtors for use for any other purpose.

44.     Debtors utilize various forms and checks in the operation of their business, although most of the Debtor's business is conducted electronically via e mail, and in the case of banking, via wire transfers.

**(e)     Schedules Extension, Consolidated Matrix, and Consolidated List of 30 Largest Unsecured Creditors**

45.     The Debtors request an additional 20 days to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements").

46.     I am the sole primary source of most of the information needed by Debtors' counsel to prepare the Schedules and Statements, and I am currently overwhelmed with requests for information, requests for preparation of budgets, and all the other day to day and hour to hour information needed to prepare the bankruptcy filings, respond to inquiries from the proposed DIP

lender and other creditors and potential investors and purchasers, not to mention continuing to manage the ongoing financial affairs of an operating business, it is simply impossible for me to locate, provide to counsel, and review for accuracy in 14 days all the data that goes into the Schedules and Statements.

47.     While the Debtors, with the help of their attorneys, are diligently preparing the Schedules and remaining Statements, the Debtors' primary focus thus far has been preparing for the filing of their chapter 11 cases, securing DIP financing, and maintaining momentum in its sale process.  In view of the amount of work entailed in completing the Schedules and Statements and the competing demands upon the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, the Debtors will not be able to complete the Schedules and all of the Statements properly and accurately either within the required fourteen-day time period provided for under Bankruptcy Rule 1007(c) or by the Petition Date, as respectively required.

48.     Accordingly, the Debtors request that the deadlines by which the Debtors must file their Schedules and Statements be extended by sixteen days, to February 21, 2014.  In view of the above, the amount of information that must be assembled and analyzed, and the significant amount of employee time that must be devoted to complete the Schedules and Statements, ample cause exists for the requested extension.

   **(g)     DIP Financing Motion**

49.     The Debtors seek authority to obtain post-petition financing in the aggregate amount of up to $2.5 million (the "DIP Availability" or "DIP Credit Facility"), subject to the terms and conditions of the Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement"

and collectively with all agreements, documents, and instruments delivered or executed in connection therewith, the "Financing Documents") between the Debtors and Horizon.

50.     XPS's payroll is due on Thursday, January 23, 2014, and it cannot be made absent the Initial DIP Availability funding.  Thus, the Debtors requested that the Court schedule the Interim Hearing to consider this motion on January 23, 2014, and the Court granted the request. It is anticipated that the proposed the Initial DIP Credit Facility will enable the Debtors to pay their ongoing operating expenses and the administrative claims of the estates through the end of February.  If applicable, the remaining DIP Availability or financing provided by the Substitute DIP Lender will provide sufficient funds to conduct a competitive § 363 sale process.

51.     The terms and conditions of the DIP Credit Facility shall be embodied in a final order and the DIP Credit Agreement.  The Debtors will seek a hearing on the Final DIP Facility Order within 21 days.  A summary of the terms of the proposed DIP Credit Facility can be found in the DIP Financing Motion.

52.     The Debtors have been unable to procure the credit required to fund the administration of their estates in the form of unsecured credit on better terms than those offered by the DIP Lender.  The Debtors, therefore, have no choice but to seek credit on a secured basis in exchange for the granting of liens on the DIP Collateral.

53.     Since prior to the commencement of these cases, the Debtors have been confronted with the significant challenge of securing funding to pay for the expenses of the operation of their businesses as well as for the administration of their estates.  If the Debtors cannot secure funding to pay payroll taxes, salaries, and other estate expenses, then the Debtors cannot reasonably accomplish a sale of their business or otherwise successfully reorganize.

54.     The Debtors have negotiated the terms of this DIP Credit Facility in good faith and at arm's-length to fund the administrative expenses of the Debtors' estates (i) through the end of February if the Debtors do not obtain a Substitute Stalking Horse Bidder or (ii) through the end of the section 363 sale process (subject to certain deadlines) if the Debtors do obtain a Substitute Stalking Horse Bidder.  The proposed post-petition financing will ensure that the Debtors have the funds necessary to pay taxes and salaries, and to the extent possible, to preserve the Debtors' going concern value through the sale process.  The Debtors' regular cash flow is not sufficient to pay the ongoing operating and administrative expenses.  Accordingly, the Debtors have been unable to obtain funds on an unsecured basis.

55.     Furthermore, the Debtors with the assistance of Gordian Group have diligently sought financing from sources other than the DIP Lender.  The Debtors believe that in today's market, debtor-in-possession or "DIP" financing on the same or similar terms of the DIP Credit Facility is not available from traditional third-party institutional lenders.  The terms of the only other prospective lender's financing proposal was not, in the Debtors' business judgment, on better terms.  After diligent efforts, the Debtors' best business judgment is that the DIP Lender is the best source of financing and the DIP Credit Facility is on the best terms for these Debtors.

**(h)**     omitted

**(i)**     omitted

**(j)**     **Employee Wages and Benefits**

56.     As of the Petition Date, XPS had approximately 37 regular full-time and part-time employees out of a workforce that had been approximately 70 in December and approximately 50 earlier this month.  XPG has one part time employee and XPI has none.  Additional furloughs may be necessary due to budget constraints.

