## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re | § | |
| **XTREME POWER INC.,** | § | **CASE NO. 14-10096** |
| **XTREME POWER SYSTEMS, LLC, and** | § | **CASE NO. 14-10095** |
| **XTREME POWER GROVE, LLC** | § | **CASE NO. 14-10097** |
| **Jointly Administered Debtors.** | § | **CHAPTER 11** |
| | § | **(Jointly Administered Under** |
| | § | **CASE NO. 14-10096)** |

**DEBTORS' MOTION FOR ORDERS (A)(I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS BY PUBLIC AUCTION; (II) SCHEDULING A HEARING TO CONSIDER THE SALE OF ASSETS; AND (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (B)(I) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF POTENTIAL DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

> **This pleading requests relief that may be adverse to your interests.**
>
> **If no timely response is filed by February 4, 2014, the relief requested herein may be granted without a hearing being held.**
>
> **A hearing on this motion will be held on February 6, 2014 at 1:30 p.m. (central time) in the courtroom of the Honorable H. Christopher Mott, Homer J. Thornberry Federal Judicial Building, 903 San Jacinto Blvd., Austin, Texas.**

Xtreme Power Inc. ("**XPI**"), Xtreme Power Systems, LLC ("**XPS**"), and Xtreme Power Grove, LLC ("**XPG**") (collectively, the "**Debtors**" or the "**Company**"), hereby submits this motion (the "**Motion**") requesting entry of an order pursuant to sections 105, 363, 365, 503, and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), Rules 2002, 6003, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 6004(b) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Western District of Texas (the "**Local Rules**") (a)(i) approving bidding

procedures in connection with the sale of substantially all of their assets by public auction; (ii) scheduling a hearing to consider the sale of assets; and (iii) approving the form and manner of notice thereof; (b)(i) authorizing and approving the sale of assets free and clear of liens, claims, encumbrances and interests, and (ii) approving the assumption and assignment of designated executory contracts and unexpired leases; and (c) granting related relief. In further support of this Motion, the Debtors represent as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

2.      On January 22, 2014, the Debtors commenced the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") by each filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas (the "**Court**").

3.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this Motion, no trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

4.      A detailed description of the Debtors' business and the reasons for filing these Chapter 11 Cases is set forth in the Declaration of Ken Hashman in Support of Chapter 11 Petitions and First Day Motions and Applications (the "**Hashman Declaration**"), which is incorporated herein by reference.

## THE PROPOSED SALE OF THE ASSETS

5.     As described in the Hashman Declaration, the Debtors commenced these Chapter 11 Cases to conduct a sale of all or substantially all of their assets (the "**Assets**") with the goal of maximizing value for all stakeholders.  As discussed below, consummation of a sale transaction is in the best interests of all of the Debtors' estates and is a condition of the Debtors' DIP Credit Facility (as defined below).  The cash flow issues facing the Debtors' continued operation of their businesses (as set forth in additional detail below and in the Hashman Declaration) necessitate the completion of a sale of the Debtors' Assets as expeditiously as possible.

**A.     The Debtors' Assets and Need to Sell Assets**

6.     The Debtors design, engineer, install, and monitor integrated energy storage systems for Power Generators, Grid Operators and Commercial & Industrial End Users, among others.  The company's technology, coupled with its expert team of engineers is able to address the most complex grid challenges with effective and reliable solutions.  The Company has 12 projects in operation with 60 MW of grid-scale installations ranging from 1MW up to 36MW. The Company's operational experience includes more than 34,100 MWh charged and discharged and over 472,200 hours of integrated power unit operation.  While the Debtors' biggest projects have been integrated with renewable generation, they also deliver economic solutions to mainstream grid problems that have traditionally been filled by conventional generators using fossil-fired equipment.

7.     In 2013, the Debtors' ability to continue as a going concern had become dependent, in large part, on obtaining one or more substantial infusions of financing for working capital and operating expenses.  Without such additional funding, the Debtors were unable to pay ordinary operating expenses such as payroll taxes and salaries.

8.     Thus, the Debtors engaged Gordian Group who contacted more than 50 clean and/or energy technology and other financial investors regarding a debt investment in the Company.  Concurrently, Roth Capital contacted approximately 40 potential strategic investors regarding the acquisition of the company.

9.     Roth Capital and the Gordian Group continued their marketing efforts in December 2013 and into 2014.  The Debtors' goal was to consummate a transaction and/or raise capital through debt financing out of court.  However, the Debtors' operations were stymied by a liquidity crisis, which in turn made an out of court transaction unworkable.  The lack of liquidity threatened the viability of any sale process, in or out of court.  Accordingly, the Debtors' Board of Directors authorized the Gordian Group to seek a purchaser of substantially all of the Debtors' Assets in the context of bankruptcy section 363 sale process.

10.    As more fully described in the Debtors' motion to approve debtor in possession financing, Horizon Technology Finance Corporation ("**Horizon**"), one of the Debtors' senior secured prepetition lenders, agreed to provide a postpetition debtor in possession financing facility (the "**DIP Credit Facility**" and to become the lender thereunder, the "**DIP Lender**") to allow the Debtors to continue their marketing efforts and implement a competitive bidding process.

11.    The Court entered an interim order approving the DIP Credit Facility on or about January 24, 2014 (the "**Interim DIP Order**"), and scheduled a hearing for February 21, 2014 at 1:30 pm, prevailing Central time, to consider final approval of the DIP Credit Facility.  Under the terms of the DIP Facility, Horizon will serve as an initial stalking horse bidder that will purchase substantially all assets (the "**Back Up Sale Transaction**") for the price of its pre and post-petition debt plus the debt of Silicon Valley Bank (the Debtors' senior-most secured lender).

However, neither the Debtors nor, on information and belief, the DIP Lender desire to close the Back Up Sale Transaction. The Back Up Sale Transaction was intended to initiate the competitive section 363 sale. The financing provided by the DIP Credit Facility permits the Debtors to continue to operate as a going concern while Gordian Group continues its marketing efforts. The Debtors believe that conducting a sale process according to this timeline will produce a fair and robust auction and will provide these estates with the best opportunity to maximize the value of their Assets.

12. To avoid closing the Back Up Sale Transaction, one of two things must occur. First, the Debtors must designate a party other than the DIP Lender as a stalking horse to replace the DIP Lender (the "**Substitute Stalking Horse**"); or second, the Debtors must receive a financing commitment from a third party lender by February 28, 2014 that closes on March 4, 2014 (the "**Substitute DIP Closing**") that would permit the Debtors to operate during an extended sale process. The Substitute DIP Closing is subject to terms in the DIP Credit Facility. Further, by February 28, 2014 (or March 31, 2014 in the event the Substitute DIP Closing occurs), the Debtors must deliver to counsel for the DIP Lender a "Notice of Designation" that sets forth the general terms of the Substitute Stalking Horse Bidder's asset purchase that includes the purchase price, the identity of the proposed Substitute Stalking Horse Bidder, the financial wherewithal of the Substitute Stalking Horse Bidder, any conditions to closing, and the terms of any Break-Up Fee or any bid protections.

## C.     The Debtors' Marketing Efforts Thus Far

13. As mentioned above, the Debtors engaged Gordian Group to implement a completive sale process. The Gordian Group has worked closely with the Debtors' management

to analyze their current financial position and business operations and to prepare diligence materials and for prospective purchasers interested in the Debtors' Assets.