57.     The Debtor seeks approval to pay accrued prepetition wages to each employee only in amounts that are less than the bankruptcy wage priority amount, which I am told is currently $12,475.  A detailed list identifying the names and amounts will be provided to the Court and to the US Trustee prior to or at the hearing on the motion.

58.     XPS pays employees bi-weekly, exclusive of deductions and exclusions.

59.     Employee wages are paid on Thursday for the two weeks ending the previous Sunday, in arrears.  Thursday, January 23, 2014, is a regular payday for the two weeks ending Sunday, January 19.  Thus, as of the Petition Date, the Company owes its employees pre petition wages for a full two week pay period, and will owe for two additional pre petition days, January 20 and 21, the pay for which will be due on February 6.  Some employees are owed much more due to salary deferrals, retention bonuses, and incentive bonuses that the Debtor did not pay due to cash constraints.

60.     Xtreme Power pays its employees and most contractors on a biweekly basis through the ExponentHR payroll system.  Exempt employees are paid salary based on 80 hours and non-exempt employees are paid for actual hours worked per biweekly pay period.  Non-exempt employees are paid at an overtime rate of 1.5 times their hourly base rate for any hours worked over 40 in a 7-day work week.

61.     Regular full-time employees at Xtreme Power earn Paid Time Off (PTO).  The per period accrual rates vary depending upon employment classification.  All regular full-time employees receive 8 paid holidays per calendar year.

62.     Xtreme Power employees are eligible to participate in a 401k plan through Principal Financial.  Employees make their contribution elections directly through the Principal website.  Principal advises XP Payroll Department when changes are made to an employee's

401k deductions in order for the change to be made in the ExponentHR payroll system. There is a very small amount of pre petition payments due to the 401k plan, which the Debtors seek approval to pay.

63.     Xtreme Power employees working at least 30 hours per week are eligible to enroll in its group health plans. Premium payment is shared between Xtreme Power and the employee. There are two major medical plans offered through Blue Cross Blue Shield of Texas. Employees can choose between a traditional PPO plan and a High Deductible health plan. Employees may also elect to participate in Flexible Savings and/or Health Savings accounts depending on the health plan chosen and according to the current regulations that govern these savings plans. For those enrolled in the High Deductible health plan, Xtreme Power contributes $25 per biweekly pay period to a Health Savings Account for each employee. There is a small amount of outstanding pre petition payment due to the Health Savings Account, which the Debtors seek approval to pay.

64.     Xtreme Power participates in a group dental plan administered by Principal Dental. All regular full time employees are enrolled in this plan and the premium is paid by Xtreme Power. Employees can elect to enroll dependents in the dental plan at additional cost to the employee.

65.     Xtreme Power pays the premiums for Basic Life and Long Term Disability plans for its regular full time employees. These plans are administered through Mutual of Omaha. There are additional voluntary plans such as Supplemental Life and Short Term Disability available to employees at their own cost. Voluntary plans are available from Mutual of Omaha and AFLAC.

66.     Additionally, sick pay is accrued based on current salary rates.

**(k)     Insurance**

67.     In connection with the operation of their businesses, the Debtors maintain workers' compensation, general liability, and property insurance programs, which provide insurance coverage for claims relating to, among other things, workers' compensation, automobile losses and liability, directors' and officers' liability, fiduciary liability, and general liability, life medical, and disability (the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers") including, but not limited to, the Insurance Programs and Insurance Carriers as follows:

- Chubb Insurance -  Property, Worker's Compensation & Other Corporate policies

- AIG First Insurance  -- Products and Pollution Liability

- Chubb  -- D&O

- BlueCross/BlueShield Ins – Employee Medical

- Principle Life Insurance – Employee life

- Mutual of Omaha – life, long term disability, AD&D voluntary supplemental life and short term disability

- Kaiser – Employee medical (Hawaii)

68.     The Debtors are required to pay, either directly or through the Debtors' insurance brokers, premiums in connection with the Insurance Programs noted above (collectively, the "Insurance Premiums").  The Insurance Premiums are based on a fixed rate established and billed by each Insurance Carrier.  The premiums for most of the Insurance Programs are determined annually and are either paid at the inception of each policy or are financed though insurance policy premium financing. Debtors owe premiums or premium financing payments under the Insurance Programs on the Petition Date, which are due now, of approximately $210,000.00  Other amounts will come due in the future and Debtors seek authority to pay those

sums as well, including but not limited to purchase of a one year tail for the D&O Policy that expires in March. The Debtors seek authorization to satisfy these obligations as they become due.

**(l)      Retention Of Professionals**

69.     The Debtors will seek to employ the following professionals:

- Jordan, Hyden, Womble, Culbreth & Holzer, P.C. as Debtor's counsel.

- Baker Botts, L.L.P., as special transactional counsel.

- Gordian Group as investment banker and financial advisor.

The Debtors have filed or will soon file applications for approval to retain these professionals, and will request that the Court consider the applications in due course.

Dated: January 23, 2014

_____
Ken Hashman, Affiant

**STATE OF TEXAS**              §
                                          §
**COUNTY OF TRAVIS**         §

SUBSCRIBED AND SWORN TO BEFORE ME, by   on this 23rd day of January, 2014, to certify which witness my hand and seal of office.

JOHN STEVEN PUAILOA
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 5/29/16

_____
NOTARY PUBLIC, STATE OF TEXAS
Commission Expires May 29th 2016