14.      In furtherance of these efforts, the Gordian Group has identified and contacted prospective purchasers, solicited their interest, executed confidentiality agreements, and circulated diligence materials.  To date, the Gordian Group has contacted approximately 50 potential buyers.  As part of this process, Gordian Group has sent "teasers" summarizing the Debtors' Assets and confidentiality and nondisclosure agreements to potential buyers. Accordingly, the Debtors have filed this Motion while the marketing process continues in compliance with the DIP Credit Facility and the Interim DIP Order, to ensure that the Asset sale process can be completed expeditiously and maximum value can be achieved for the Debtors' stakeholders.

**SUMMARY OF RELIEF REQUESTED**

15.      The Debtors seek, pursuant to sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9008, and 9014 and Local Bankruptcy Rule 6004(b), the Court's approval of: (a) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Assets (collectively, the "**Bidding Procedures**," attached as <u>Annex 1</u> to the Bidding Procedures Order (as defined below)); (b) the sale of the Assets free and clear of Claims (as defined below) to the Prevailing Bidder (as defined in the Bidding Procedures); and (c) the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder.

16.      More specifically, through this Motion, the Debtors request that the Court enter two orders: (i) a Bidding Procedures Order (as defined below) and (ii) the Horizon Sale Order or the Prevailing Bidder Sale Order (both defined below), depending on the outcome of certain events as set forth below.

17.     First, at a hearing (the "**Bidding Procedures Hearing**") to be held on February 6, 2014 at 1:30 pm or as soon thereafter as the Court may take up the matter, the Debtors request entry of an order in substantially the form attached hereto as <u>Exhibit A</u> (the "**Bidding Procedures Order**"), which, in the event that the Debtors timely designate a Substitute Stalking Horse or in the event the Substitute DIP Closing occurs:

    (a) authorizes and approves (i) the Debtors' proposed procedures for the submission and consideration of bids for the Assets pursuant to the Bidding Procedures set forth in <u>Annex 1</u> attached to the proposed Bidding Procedures Order and incorporated herein in its entirety by reference; and (ii) the form and manner of notice of these matters, including the notice of the Prevailing Bidder Sale Hearing in the form attached as <u>Annex 2</u> to the proposed Bidding Procedures Order (the "**Sale Notice**") to be served on parties in interest; and

    (b) authorizes and approves (i) the Debtors' proposed procedures for (A) the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder in connection with a proposed Asset acquisition transaction, and (B) curing defaults under these executory contracts and unexpired leases; and (ii) notice of the assumption and assignment of such executory contracts and unexpired leases and the proposed amounts necessary to cure defaults related thereto (the "**Cure Costs**") in the form attached as <u>Annex 3</u> to the proposed Bidding Procedures Order (the "**Assignment Notice**").

18.     Second, in the event that the Debtors do not timely identify a Substitute Stalking Horse or if the Substitute DIP Closing does not occur, the Debtors request the entry of an order (the "**Horizon Sale Order**") at a hearing to be held on February 21, 2014 at 1:30 pm (the "**Horizon Sale Hearing"**), authorizing (a) the sale of the Assets to Horizon free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions (collectively, "<u>Claims</u>") other than any Claims expressly

assumed by Horizon; and (b) the assumption and assignment of certain executory contracts and unexpired leases intended to be acquired by Horizon as part of any Asset acquisition transaction.

## PROPOSED NOTICE, BIDDING AND OTHER PROCEDURES

**A.      Proposed Bidding Procedures**

19.      The Debtors believe the proposed Bidding Procedures will maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors, and other interested parties.  The Bidding Procedures contemplate an auction process pursuant to which bids for the Assets will be subject to higher or otherwise better offers.  The Bidding Procedures primarily benefit the Debtors by creating a bidding process that ensures, among other things: (a) structure and logistical certainty to the process; (b)  the Debtors' ability to compare the relative values of competing offers, if any; (c) that potential purchasers have the financial wherewithal to timely consummate a purchase of the Assets; and (d) meaningful bidding increments.

20.      The Bidding Procedures are set forth in detail in <u>Annex 1</u> to the Bidding Procedures Order.  The Bidding Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a bid, the method and criteria for bids to become "qualified," the manner in which qualified bids will be negotiated, clarified and improved, and the criteria for selecting the Prevailing Bidder, including if necessary, through a public auction.

21.     As described below and more fully in the Bidding Procedures, only Qualified

Bidders who timely submit Qualified Bids will be eligible to participate in the Auction.

Specifically, the Bidding Procedures provide, in relevant part, as follows:[1]

***Participation Requirements and Due Diligence***

1.      In order to participate in the bidding process, the Auction, or otherwise be considered for
        any purpose hereunder, a person interested in purchasing the Assets (a "Potential
        Bidder") must first deliver the following materials to the Debtors and their counsel:

        (a)     An executed confidentiality agreement in form and substance satisfactory to the
                Debtors and their counsel (the "Confidentiality Agreement"). Without limiting
                the foregoing sentence, the Confidentiality Agreement will provide that all non-
                public information about the Debtors received by a Potential Bidder, or if the
                bidder is qualified, a Qualified Bidder (as defined below), will be kept strictly
                confidential and used only in connection with analyzing a transaction for the
                purchase of the Assets. The Confidentiality Agreement also will provide that the
                Debtors and their advisors will have access to information provided about a
                Potential Bidder by the Potential Bidder and that any confidential information
                received from a Potential Bidder will be used only in connection with analyzing
                whether the Potential Bidder will be qualified as a Qualified Bidder and a
                potential transaction for the Assets.

        (b)     Written evidence that enables the Debtors and their advisors to determine, in their
                sole discretion, in consultation with the DIP Lender, whether the Potential Bidder
                has the financial and other ability to close the contemplated sale transaction and
                provide adequate assurance of future performance under all contracts to be
                assumed and assigned in connection therewith.

        (c)     The Debtors shall provide these Bidding Procedures, together with a copy of a
                form Asset Purchase Agreement (the "APA"), to each Potential Bidder. All
                Potential Bidders, whether deemed Qualified Bidders (as defined below) or not,
                consent to the jurisdiction of this Bankruptcy Court to determine matters
                concerning the sale, their Bid and otherwise with respect to the process and waive
                any right to any other venue.

2.      Any Potential Bidder wishing to conduct due diligence concerning a prospective
        acquisition transaction of the Assets shall be granted access to all relevant information
        regarding the Assets and the related business of each of the Debtors reasonably necessary
        to enable a Potential Bidder to evaluate the Assets and the prospective transaction. The
        Debtors shall make such access available to Potential Bidders during normal business

---

[1]Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding
Procedures.  To the extent that the bidding provisions set forth below differ in any way from the terms set forth in
the Bidding Procedures, the terms of the Bidding Procedures shall control.

hours as soon as reasonably practicable following execution of the Confidentiality Agreement. Potential Bidders interested in conducting due diligence should contact Matthew Jacobs, Gordian Group LLC, 950 Third Avenue, NY, NY 10022 (212.486.3600). Notwithstanding the foregoing, the Debtors are not required to provide confidential or proprietary information to any person if the Debtors, in consultation with the DIP Lender, believe that such disclosure would be detrimental to the interests of the Debtors' estates. All due diligence must be completed before the Bid Deadline (as defined below) unless the Debtors in their sole discretion, but in consultation with the DIP Lender and the Committee, agree otherwise. No condition(s) allowing or regarding further due diligence will be accepted or authorized after the Bid Deadline. Potential Bidders are required to exercise their own discretion before relying on any information regarding the Assets provided by the Debtors. Neither the Debtors nor their representatives (nor the DIP Lender or its representatives) are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto.

3.      The Debtors shall: (i) receive and evaluate any Bids from Potential Bidders; (ii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid (as defined below); and (iii) take any other actions contemplated under these Bidding Procedures.

### *Submission of Bids*

4.      Any Qualified Bidder interested in purchasing the Assets must submit a Bid prior to 4:00 p.m. prevailing Central time on March 28, 2014 (the "Bid Deadline"); provided, however, that if the Substitute DIP Closing occurs, the Bid Deadline shall be April 28, 2014. In order for such Bid to be considered, however, it must be a "Qualified Bid."

5.      The Debtors and their advisors, in consultation with the DIP Lender, will determine if a Bid is a Qualified Bid based on the requirements herein. A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtors, in their sole discretion, but in consultation the DIP Lender and any official committee appointed in these Chapter 11 Cases (the "Committee") , determine that such Potential Bidder submitted a Qualified Bid.

6.      A Bid will be considered a "Qualified Bid" only if the Bid is for the purchase and sale of all or substantially all of the Assets and fulfills the following requirements on or prior to the Bid Deadline (capitalized terms used in this section are defined later in the Bidding Procedures):

(a)      Provides that the Qualified Bidder's Bid shall remain open and irrevocable until the earlier of (X) thirty (30) days following the date of entry of a Prevailing Bidder Sale Order; or (Y) the date of the closing of the sale of the Assets pursuant to the Prevailing Bidder Sale Order (the "Bid Expiration Date");

(b)     Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

(c)     Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the proposed transaction, in each case acceptable to the Debtors in their sole discretion, but in consultation with the DIP Lender;

(d)     Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the APA, or a representation that no such authorization or approval is required;

(e)     Provides that the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtors, in consultation with the DIP Lender;

(f)     Provides by wire transfer or immediately available funds to the Debtors or an appropriate escrow agent before the Bid Deadline of an earnest money deposit equal to (X) 10% of the dollar amount of the purchase price of such Bid; or (Y) 10% of the value of such Bid, (the "Deposit");

(g)     Provides evidence satisfactory to the Debtors that the Qualified Bidder is reasonably likely to obtain prompt regulatory approval, if any is required, to purchase the Assets;

(h)     Is submitted in a writing in the form of the APA with any proposed changes to the APA set forth in an electronic form both clean and marked to reflect such changes signed by the Qualified Bidder, that:

    (i)      Identifies the Qualified Bidder and any members of its investor group, if applicable;

    (ii)     Is not subject to conditions, representations or terms that the Debtors determine, in consultation with the DIP Lender, to be unacceptable;

    (iii)    Is not conditioned upon the Bankruptcy Court's approval of any Bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment; provided, however, the Debtors may accept an Initial Highest Bid (as defined below) with such bid protections to the extent authorized by the Court according to the procedure outlined below;

    (iv)     Does not contain any financing or due diligence contingencies to closing of the proposed transaction unless the Debtors and the DIP Lenders otherwise agree that such contingencies are acceptable;

(v)    Does not contain any condition to closing of the transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval and any required governmental and/or regulatory approval);

(vi)    Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Assets and the proposed transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Assets in making its Bid or that of any of its legal, financial or other advisors, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors or the Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the APA ultimately accepted and executed by the Debtors;

(vii)    Identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the Debtors to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code) along with the Bid; and

(i)    Contains other information reasonably requested by the Debtors.

7.    A Qualified Bidder that desires to make a Bid must deliver written electronic copies of its Bid on or prior to the Bid Deadline to any of the following representatives of the Debtors: (1) Peter S. Kaufman and David L. Herman, Gordian Group LLC, 950 Third Avenue, NY, NY 10022; (2) Shelby A. Jordan and Nathaniel Peter Holzer, Jordan, Hyden, Womble, Culbreth & Holzer P.C., 500 N. Shoreline Blvd, Suite 900, Corpus Christi, Texas 78471; (3) Steve Tyndall, Baker Botts L.L.P., 98 San Jacinto Boulevard Suite 1500 Austin, Texas 78701-4078; and (4) Omar J. Alaniz, Baker Botts L.L.P., 2001 Ross Avenue, Dallas, Texas 75201. The Debtors shall deliver copies of any such Bids to the DIP Lender and the Committee.

8.    After the Bid Deadline, the Debtors, in their sole discretion but in consultation with the DIP Lender and the Committee, shall determine which Qualified Bid represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder"). Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid or a Qualified Partial Bid will be advised of such Initial Highest Bid and the Debtors may: (a) distribute copies of other Qualified Aggregate Bids or Qualified Partial Bids to other Qualified Bidders prior to or during the Auction; or (b) proceed with the open or sealed bidding process set forth in the Bidding Procedures Order to the extent authorized therein.

*Due Diligence From Potential Bidders or Qualified Bidders*

9.       Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Assets.  Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtors to determine that a Potential Bidder is not a Qualified Bidder.  Similarly, each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Assets as the Auction progresses. Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtors to determine that the Qualified Bidder may no longer participate in the Auction.

*"As Is, Where Is"*

10.      The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates or any other party, except to the extent set forth in the APA between the Debtors and the Prevailing Bidder.  Except as otherwise provided in the Prevailing Bidder's APA, all of the Debtors' right, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein (collectively, the "Claims") pursuant to section 363(f) of the Bankruptcy Code, such Claims to attach to the net proceeds of the sale of the Assets, with the same validity and priority as existed immediately prior to such sale.

*Later Award of Break-Up Fee to Substitute Stalking Horse Bidder*

11.      Pursuant to the Bidding Procedures Order, on or prior to February 28, 2014 (or March 31, 2014 in the event the Substitute DIP Closing occurs), the Debtors may designate a Substitute Stalking Horse Bidder to take the place of the DIP Lender as the initial stalking horse bidder.  The Debtors may agree to pay the Substitute Stalking Horse Bidder (i) a break-up fee in an amount up to 2.5% (or such higher percentage as the Debtors shall agree, subject to Court approval) of the total guaranteed cash price contained in its Initial Highest Bid plus (ii) reimbursement of reasonable expenses in an amount to be determined (item (i) and (ii) together, the "Break-Up Fee"); provided that the Break-Up Fee may only be paid upon the closing and from the sale proceeds of a sale of the Assets to a Prevailing Bidder other than the Substitute Stalking Horse.  Any agreement to provide a Break-Up Fee shall be (a) approved by the Court by separate order entered no later than March 4, 2014 (or April 4, 2014 if the Substitute DIP Closing occurs), following a hearing upon no less than three (3) days notice to: (i) counsel to the DIP Lender; (ii) counsel to the Committee; and (iii) the Office of the U.S. Trustee.  If the Debtors designate a Substitute Stalking Horse and obtain the Court's approval of a Break-Up Fee on or before March 4, 2014 (or April 4, 2014 if the Substitute DIP Closing occurs), the Debtors shall provide notice of the order approving same prior to the Bid Deadline to any other party that expressed an interest in acquiring the Assets.

*The Auction*

12.     If more than one Qualified Bid has been submitted for the Assets in accordance with these Bidding Procedures, the Debtors will conduct the Auction on March 31, 2014 at _____ a.m., prevailing Central time, or April 30, 2014 in the event of the Substitute DIP Closing occurs, with respect to such Qualified Bids in order to determine the highest and best Bid (the "Prevailing Bid") to submit for approval by the Bankruptcy Court at the Prevailing Bidder Sale Hearing (as defined below).  The Auction shall be organized and conducted by the Debtors at Baker Botts L.L.P., 98 San Jacinto Boulevard Suite 1500 Austin, Texas 78701-4078 or such other location as may be announced prior to the Auction to all Qualified Bidders, the DIP Lender, the U.S. Trustee, and the Committee. The Auction will be recorded by video or stenographic means.

13.     The only persons or entities who will be permitted to Bid at the Auction are the authorized representatives of each Qualified Bidder (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by the Debtors, the DIP Lender, the Committee, and their respective counsel, financial advisors, and/or other authorized representatives.

14.     The Debtors are authorized to conduct the Auction in accordance with such procedures and requirements as may be established at the discretion of the Debtors and their counsel, in consultation with counsel to the DIP Lender and the Committee, which rules may include the determination of the amount of time between Qualified Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open or sealed bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

15.     The first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder in the amount of the Initial Highest Bid.  The next Qualified Bid at the Auction shall be an amount equal to or greater than the Initial Highest Bid plus the amount of the approved Breakup Fee (if any) plus the Minimum Bid Increment (as defined below).  Thereafter, the Auction will continue in the manner determined by the Debtors above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, although received from a Qualified Bidder that made a Qualified Bid prior to the Bid Deadline, need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in higher increments of at least $100,000 in cash (the "Minimum Bid Increment").

16.     The Debtors, in consultation with the DIP Lender and the Committee, shall determine, in their sole discretion, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

17.     At the conclusion of the Auction: (i) the Debtors shall, in their sole discretion but in consultation with the DIP Lender and the Committee, select (X) the Prevailing Bid and (Y) the second highest or best offer for the Assets (the "Back-Up Bid"); (ii) the Debtors shall notify the Prevailing Bidder that such person's offer has been determined by the

Debtors to be the Prevailing Bid and will be contingent only on Bankruptcy Court approval, and shall notify the person that made the Back-Up Bid (the "Back-Up Bidder") that such person's offer has been determined by the Debtors to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid to close as set forth below and Bankruptcy Court approval; and (iii) the Debtors shall file a notice with the Bankruptcy Court announcing the Prevailing Bidder.  Prior to the commencement of the Prevailing Bidder Sale Hearing, the Prevailing Bidder shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder to all of the terms and conditions contemplated by the Prevailing Bid.

18.     The Deposit of the Prevailing Bidder or the Back-Up Bidder, as the case may be, shall be applied by the Debtors against the purchase price to be paid by the Prevailing Bidder or the Back-Up Bidder, as applicable, at the closing of the relevant transaction approved by the Bankruptcy Court.  The Prevailing Bidder's Deposit shall be held by the Debtors and forfeited to the Debtors if the Prevailing Bidder breaches its obligations to close under the APA in accordance with the Prevailing Bid.

19.     The Debtors shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtors' acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Prevailing Bidder Sale Hearing.

### Back-Up Bidder

20.     If for any reason the Prevailing Bidder fails to consummate the acquisition of the Assets in accordance with the Prevailing Bid, and in any event no later than ten (10) days from the entry of the Prevailing Bidder Sale Order, the Debtors are authorized to proceed with the sale of the Assets to the Back-Up Bidder in accordance with the Back-Up Bid without further order of the Bankruptcy Court.  If for any reason the Back-Up Bidder fails to consummate the acquisition of the Assets in accordance with the Back-Up Bid, the Back-Up Bidder's Deposit shall be forfeited to the Debtors.

### Deposit

21.     No later than the third (3rd) business day following the entry of the Prevailing Bidder Sale Order, the Debtors shall return to each Qualified Bidder(s), other than the Prevailing Bidder and the Back-Up Bidder, their respective Deposit(s).  No later than the third (3rd) business day after the closing of the sale of the Assets to the Prevailing Bidder, the Debtors shall return the Back-Up Bidder's Deposit to the Back-Up Bidder.

***Prevailing Bidder Sale Hearing and Objection Deadline***

22.    The sale hearing to consider the relief requested in the Sale Motion (defined below) and to consider whether to approve the Prevailing Bid and the Back-Up Bid (the "Prevailing Bidder Sale Hearing") shall be held before the Bankruptcy Court on April 4, 2014 at [_____].m., prevailing Central time, or May [5], 2014 if the Substitute DIP Closing occurs, at which time the Court will enter the "Prevailing Bidder Sale Order."

23.    Objections, if any, to the to approval of the sale of Assets to the Prevailing Bidder (the "Sale Motion") —other than an objection to the proposed assumption and assignment of the Designated Agreements or to any proposed Cure Costs—including, but not limited to, the sale of the Assets free and clear of Claims pursuant to section 363(f) of the Bankruptcy Code shall be (a) be in writing; (b) clearly specify the grounds for the objection; (c) conform to the Bankruptcy Rules and the Local Rules; and (d) be filed with the Court and served so as to be received by the following parties by email (collectively, the "Objection Notice Parties") by no later than 12 Noon (Central time) on April 3, 2014 or, in the event the Substitute DIP Closing occurs, May 2, 2014   (the "Objection Deadline"): (1) counsel for the Debtors (i) Shelby A. Jordan: sjordan@jhwclaw.com, (ii) Nathaniel   Peter   Holzer:        pholzer@jhwclaw.com,   (iii)   Steve   Tyndall: steve.tyndall@bakerbotts.com,  (iv)  Omar  J.  Alaniz:  omar.alaniz@bakerbotts.com; (2) counsel for the DIP Lender: (i) Charles A. Dale III: chad.dale@klgates.com, (ii) A. Lee Hogewood III: lee.hogewood@klgates.com; (3) counsel for the Committee: []; and (4) the U.S. Trustee, Deborah Bynum:  Deborah.A.Bynum@usdoj.gov.

24.    Any person objecting to the Sale Motion that has not filed an objection by the Objection Deadline shall not be heard at the Prevailing Bidder Sale Hearing and shall be barred from objecting to the Sale Motion.

***Modifications***

25.    The Debtors in their sole discretion, but in consultation with the DIP Lender and the Committee, may adopt, implement, and/or waive such other, additional or existing procedures or requirements that serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend at an Auction or participated in the Auction, as appropriate.

26.    The Debtors, in their sole discretion but in consultation with the DIP Lender and the Committee, may (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of the Prevailing Bidder Sale Order approving the Prevailing Bid, any Bid that, in the discretion of the Debtors, in consultation with the DIP Lender and any Committee is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors.  At or before the conclusion of the Auction, the Debtors in their sole discretion, but in consultation with the DIP Lender

and the Committee, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in this case.

22.     The Debtors will consider all proposals that are deemed qualified in accordance with the Bidding Procedures.  The Debtors will consider proposals for the acquisition of substantially all of the Assets in a Qualified Bidder.  The Bidding Procedures establish the terms and conditions the Prevailing Bidder must satisfy to acquire the Assets.

23.     The Debtors reserve the right to modify the Bidding Procedures as necessary, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtors in their sole discretion, in consultation with counsel to the DIP Lender and the Committee, after or as they deem appropriate to maximize value for the Debtors' estates and creditors.  In addition, the Debtors reserve their right to withdraw any or all Assets from the sale at any time prior to the Court's approval of such sale.

24.     The Debtors will present the results of the Auction to the Court at a hearing to be held after the Auction, if applicable (the "**Prevailing Bidder Sale Hearing**"), at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted and the Prevailing Bidder was properly selected in accordance with these Bidding Procedures; (b) the Auction was fair in substance and procedure; and (c) consummation of the Asset sale by the Prevailing Bidder will provide the highest or otherwise best value for the Assets and is in the best interests of the Debtors, their estates and creditors.

25.     The Debtors believe that the Bidding Procedures are fair and reasonable, and are not likely to dissuade any serious potential alternative purchaser from bidding for the Assets.

**B.      Proposed Bidding Protections and Later Award of Break-Up Fee**

26.      The Debtors have proposed that the DIP Lender serve as the initial stalking horse to kick-start the competitive bidding process.  However, neither the Debtors, nor on information and belief the DIP Lender, desires to close the Back Up Sale Transaction if a higher and better offer can be obtained for the Debtors' Assets.  The Debtors' agreement with the DIP Lender contemplates that the Debtors will seek to obtain a Substitute Stalking Horse Bidder.  Accordingly, the Debtors request authority, in the exercise of their sound business judgment, to seek the Court's later approval, upon no less than three (3) days-notice to certain parties in interest identified above, of a break-up fee up to 2.5% (or such higher percentage that the Debtors may agree to with Court permission) of the total guaranteed cash price offered by such Substitute Stalking Horse Bidder plus reimbursement of reasonable expenses in an amount to be determined (together, the "Break-Up Fee") to a Qualified Bidder who agrees to provide a Qualified Bid for the Assets that will serve as the Substitute Stalking Horse Bidder at the Auction.  Any agreement to provide a Break-Up Fee would be expressly conditioned on the Court's approval on or before March 4, 2014 (or April 4, 2014 if the Substitute DIP Closing occurs) and consummation of a sale of the Assets to a Prevailing Bidder.  In the event that the Debtors agree to a Break-Up Fee that is approved by the Court, and (a) the Prevailing Bidder is the Prevailing Bidder as a result of such bidder's exercise of any credit bid right, or (b) a sale of the property does not close for any reason on or before ten (10) days after entry of the Prevailing Bidder Sale Order, the Break-Up Fee will not be paid by the Debtors, their estates, or any other person or party, and no obligation will be created, and any agreement by the Debtors to pay a Break-Up Fee and the Court's order approving any such Break-Up Fee will provide and acknowledge the same.

27.     The Substitute Stalking Horse Bidder will have expended considerable time, money, and energy pursuing the transaction and will have engaged in extended and lengthy good faith negotiations.  In particular, the Substitute Stalking Horse Bidder would have taken part of an extensive process undertaken by the Debtors and their professionals to identify and negotiate a transaction that the Debtors believe to be the highest or best proposal for an acquisition of the Assets in order to maximize the value realized for the benefit of the Debtors' estates and their creditors.  Accordingly, the Debtors may not be able to find a bidder willing to serve as a Substitute Stalking Horse Bidder without having the flexibility to offer a Break-Up Fee and obtain the Court's approval of it on shortened notice.

## C.     Proposed Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases

28.     In accordance with Bankruptcy Rule 6006(c), the Debtors must also provide notice of: (a) the potential assumption and assignment of executory contracts and unexpired leases and rights thereunder; (b) the proposed maximum Cure Costs that the Prevailing Bidder may pay to cure all defaults, if any, under executory contracts and unexpired leases and rights thereunder that the Debtors propose to assume and assign; and (c) the deadline to file objections to such assumption and assignment, maximum Cure Costs, the existence of any defaults, and/or adequate assurance of the future performance.

29.     The Debtors propose the following procedures (the "**Contract Procedures**") to govern the assumption and assignment of the Potential Designated Contracts in connection with the sale of the Assets:[2]

(a)     Within five (5) business days after the Debtors have timely designated a Substitute Stalking Horse, the Debtors shall file with this Court and shall serve an Assignment Notice by overnight delivery service on each non-debtor

---

[2]If requested by the Prevailing Bidder, these Contract Procedures may be modified if necessary by further order of this Court.

counterparty to an executory contract or unexpired lease with any of the Debtors (each a "**Non-Debtor Counterparty**") that may be assumed and assigned to the Prevailing Bidder (the "**Potential Designated Contracts**").  The Debtors shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to the Potential Designated Contracts and the proposed corresponding Cure Costs under the Potential Designated Contracts as of the Petition Date.

(b)     At any time prior to the closing of any sale transaction for the Assets, the Prevailing Bidder may direct the Debtors to serve a notice excluding any of the Potential Designated Contracts on (i) the Non-Debtor Counterparty to such Potential Designated Contracts and (ii) all Objection Notice Parties other than the Debtors, indicating, by reasonably specific information, which Potential Designated Contracts have been excluded, and stating that the Prevailing Bidder has excluded such Potential Designated Contracts.  Upon consummation of the sale with the Prevailing Bidder and service of such notice, the executory contracts and/or unexpired leases referenced in such notice (x) shall no longer be considered Potential Designated Contracts; (y) shall not be deemed to be, or to have been, assumed or assigned; and (z) shall remain subject to assumption, rejection or assignment by the Debtors.

(c)     For each Potential Designated Contract, on the Assignment Notice, the Debtors shall indicate the proposed Cure Costs relating to such Potential Designated Contract.  The Assignment Notice also may identify any additional terms or conditions of assumption and assignment.

(d)     Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the Potential Designated Contracts, excluding, objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received by the Notice Parties so that it is received no later than 4:00 p.m. (prevailing Central time) on March 28, 2014 [make sure this is defined] (the "**Cure Objection Deadline**").  Notwithstanding the foregoing, Non-Debtor Counterparties shall have until Noon (prevailing Central time) on April 3, 2014, to submit an objection to the Debtors' ability to assign the Potential Designed Contract to the Prevailing Bidder without the Non-Debtor Counterparty's consent or to the adequate assurance of future performance to be provided (the "**Adequate Assurance Objection Deadline**," and together with the Cure Objection Deadline, the "**Contract Objection Deadlines**").

(e)     Where a Non-Debtor Counterparty to a Potential Designated Contract files an objection meeting the requirements of paragraph (d), objecting to the assumption by the Debtors and assignment to the Prevailing Bidder of such Potential Designated Contract (the "**Disputed Designation**") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "**Disputed Cure Costs**"), the Debtors and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtors

and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Court at the Prevailing Bidder Sale Hearing, unless the Debtors, the Prevailing Bidder and the Non-Debtor Counterparty to the Potential Designated Contract in dispute agree otherwise. If the Court determines at the Prevailing Bidder Sale Hearing that the Potential Designated Contract will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered a Potential Designated Contract. If any objection related to a Disputed Designation or Disputed Cure Costs is continued beyond the Prevailing Bidder Sale Hearing, the Prevailing Bidding shall escrow the portion of the Cure Costs that is disputed pending such resolution.

(f) Any Non-Debtor Counterparty to a Potential Designated Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Potential Designated Contract by the Contract Objection Deadlines, as applicable, is deemed to have consented to such Cure Costs and the assumption and assignment of such Potential Designated Contract by the Debtor and to the Prevailing Bidder, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates or the Prevailing Bidder.

(g) If the Non-Debtor Counterparty to a Potential Designated Contract fails to timely object to the assumption and assignment of a Potential Designated Contract or the proposed Cure Cost relating thereto by the Contract Objection Deadlines, as applicable, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Potential Designated Contract shall be deemed to be assumed by the Debtors and assigned to the Prevailing Bidder and the proposed Cure Cost related to such Potential Designated Contract shall be established and approved in all respects, subject to the conditions set forth in paragraph (h) below.

(h) The Debtors' decision to assume and assign the Potential Designated Contract is subject to Court approval and consummation of an Asset sale transaction with a Prevailing Bidder. Accordingly, subject to the satisfaction of conditions in subparagraph (g) above, the Debtors shall be deemed to have assumed and assigned each of the Potential Designated Contracts as of the date of and effective only upon the closing date of an Asset sale transaction with a Prevailing Bidder, and absent such closing, each of the Potential Designated Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code. Also, assumption and assignment of the Potential Designated Contracts is subject to the Prevailing Bidder's right set forth in subparagraph (b) above (and inclusion of any document on the list of Potential Designated Contracts shall not constitute or be deemed to be a determination or admission by the Debtors or the Prevailing Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved). The Prevailing Bidder shall have

no rights in and to a particular Potential Designated Contract until such time as the particular Potential Designated Contract is assumed and assigned in accordance with the procedures set forth herein.

(i)     Except as may otherwise be agreed to in an APA with a Prevailing Bidder or by the parties to a Potential Designated Contract, the defaults under the Potential Designated Contract that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: the Purchaser shall pay all Cure Costs relating to an assumed executory contract or unexpired lease within ten days after the later of (i) the closing date specified in the APA entered into with a Prevailing Bidder or (ii) the date on which such executory contract or unexpired lease is deemed assumed and assigned, in accordance with subparagraph (h) of these Contract Procedures.

## BASIS FOR RELIEF

**A.     Approval of the Bidding Procedures Is Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors**

*(1)     The Bidding Procedures Are Appropriate under the Circumstances*

30.     Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property.  In the hope of maximizing the value received by the estate, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process.  *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

31.     Although the Debtors and Gordian Group commenced efforts to market the Assets for sale prior to the Petition Date, a going concern stalking horse bid has not yet been identified.  Notwithstanding that, the Debtors believe that the Bidding Procedures will help the Debtors receive the maximum value for the Assets by establishing a competitive bidding process where potentially interested parties can step forward and bid, knowing, among other things, the

quality of the title they will receive if they are the Prevailing Bidder. The Debtors believe that the Bidding Procedures will encourage active bidding from seriously interested parties who possess the financial and operational capacity to purchase or operate the Assets. Furthermore, the proposed Bidding Procedures will allow the Debtors to conduct an auction in a controlled, fair and competitive fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the Assets. Therefore, the Debtors believe the Bidding Procedures will confirm that they are receiving the greatest possible consideration for the Assets.

32.     Procedures to dispose of assets, similar to the proposed Bidding Procedures, have been approved in other large, complex chapter 11 cases in this and nearby Districts. *See, .e.g., In re VPR Operating, LLC*, Case No. 13-10599 (Bankr. W.D. Tex. 2013) (Dkt 256);*In re ATP Oil & Gas Corporation*, Case No. 12-36187 (Bankr. S.D. Tex. 2013) (Dkt 1419); *In re ASARCO LLC*, Case No. 05-21207 (Bankr. S.D. Tex. July 1, 2008) (Dkt 8262). In sum, the Debtors believe that the proposed Bidding Procedures provide an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for the Assets. Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

*(2)     The Overbid Protections Are Appropriate Under the Circumstances*

33.     The Minimum Bid Increment is appropriate under the circumstances and will enable the Debtors to simultaneously maximize the value for the Assets while limiting the chilling effect in the marketing process. This provision also is consistent with the overbid increments previously approved bankruptcy courts. *See e.g.*, *In re ATP Oil & Gas Corporation*, Case No. 12-36187 (Bankr. S.D. Tex. Feb. 14, 2013); *WP Steel Venture LLC*, Case No. 12-11661 (Bankr. D. Del. June 21, 2012); *Solar Trust of America, LLC*, Case No. 12-11136 (Bankr.

D. Del. May 11, 2012); *Contract Research Solutions, Inc.*, Case No. 12-11004 (Bankr. D. Del. April 12, 2012); *In re ASARCO LLC*, Case No. 05-21207 (Bankr. S.D. Tex. July 1, 2008).

       *(3)*      *The Break-Up Fee Is Appropriate Under the Circumstances.*

34.     The Debtors reserve the right to seek the Court's approval, upon no less than three (3) days-notice to certain parties in interest, of a Substitute Stalking Horse Bidder on or before March 4, 2014 and to offer that bidder a Break-Up Fee.  The Debtors believe that this case warrants such relief to ensure the Debtors' ability to take advantage of a potentially value maximizing initial bid to serve as the Substitute Stalking Horse Bid (which is essentially the initial going concern bid).

35.     Break-up fees are a vital means by which a debtor in possession can manage value maximization risk by setting a value floor for the assets to be sold, which is a key benefit to the Debtors and their estates and weighs heavily in favor of approving the procedures for later offering the Break-Up Fee.  Moreover, without the ability to later offer the Break-Up Fee upon shortened notice, the sale and reorganization process might be substantially hampered.  Such fees encourage the investment of time, effort and money necessary to consummate a sale of the Assets, despite the possibility that the Substitute Stalking Horse may not be the Prevailing Bidder.  A break-up fee is an important tool to be used to encourage bidding.

36.     The Break-Up Fee provides the incentive required to induce a Qualified Bidder to submit or increase its bid prior to the date the Debtors are required to designate a Substitute Stalking Horse.  To the extent bids can be improved prior to this date, a higher floor is established for further bidding.  Thus, even if the Stalking Horse Bidder is granted the Break-Up Fee and ultimately is not the Prevailing Bidder, the Debtors and their estates will have benefited from the higher floor established by the improved bids.  The Debtors submit that the proposed

procedures for later awarding the Break-Up Fee will not chill bidding – instead, it will only be offered if the Debtors receive a Bid that is worthy of such protection.

37.     The Break-Up Fee, to the extent offered by the Debtors and approved by the Court would be: (a) commensurate to the benefit conferred on the Debtors' estates by the Substitute Stalking Horse Bidder, and (b) reasonable and appropriate in light of, among other things (i) the size and nature of the Asset sale contemplated and comparable transactions, (ii) the substantial efforts that will need to be expended by the Substitute Stalking Horse Bidder, (iii) the benefits will have provided to the Debtors' estate, their creditors and other parties in interest, notwithstanding that the Substitute Stalking Horse Bidder's bid may be terminated by the Debtors if any higher or otherwise better transaction is identified and consummated at the conclusion of the Auction, and (c) likely to induce the Substitute Stalking Horse Bidder to serve as a "stalking horse" bidder and to continue to pursue the Asset sale transaction.

38.     The Debtors believe, based on their reasoned business judgment, that their ability to designate an Substitute Stalking Horse Bidder to serve as a "stalking horse" would enhance their ability to maximize value without chilling bidding.  The presence of the ability to later offer a Break-Up Fee, first and foremost, signifies the existence of a contractually-committed bidder at a floor price believed to be fair and reasonable.  In addition, such an incentive provides the Debtors with the upside opportunity of potentially receiving a higher or otherwise better offer which, absent such a bid floor, might not otherwise be realized.  Further, the Debtors believe, based on their reasoned business judgment, that the amount of the Break-Up Fee would be reasonable and appropriate relative to the commitments made and resources expended by the Substitute Stalking Horse Bidder.  If the Break-Up Fee were to be paid, it will be because the Debtors have received a higher or otherwise superior offer.

39.     Outside the bankruptcy context, courts routinely uphold the business judgment of boards that approve break-up fees that are designed to maximize value and do not chill the auction process.  Such fees are presumptively appropriate under the business judgment rule and non-bankruptcy courts rarely rule on their propriety. *See, e.g., Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't. Stores*, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614 (S.D.N.Y. 1987); *Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*, 729 A.2d 280 (Del. Ch. 1998); *Kysor Indus. Corp. v. Margaux, Inc.*, 674 A.2d 889, 897 (Del. 1996) (explaining that termination fees are not unusual in merger context).

40.     Similarly, bankruptcy courts generally defer to the debtor's business judgment in approving a reasonable break-up fee and such fees are commonplace in complex chapter 11 cases.  *See, e.g., In re ATP Oil & Gas Corporation*, Case No. 12-36187 (Bankr. S.D. Tex. 2013) (3.0% break-up fee approved); *In re Deep Marine Holdings,* Case No. 09-39313 (Bankr. S.D. Tex. April 12, 2010) (3.0% break-up fee approved); *In re Davis Petroleum Corp.*, Case No. 06-20152 (Bankr. S.D. Tex. 2006) (2.5% break-up fee approved); *In re Adelphia Commc'n Corp.*, Case No. 02-41729 (Bankr. S.D.N.Y. 2007) (2.5% break-up fee approved); *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. 2003) (3.0% break-up fee approved).

*(4)     The Proposed Sale Notice and Assignment Notice and Proposed Dates for the Sale Objection Deadlines, the Contract Objection Deadlines and the Prevailing Bidder Sale Hearing Are Appropriate*

41.     Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the time and place of the Prevailing Bidder Sale Hearing, the terms and conditions of the sale and the deadline for filing any objections related thereto.  The Debtors submit that the Sale Notice fully complies with Bankruptcy Rules 2002(a) and (l) and includes adequate information to (a) enable interested

parties to bid on the Assets pursuant to the Bidding Procedures and by the Bid Deadline, and (b) inform such parties of the Prevailing Bidder Sale Hearing and the relevant Sale Objection Deadline related thereto (collectively, the "**Notice Objectives**").

42.     The Debtors submit that the proposed Sale Objection Deadline is reasonable and appropriate under the circumstances.   Parties in interest are provided adequate notice in accordance with the Bankruptcy Rules and the Local Rules.

43.     The Debtors submit that the notice to be provided via the Assignment Notice is reasonably calculated to provide all counterparties to the Potential Designated Contracts with proper notice of the potential assumption and assignment of their executory contracts or unexpired leases, any Cure Costs relating thereto and the Contract Procedures, including, but not limited to, the Contract Objection Deadlines. As such, the proposed Assignment Notice is appropriate and sufficient under the circumstances.

44.     The Debtors submit that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitutes good and adequate notice of the Bidding Procedures and the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadlines; and (d) the Prevailing Bidder Sale Hearing.   Therefore, the Debtors respectfully request this Court to approve the proposed notice procedures.

**B.     Approval of the Proposed Sale Is Appropriate and In the Best Interests of the Debtors' Estates and Creditors**

*(1)     The Sale of the Assets is Within the Sound Business Judgment of the Debtors and Should be Approved*

45.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." *See* 11 U.S.C. § 363(b)(1); *see also Cajun Elec. Power Coop., Inc. v. Official Comm. of Unsecured Creditors (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997). A debtor must demonstrate sound business judgment for a sale of assets outside the ordinary course of business. *See, e.g., Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986). Pursuant to section 105(a), a bankruptcy court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *See* 11 U.S.C. § 105(a).

46. The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with a sale of the Assets to the Prevailing Bidder, if any, is based upon sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

47.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152,154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctrs. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

48.    The Debtors submit that more than ample business justification exists to sell the Assets to Horizon or the Prevailing Bidder, as the case may be, pursuant to the Bidding Procedures, thereby satisfying the first prong of *Abbotts Dairies* and that further justification for the sale of the Assets will be demonstrated at both the Horizon Sale Hearing and the Prevailing Bidder Sale Hearing.  In addition, the Debtors believe that the Bidding Procedures are the best method by which they can obtain the most value for the Assets and provide interested parties with accurate and reasonable notice of the Asset sale.  The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and competitive fashion that will encourage

participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Assets by helping ensure a competitive and fair bidding process.

49.     The Debtors believe the sale of their Assets must occur quickly in order to maximize the value of their estates, and that significant time spent in Chapter 11 increases the real and palpable risk of business loss and value deterioration.   The Debtors' liquidity is constrained and they have little ability to invest in their businesses.   Absent a prompt sale of the Assets pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Assets will be significantly compromised because the Debtors lack the financing necessary to fulfill certain pending or recently obtained projects to produce the cash flow necessary to maximize their potential revenues.

50.     Finally, the Interim DIP Order requires that the Debtors consummate a sale of their Assets by March 4, 2014 if no Substitute Stalking Horse Bidder or Substitute DIP Lender can be found; April 14, 2014 in the event the Debtors timely designate a Stalking Horse Bidder; or May 14, 2014 in the event the Substitute DIP Closing timely occurs.   Therefore, it is imperative that the Debtors complete a sale of the Assets as early on in these Chapter 11 Cases as possible.   The Debtors respectfully submit that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of the Debtors and their stakeholders.

51.     In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Assets in the past year.   Accordingly, the proposed sale of the Assets satisfies the second prong of the *Abbotts Dairies* standard.

52.     The Bidding Procedures are also designed to maximize the value received for the Assets.  The process proposed by the Debtors provides bidders ample time and information to submit a timely bid, while maximizing the sale of the Assets as a going-concern.  Along with the Debtors' marketing process, the Bidding Procedures are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price.   The Debtors are subjecting the value of the Assets to market testing and permitting Qualified Bidders to bid on the Assets at the Auction, thereby subjecting the proposed sale to a market check through the solicitation of competing bids in a court-supervised process. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable thereby satisfying the third prong of the *Abbotts Dairies* standard.

(2)     *The Prevailing Bidder Should Be Entitled to "Good Faith" Purchaser Protection Under Section 363(m) of the Bankruptcy Code*

53.     The Debtors request that the Court find that Horizon or the Prevailing Bidder, as applicable, are each entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

54.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased **. . .** such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

55.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors

and the potential purchaser to act in good faith in negotiating the sale of the Assets and the assignment of the Potential Designated Contracts related thereto.

56.     Although the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147; *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct in the course of the sale proceedings") (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

57.     Here, the sale of the Assets and the assignment and/or transfer of the Potential Designated Contracts will be in good faith.  As discussed throughout this Motion, and as will be further demonstrated at the Horizon Sale Hearing or the Prevailing Bidder Sale Hearing, any sale agreement will be the culmination of a negotiation process in which all parties will be represented by counsel and all negotiations have been and will continue to be conducted on an arm's-length, good faith basis.

58.     Moreover, the Debtors will not choose a Prevailing Bidder whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and would be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.  Finally, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.

Under the circumstances, the Prevailing Bidder should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

59.     All parties in interest will receive notice of the Asset sale pursuant to the Sale Notice and will be provided with an opportunity to be heard.  Additionally, all counterparties to Potential Designated Contracts will be provided notice of assumption, and assignment and any proposed Cure Costs associated therewith and an opportunity to be heard pursuant to the Assignment Notice.  The Debtors submit that such notice is adequate for entry of the Prevailing Bidder Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

> (3)     *The Proposed Asset Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code*

60.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck*

*Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

61.     The Debtors submit that the sale of the Assets will satisfy the requirements of section 363(f) of the Bankruptcy Code.   For example, the Debtors will provide all parties asserting Claims against the Assets, including, but not limited to, all creditors and interest holders of the Debtors, with notice of, and an opportunity to object to, the sale of such Assets. Absent objection, each such party will be deemed to have consented to the sale of the Assets.  In addition, the Debtors believe that certain of the parties asserting Claims against the Assets could be compelled to accept a monetary satisfaction of such interests.  Finally, any Claim against the Assets will attach to the net proceeds of the Asset sale with the same validity and in the relative priorities established under the Interim DIP Order and applicable nonbankruptcy law. Accordingly, approval of the sale of the Assets free and clear of all Claims is warranted.

    *(4)*     *The Non-Debtor Counterparties are Adequately Protected and Assumption and Assignment of Potential Designated Contracts is a Sound Exercise of  the Debtors' Business Judgment*

62.     To facilitate and effectuate the sale of the Assets, the Debtors seek authority to assume and assign various Potential Designated Contracts to the Prevailing Bidder to the extent required by such Prevailing Bidder under the Contract Procedures.   Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act

section 77 subsection (b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. National Fuel Gas Dist. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re AbitibiBowater, Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009).

63.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

64.     The Prevailing Bidder may desire to take assignment of certain executory contracts and unexpired leases related to the Assets. To the extent Potential Designated Contracts are identified for assumption and assignment, the Debtors believe that it can and will demonstrate that all requirements for assumption and assignment of the Potential Designated Contracts will be satisfied at the Prevailing Bidder Sale Hearing. The Debtors, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Assets

and assuming and assigning to the Prevailing Bidder the Potential Designated Contracts would be in the best interests of their estates.  Moreover, the Debtors will provide all parties to the Potential Designated Contracts an opportunity to be heard pursuant to an Assignment Notice in accordance with the Contract Procedures.  Finally, the Debtors propose to satisfy all amounts due and owing under the Potential Designated Contracts in accordance with the Contract Procedures. Thus, the Debtors request that the assumption and assignment of the Potential Designated Contracts be approved.

## WAIVER OF THE CERTAIN REQUIREMENTS OF LOCAL SALE GUIDELINES

65.    Section B(1)(c) of the "Guidelines for Early Disposition of Assets in Chapter 11 Cases the Sale of Substantially All Assets in Chapter 11 Cases and Overbid and Topping Fees" (the "Sale Guidelines").   As set forth above, the Debtors and their professionals have commenced an aggressive marketing of the Assets.   Nevertheless, the terms of the sale of the Assets, including, in particular, the potential distribution of Assets among lots, potential bases to calculate the purchase price of such Assets, and the extent of assumed liabilities, are uncertain to the Debtors as of the date hereof.  Any such forms the Debtors might submit at this time would be merely generic in nature, rather than based on any actual transaction or terms being proposed. Ultimately, the transaction(s) and term(s) proposed could differ materially from any speculative forms presented at this time.   Consequently, submitting these forms now would be counterproductive and could confuse potential bidders and other interested parties and could have a chilling effect on bidding.[3]  Accordingly, the Debtors request a waiver of the provisions of Local Rule 6004-1 to the extent applicable.

---

[3]As set forth above, pursuant to the Bidding Procedures, the Debtors intend to file with the Court and serve on interested parties any APA entered into with a potential stalking horse Bidder and, prior to entering into such an APA, may file and serve a form APA.  In addition, following any designation of a Prevailing Bid, such Bid

## REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)

66.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Bidding Procedures Order and the Prevailing Bidder Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

67.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Banks. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy ¶ 6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.

## NOTICE

68.     As of the date hereof, no trustee, examiner, or creditors' committee has been appointed in the Debtors' Chapter 11 Cases.  Notice of this Motion has been given to the

---

(including the applicable APA) will be filed with the Court and served on interested parties.  As such, notice of the terms of any APA will be provided to interested parties prior to approval of any Sale.

following parties or, in lieu thereof, to their counsel, if known: (a) the U.S. Trustee; (b) counsel to the DIP Lender; (c) counsel to any official committee appointed in these Chapter 11 Cases; (d) all parties that have filed a request for notice pursuant to Bankruptcy Rule 2002; (e) all parties who are known by the Debtors to assert Claims with respect to the Assets, including, but not limited to, all known creditors and interest holders of the Debtors; (f) the United States Attorney's office; (g) all state attorneys general in states in which the Assets are located; (h) the Internal Revenue Service; (i) for each state in which the Assets are located, the applicable taxing authorities; and (j) the U.S. Environmental Protection Agency and similar state agencies. In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court: (a) enter the Bidding Procedures Order in substantially the form attached hereto as Exhibit A, (i) approving bidding procedures in connection with the sale of substantially all of their assets by public auction; (ii) scheduling a hearing to consider the sale of assets; and (iii) approving the form and manner of notice thereof; (b) enter the Horizon Sale Order or the Prevailing Bidder Sale Order depending on circumstances set forth in this motion, in a form to be determined, (i) authorizing and approving the sale of Assets free and clear of Claims and (ii) approving the assumption and assignment of the Potential Designated Contracts; and (c) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  January 24, 2014
      Austin, Texas

                 Respectfully submitted,

***JORDAN, HYDEN, WOMBLE, CULBRETH &
HOLZER, P.C.***

<u>*/s/ Shelby A. Jordan by N.P. Holzer*</u>
Shelby A. Jordan
Texas Bar No. 11016700
100 Congress Ave., Suite 2109
Austin, TX 78701
Telephone:   (512) 469-3537
Facsimile:    (361) 888-5555

Nathaniel Peter Holzer
Texas Bar No. 00793971
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX 78401-0341
Telephone:   (361) 884-5678
Facsimile:    (361) 888-5555

Antonio Ortiz
Texas Bar No. 24074839
1534 E. 6th Street, Suite 104
Brownsville, TX 78520
Telephone:   (956) 542-1161
  Telecopier:   (956 ) 542-0051

**PROPOSED ATTORNEYS FOR DEBTORS-IN-
POSSESSION**

**<u>EXHIBIT A</u>**

*[Proposed Bidding Procedures Order]*