**Granted after final hearing on 2/21/14.**



## IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.

## Dated: February 21, 2014.

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| In re | § | |
| **XTREME POWER INC.,** | § | **CASE NO. 14-10096** |
| **XTREME POWER SYSTEMS, LLC, and** | § | **CASE NO. 14-10095** |
| **XTREME POWER GROVE, LLC** | § | **CASE NO. 14-10097** |
| **Jointly Administered Debtors.** | § | **CHAPTER 11** |
| | § | **(Jointly Administered Under** |
| | § | **CASE NO. 14-10096)** |

### FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507
### (A) AUTHORIZING POST-PETITION FINANCING, AND
### (B) GRANTING ADEQUATE PROTECTION, AND
### (C) GRANTING RELATED RELIEF

THIS MATTER having come before the Court upon the motion (the "DIP Motion") of Xtreme Power Inc., Xtreme Power Grove, LLC, and Xtreme Power Systems, LLC (collectively, the "Debtors" or "Borrowers"), in the above-captioned chapter 11 cases (collectively, the "Cases") pursuant to Sections 105, 361, 362, 363, 364(c), 364(d) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the Western District of Texas, Austin Division (the "Local Rules"), seeking, among other things:

(i)     authorization for the Debtors to obtain a secured post-petition debtor-in-possession financing facility (the "DIP Credit Facility" or "DIP Loan") from Horizon Technology Finance Corporation or an affiliated designee ("Lender") pursuant to the terms and conditions set forth in that certain term sheet attached hereto as Exhibit B  (the "DIP Term Sheet")[1] and to the terms and conditions of other definitive documentation in form and substance satisfactory to Lender and otherwise consistent with the DIP Term Sheet (the "DIP Documents");

(ii)     authorization for the Debtors to execute and deliver the DIP Documents and to perform such other and further acts as may be required in furtherance of the DIP Credit Facility and the DIP Documents;

(iii)     authorization for the Debtors to draw on the DIP Credit Facility in an amount not to exceed the DIP Availability (as defined below), subject to the conditions precedent set forth in the DIP Term Sheet, and to use proceeds of the DIP Credit Facility to pay for, among other things, working capital and general corporate purposes of the Debtors and the administration of the Cases, but only in accordance with the then-current Approved Budget (as defined in the DIP Term Sheet, a copy of the current Approved Budget is attached hereto as Exhibit A);

(iv)     the granting of adequate protection to the Silicon Valley Bank ("SVB"), and the Lender on account of their respective pre-petition liens, claims, and security interests being primed by the DIP Credit Facility;

(v)     granting the DIP Credit Facility and all obligations arising thereunder (collectively, the "DIP Obligations") allowed superpriority administrative expense claim status in the Cases pursuant to 11 U.S.C. § 364(c)(1);

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Term Sheet or the DIP Motion.  To the extent of any inconsistency, the meanings ascribed in the DIP Term Sheet shall govern.

(vi)     granting to the Lender automatically perfected first-priority security interests in and liens on all of the Collateral (as defined below) to secure all DIP Obligations pursuant to 11 U.S.C § 364(c)(2),(3) and (d);

(vii)    modifying the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to provide Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Term Sheet.

NOW THEREFORE, the Court having considered the DIP Motion, the exhibits attached thereto, the DIP Term Sheet, and the evidence submitted at the Final Hearing; and due and appropriate notice of the DIP Motion, the relief requested therein, and notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001, and 9014; and the Final Hearing to consider the relief requested in the DIP Motion having been held and concluded; and all objections, if any, to the final relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the final relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     **Cases**.  On January 22, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the entry of this Final Order, the Court has not appointed a trustee or examiner.

B.     **Jurisdiction and Venue**.  This Court has jurisdiction over the DIP Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtors' Chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(1).

C.     **The Pre-Petition Senior Debt**.   Subject to the right of the Official Committee of Unsecured Creditors' (the "Committee") right to examine and object to the amount, validity and priority of the  pre-petition claims and liens asserted by Lender and Silicon Valley Bank as provided in paragraph ___ below, prior to the Petition Date, the Debtors and Lender were parties to a Secured Promissory Note dated September 28, 2012 (the "Pre-Petition Note").  As of the bankruptcy filing date, the outstanding amount under the Pre-Petition Note was approximately $6.8 million (the "Pre-Petition Lender Debt")  Pursuant to a Venture Loan and Security Agreement, as amended, the Pre-Petition Lender Debt is secured by substantially all of the Debtors' assets (the "Pre-Petition Lender Security").  The Debtors and Silicon Valley Bank were parties to a Loan and Security Agreement dated April 18, 2011 (the "SVB Loan").  As of the bankruptcy filing, the outstanding amount under the SVB Loan was approximately $500,000 (the "SVB Debt").  The SVB Debt is secured by substantially all of the Debtors' assets (the "SVB Security" and together with the Pre-Petition Lender Security, the "Existing Security Interests").  The SVB Security is senior to the Pre-Petition Lender Security. The Pre-Petition

4

Lender Debt, together with the DIP Obligations and all other post-petition amounts owed by Debtors to Lender, constitute the "Obligations".  The Committee shall have until March 18, 2014 to file an objection or adversary proceeding objecting to the pre-petition claim of Lender and Silicon Valley Bank (the "Committee Reservation"). In the event that no objection or adversary proceeding is timely filed, the findings contained in this paragraph shall be binding on the Committee. In the event that that Committee timely files such an objection or adversary proceeding, such findings shall not bind the Committee and shall be subject to further orders of this Court.

D.    **Unsecured Credit Unavailable**.    Since prior to the commencement of these cases, the Debtors have been confronted with the significant challenge of securing funding to pay for the expenses of the operation of their businesses as well as for the administration of their estates.  The DIP Credit Facility will ensure that the Debtors have the funds necessary to pay taxes and salaries, and to the extent possible, to preserve the Debtors' going concern value through the contemplated sale process.  The Debtors' regular cash flow is not sufficient to pay the ongoing operating and administrative expenses.  The Debtors' financial advisor, the Gordian Group, was unable to obtain financing on behalf of the Debtors on an unsecured basis or on better terms as the terms under the DIP Credit Facility.  Accordingly, the Debtor cannot obtain funds on an unsecured basis or on any other bases other than the terms of the DIP Credit Facility.

E.    **Sound Business Judgment**.  The Debtors negotiated the DIP Credit Facility at arms' length and in accordance with their sound business judgment.    The financing contemplated by the DIP Credit Facility benefits the Debtors' estates.  With the credit provided under the DIP Credit Facility, the Debtors can preserve the enterprise value of the estates.

Without the financing furnished by the DIP Credit Facility, the entire reorganization, refinancing, and/or sale effort will be jeopardized.

F. **Irreparable Harm**. The Debtors currently require the immediate and continued use of the financing provided by the DIP Credit Facility in order to complete the sale process as approved by the Court in the Bidding Procedures Order. It is essential that the Debtors continue to stabilize their operations and pay for ordinary, post-petition operating expenses. It is anticipated that the estates will need the amounts set forth in the Approved Budget to finance their operations in Chapter 11 through the end of March 2014. Absent immediate and continued use of the DIP Availability, the Debtors will be unable to pay ongoing operational expenses. Consequently, if relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of the Debtors' estates, their creditors and other parties in interest.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1. <u>Final Financing Approved</u>. The DIP Motion is granted on a final basis in accordance with the terms of this Final Order.

2. <u>Objections Overruled</u>. All objections to the DIP Motion, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.

3. <u>Authorization of the DIP Credit Facility</u>. The Debtors are expressly and immediately authorized to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Term Sheet and to execute the DIP Loan Documents, which are expressly approved and incorporated herein by reference. The DIP

Availability (defined below) is hereby approved upon the terms and conditions set forth herein and in the DIP Term Sheet and DIP Loan Documents upon execution. The DIP Obligations shall represent valid and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms.

4.     <u>Authorization to Execute Documentation</u>.  The Debtors are hereby authorized to execute, enter into, and deliver the DIP Documents and all instruments and documents which may be required or reasonably necessary for the performance by the Debtors under the DIP Credit Facility and the creation and perfection of the DIP Liens (as defined herein) as described in and provided for by this Final Order and the DIP Term Sheet, including, without limitation, the Amended and Restated Postpetition Financing and Security Agreement, a true and accurate copy of which is attached hereto as <u>Exhibit C</u> and incorporated by this reference ("<u>DIP Financing Agreement</u>").  Pending the execution of the DIP Documents, the DIP Term Sheet and this Final Order shall evidence the validity and binding effect of the Debtors' DIP Obligations and shall govern the financial accommodations to be provided to the Debtors by Lender.

5.     <u>Authorization to Borrow</u>.  Subject to the terms, conditions, limitations on availability set forth in the DIP Term Sheet, the DIP Documents, the DIP Financing Agreement, and this Final Order, and in order to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to request, and Lender is authorized to provide, funding in accordance with the Approved Budget for the period from the Petition Date through February 21, 2014, and, upon entry of this Final Order, then through April 4, 2014, for a total amount of up to $2,892,806.45 (the "<u>DIP Availability</u>").

6.     <u>No Obligation to Extend Credit</u>. The Lender shall have no obligation to make any loan or advance under the DIP Term Sheet, unless all of the conditions precedent to the

making of such extension of credit under the DIP Term Sheet and this Final Order have been satisfied in full or waived by the Lender in its sole discretion.

7. <u>Use of DIP Credit Facility Proceeds</u>. From and after the Petition Date, the Debtors shall use advances under the DIP Credit Facility only for the purposes specifically set forth in this Final Order, the DIP Term Sheet, the DIP Documents, the DIP Financing Agreement and in compliance with the Approved Budget. Notwithstanding anything to the contrary, in no event shall the proceeds of the DIP Credit Facility be used (A) for any purpose that is not permitted under the Final Order; and (B) in a manner not consistent with the Approved Budget.

8. <u>Superpriority Claims</u>. Pursuant to Section 364(c)(1) of the Bankruptcy Code, but subject to the Carve-Out (as defined below), all of the DIP Obligations shall constitute allowed superpriority administrative expense claim against each of the Debtors (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtors or their estates in the Cases, at any time existing or arising, of any kind or nature whatsoever, including without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, any successor trustee or other estate representative and any creditor or other party in interest to the extent permitted by law.

9.    <u>DIP Liens</u>.  As security for the DIP Obligations, effective and perfected upon January 24, 2014, the date upon which the Court approved the Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Lender or its agents over any Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to Lender subject only to the Carve-Out (defined below):

(a)    pursuant to section 364(c)(1) of the Bankruptcy Code, a perfected lien on all Collateral (as defined below) with priority over any or all administrative expenses of the kind specified in sections 503 (b) or 507 (b) of the Bankruptcy Code;

(b)    pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first-priority lien on all currently-owned or hereafter acquired assets and property, including without limitation all real and personal property, plant and equipment, accounts receivable and inventory, intellectual property, claims, and any proceeds thereof, and any rights to receive proceeds or distributions from any affiliates or subsidiaries, of the Borrowers (the "<u>Collateral</u>"), to the extent that such Collateral is not subject to valid, perfected, and non-avoidable liens as of the commencement of the Bankruptcy Cases. Without limiting the generality of the foregoing, the Collateral shall include a fully perfected security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Borrowers (save and except causes of action, including but not limited to Chapter 5 causes of action, lawsuits identified in the Debtors' bankruptcy schedules, and commercial tort claims), including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, fixtures, leasehold interests and real property interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles, investment property, and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds;

(c)    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected lien on all Collateral, subject only to valid, perfected and non-avoidable liens and in favor of third parties and in existence as of the commencement of the Bankruptcy Cases, or to valid and non-avoidable liens in favor of third parties and in existence at the time of such commencement that are

subsequently perfected as permitted by section 546(b) of the Bankruptcy Code (other than liens securing the Existing Indebtedness, which liens shall be primed as set forth below by a lien pursuant to section 364(d) of the Bankruptcy Code).

(d)     pursuant to section 364(d) of the Bankruptcy Code, a senior secured perfected lien on all Collateral, senior to any and all valid, perfected and non-avoidable liens in existence as of the commencement of the Bankruptcy Cases, or to valid and non-avoidable liens in favor of third parties and in existence at the time of such commencement that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code; provided, however, that ad valorem tax liens are expressly not subject to any priming lien provided under the terms of this Final Order; and provided further that certain cash security held by SVB ("SVB LC Collateral") to secure certain exposure it may have in connection with the Duke LC (as defined below) is expressly not subject to any priming lien provided under the terms of this Final Order; and provided further that the lien of Zuniga under the terms of that certain deed of trust on the Debtor's Kyle, Texas facility is also expressly not subject to any priming lien under the terms of the Interim Order or this Final Order but such collateral is expressly subject to a junior lien in favor of the DIP Lender pursuant to section 364(c)(3) as described in the immediately preceding subparagraph(c).

Lender shall not be required to marshal the Collateral, and shall be authorized to foreclose on and liquidate any of the Collateral as consistent with the DIP Term Sheet, in any manner or order in the Lender's sole and absolute discretion.

10.     Perfection of DIP Liens. This Interim Order and this Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted to the Lender herein, including the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any lockbox or deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the Lender to the priorities granted herein. Notwithstanding the foregoing, the Lender is authorized to file, as it in its sole discretion deems necessary, such financing

statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices, other documents, and approvals shall be deemed to have been filed or recorded as of the Petition Date; *provided, however,* that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the Lender all such financing statements, mortgages, notices and other documents as the Lender reasonably request.  The Lender in its discretion may file a photocopy of the Interim Order and/or this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

11.     <u>Limitation on Charging Expenses Against Collateral</u>. Except to the extent of the Carve-Out (as defined below), no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral or the cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of Lender.

12.     <u>Carve-Out</u>.  Each of the liens and claims, including superpriority administrative expense claims granted to the Lender in connection with the DIP Credit Facility under this Final Order shall be subject only to a carve-out (the "<u>Carve-Out</u>") for the following: (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6), and (b) allowed fees and expenses incurred by Court-approved estate professionals retained pursuant to sections 327, 328 and 1103 of the Bankruptcy Code (together "Estate Expenses"); provided, however, for

each weekly advance by the Lender under the DIP Credit Facility, the Carve-Out for professional fees shall be reduced (dollar for dollar) by the amount of legal and professional fees and expenses funded pursuant to the amounts set forth in the Approved Budget for the week corresponding to such advance; provided, further that the Carve-Out shall continue to apply to funds advanced to the Debtors for purposes of paying professional fees under the Approved Budget, but which have not yet been disbursed. Nothing herein shall be construed to affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described above. Following an Event of Default, the Lender shall advance up to $100,000.00 for professional fees incurred by Court-approved estate professionals retained pursuant to sections 327, 328 and 1103 of the Bankruptcy Code after such Event of Default, but only to the extent that amounts previously advanced by Lender for the purpose of paying budgeted legal or professional fees together with retainers previously paid are insufficient to satisfy the allowed amount of such post default fees. The Debtor shall maintain in a segregated account all funds advanced under the DIP Credit Facility for the Estate Expenses and the funds in the segregated account are designated specifically for only the person for whom they were advanced under the Approved Budget, subject only to approval for payment by an order of the Bankruptcy Court for estate professionals.

13.     In addition, notwithstanding anything to the contrary contained in this Final Order, and irrespective of existing retainers, in no event shall Lender be obligated to fund any budgeted expense, including any claim to surcharge the collateral under 11 U.S.C. § 506(c) and including legal or other professional fees except at such time and in such amounts as are set

forth in the Approved Budget, provided that in no event shall Lender be obligated to fund any expense if doing so would, when combined with the amounts advanced by the Lender under the DIP Credit Facility, exceed the aggregate principal amount of the DIP Credit Facility.

14.     Adequate Protection.  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, SVB and the Lender are entitled to adequate protection of their Existing Security Interests.  The Court hereby determines that the Lender's agreement to purchase the Debtors' assets for at least the amount of SVB's indebtedness and the requirement that any subsequent bidder's bid must be at least in the amount of SVB's indebtedness (plus the Lender's pre and post-petition indebtedness) constitutes adequate protection of SVB's interest Existing Security Interests.  Further, SVB and the Lender are hereby granted the following protections:

(a)     *Adequate Protection Lien*.  As security for, and solely to the extent of any diminution in value of the Existing Security Interests, effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on the Collateral, subject and subordinate only to the Carve-Out and the DIP Liens;

(b)     *Superpriority Claim*.  To the extent of any post-petition diminution in value of the Existing Security Interests, a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, provided however that this claim shall be junior in all respects to the Carve-Out and the claims under sections 364(c)(1)(2)(3) and (d) of the Bankruptcy Code of the Lender arising under the DIP Documents;

(c)     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral or the cash Collateral (which are subject to the Existing Security Interests) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of SVB or the Lender.

(d) *Financial Reporting*.  The Borrowers shall continue to provide SVB and the Lender with financial and other reporting in accordance with the terms of their existing loan documents.  Such reports shall also be served upon counsel for the Committee. Any additional reporting to which Lender is entitled under this Final Order shall also be provided to SVB and the Committee by the Debtors.

(e) *Stay Relief as to the SVB LC Collateral*.  In the event that the nondebtor counterparty to that certain letter of credit by and between SVB, the Debtor, and Duke Energy (the "Duke LC") exercises its rights to draw upon the Duke LC and SVB determines that it is obligated to pay, and does in fact pay as a consequence of such exercise, then the automatic stay of Section 362 is hereby automatically lifted, and SVB is expressly authorized to apply such funds from the SVB LC Collateral as are necessary to offset the amount drawn on the Duke LC.

15.  <u>Maturity</u>:      The DIP Loan shall mature and be immediately due and payable in full, and the Lender shall have no further obligation to make advances under the DIP Credit Facility nor shall SVB have any further obligation to make advances under its loan to Borrower and the Borrowers shall have no further use of Cash Collateral or the DIP Credit Facility or any funds previously advanced thereunder or under the SVB Loan (the "<u>Term</u>"), upon the earliest to occur of the following events, at Lender's or SVB's sole election with respect to their respective loans:

(a) the occurrence of a Default or an Event of Default (as defined in the DIP Term Sheet, DIP Documents, or the DIP Financing Agreement), in which case, to the extent permitted by applicable law:

i. the Lender and SVB has no further obligation to make advances under the DIP Credit Facility and, except for the Carve Out, the Borrowers shall have no use of Horizon's cash collateral or the DIP Credit Facility or any funds previously advanced thereunder;

ii. after five (5) business days' notice, served by overnight delivery service or email upon the Borrowers, the Borrowers' counsel, counsel for the Committee, and the United States Trustee (the "<u>Required Notice</u>"), all of the indebtedness (including without limitation, the Pre-Petition Lender Debt and the amount of the DIP Availability advanced

to the Debtors) to the Lender and SVB shall become immediately due and payable;

iii. after the Required Notice, the Automatic Stay of Section 362 of the Code shall be automatically and completely vacated as to the Lender and SVB without further order of the Bankruptcy Court; and

iv. after the Required Notice, the Lender and SVB, without further notice, hearing, or approval of the Bankruptcy Court, shall be authorized, at its option, to take any and all actions, and remedies that the Lender or SVB may deem appropriate to proceed against, take possession of, protect, and realize upon the collateral and any other property of the estates of the Borrowers upon which the Lender or SVB has been or may hereafter be granted liens and security interests to obtain repayment of the indebtedness to the Lender and SVB.

v. the Lender and SVB shall have the relief set forth above unless the Borrowers, the Committee, or other party in interest, contest the occurrence of an Event of Default and the Bankruptcy Court determines the same prior to the expiration of the five (5) business days after the Required Notice. Lender and SVB consent to an expedited hearing or less than 5 days for the purpose of determining any such contested Default, Event of Default or the adequacy of any Required Notice.

(b)     the indefeasible payment in full of the Obligations owing to the Lender;

(e)     March 20, 2014, if no Auction shall have occurred on or prior to that date;

(f)     March 31, 2014, if no Prevailing Bidder Sale Hearing shall have occurred on or prior to that date;

(g)     the sale of Borrowers, collectively or individually, to any purchaser; or

(h)     April 4, 2014.

Upon the expiration of the Term, all outstanding principal and interest incurred or advanced post-petition and pre-petition shall be due and payable.

16.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order</u>. The Lender has acted in good faith in connection with this Final Order and its reliance on this Final Order is in good faith. Based on the findings set forth in this Final

Order and the record made during the Final Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the Lender is entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Subject to the Committee's Reservation, any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or any lien, claim or priority authorized or created hereby. Any liens or claims granted to the Lender hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

17. _Proofs of Claim_. The Lender will not be required to file proofs of claim in any of the Cases for any claim allowed herein in relation to the DIP Credit Facility. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the to the contrary, the Lender is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim in the Cases for any claim allowed herein in relation to the DIP Credit Facility.

18. _Limitations on the DIP Credit Facility and the Collateral_. The DIP Credit Facility and the Collateral may not be used in connection with: (a) preventing, hindering, or delaying any of the Lender's and SVB's enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) using or seeking to use any Cash Collateral or selling or otherwise disposing of the Collateral without the prior written consent of the Lender; (c) using or seeking to use any insurance proceeds constituting Collateral without the prior written consent of the Lender and SVB; (d) incurring indebtedness without the prior written consent of

16

the Lender and SVB, except to the extent permitted under the DIP Term Sheet; (e) objecting or challenging in any way any claims, liens, Collateral, as the case may be, held by or on behalf of the Lender and SVB; (f) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Lender and SVB or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; or (g) prosecuting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other rights or interests of the Lender and SVB.

19.    <u>Effect of Stipulations on Third Parties</u>.  Subject to the right of the Committee to file timely objections as provided in paragraph C of this Final Order, each stipulation, admission, and agreement contained in this Final Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any Chapter 7 or Chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all claims, defenses, and causes of action against the Lender and SVB as of the date of entry of this Final Order. Notwithstanding the foregoing, with respect only to the Lender's pre-petition loans and claims and the Existing Security Interests securing such loans and claims, any Committee and/or third parties shall have forty-six (46) days from the date of the Interim Order to: (i) object to the amount, validity, and/or priority of Lender's Existing Indebtedness and the liens or claims securing same; or (ii) file any affirmative claims or causes of action (including any avoidance claims) against Lender.  Failure to do so within forty-six (46) days of the Interim Order shall be

deemed a waiver of any and all such objections, claims and causes of action and the Existing Indebtedness shall be an allowed claim for all purposes.

20.  <u>Other Stipulations</u>.  The Stipulations entered into and filed with the Court in these cases as docket entries 61 and 138 respectively remain in full force and effect after entry of this Final Order and the terms of such stipulations are incorporated into this Final Order by this reference.

21.  <u>Modification of Automatic Stay</u>. The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to authorize the Debtors to pay, and Lender to retain and apply payments made, in accordance with the terms of this Final Order and the DIP Term Sheet.

22.  <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

23.  <u>Rights Preserved</u>. Entry of this Final Order is without prejudice to any and all rights of any official committees appointed in these Cases and any other party in interest with respect to any position, other than a challenge to this Final Order, which such parties or official committees deem appropriate to raise in the Case.

24.  <u>No Waiver by Failure to Seek Relief</u>. The failure of the Lender to seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Term Sheet, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

25.  <u>Binding Effect of Final Order</u>. Immediately upon execution by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the

benefit of the Debtors, the Lender, all other creditors of the Debtors, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Cases, or upon dismissal of the Case.

26.     <u>No Modification of Final Order</u>. Until and unless the DIP Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Credit Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Credit Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not, without the Lender's prior written consent, seek or consent to, directly or indirectly: (a) any modification, stay, vacatur or amendment to this Final Order; (b) the granting of any priority claim or administrative expense against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Case, equal or superior to the DIP Superpriority Claim, (c) the entry of any order allowing use of cash collateral resulting from Collateral; or (d) the granting any lien on any of the Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Term Sheet.  The Debtor irrevocably waives any right to seek any amendment, modification or extension of this Final Order without the Lender's prior written consent, and no such Lender consent shall be implied by any other action, inaction or acquiescence of the Lender.

27.     <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

28.     <u>Survival</u>.  The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the Lender pursuant to this Final Order

and/or the DIP Term Sheet, notwithstanding the entry of any such order, shall continue in the Case, or following dismissal of the Case, and shall maintain their priority as provided by this Final Order until all the DIP Obligations, pursuant to the DIP Term Sheet and this Final Order, have been indefeasibly paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Credit Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Credit Facility are terminated.

29.     <u>Bankruptcy Rule 7052</u>. The Findings and Conclusions set forth in this Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

30.     <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

####

**<u>Exhibit A</u>**

[Approved Budget]

# Revised DIP Budget

| Period | ACTUAL Jan22-Feb16 | FORECAST Feb17-23 | FORECAST Feb24-28 | FORECAST Jan/Feb | FORECAST Mar1-9 | FORECAST Mar10-16 | FORECAST Mar17-23 | FORECAST Mar24-31 | FORECAST Mar | FORECAST Apr1-4 | DIP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beg Cash** | $ 27.8 | $ 134.7 | $ 60.9 | $ 27.8 | $ 73.8 | $ 51.9 | $ 51.9 | $ 51.9 | $ 73.8 | $ 51.9 | $ 27.8 |
| **Cash Receipts** | | | | | | | | | | | |
| Awarded Project Receipts | | | | | | | | | | | |
| DIP Funding | $ 1,172.9 | $ 211.0 | $ 95.8 | $ 1,479.7 | $ 412.3 | $ 112.6 | $ 314.3 | $ 122.6 | $ 961.8 | $ 451.3 | $ 2,891.8 |
| O&M/Other Receipts | $ 42.7 | $ 21.9 | $ - | $ 64.6 | $ 32.0 | | $ - | $ - | $ 32.0 | | $ 96.6 |
| **Total Receipts** | $ 1,215.6 | $ 232.9 | $ 95.8 | $ 1,544.3 | $ 444.3 | $ 112.6 | $ 314.3 | $ 122.6 | $ 993.8 | $ 451.3 | $ 2,989.4 |
| **Recurring Monthly Expenses** | | | | | | | | | | | |
| Payroll | $ 254.4 | $ 110.7 | | $ 365.1 | $ 110.7 | | $ 110.7 | | $ 221.4 | $ 110.7 | $ 697.2 |
| Payroll - accrual | $ - | $ - | $ - | $ - | $ - | | $ - | $ - | $ - | $ 75.4 | $ 75.4 |
| Employee incentive | $ - | | | $ - | $ - | | $ - | | $ - | $ 110.7 | $ 110.7 |
| Insurance | $ 197.6 | $ 82.5 | | $ 280.1 | $ 75.0 | | $ 64.2 | | $ 139.2 | | $ 419.2 |
| Horizon Finance Fees | $ 75.0 | | | $ 75.0 | | | | | $ - | | 71.? |
| SVB Debt Service | $ 179.7 | | | $ 179.7 | $ 80.0 | | | | $ 80.0 | $ 67.9 | 327.? |
| Legal | $ 315.0 | $ 44.0 | $ 44.0 | $ 403.0 | $ 84.3 | $ 84.3 | $ 84.3 | $ 84.3 | $ 337.0 | $ 91.3 | $ 831.3 |
| Other estate professionals | $ - | $ 50.0 | $ 25.0 | $ 75.0 | $ 21.3 | $ 21.3 | $ 21.3 | $ 31.3 | $ 95.0 | $ 10.0 | $ 180.0 |
| Travel | $ - | $ 3.9 | | $ 3.9 | $ 15.0 | $ 0.9 | $ 0.9 | $ 0.9 | $ 17.6 | $ 0.9 | $ 27.5 |
| Rent | $ 39.7 | | | $ 39.7 | $ 19.8 | | | | $ 19.8 | $ 19.8 | $ 79.9 |
| Utilities | $ 3.1 | $ 9.3 | $ 6.5 | $ 18.9 | | | $ 8.2 | | $ 8.2 | | $ 27.1 |
| Teleco | $ 7.5 | $ 4.8 | $ 3.8 | $ 16.1 | | | $ 7.6 | | $ 7.6 | | $ 24.? |
| Taxes | $ 23.1 | | | $ 23.1 | $ 53.9 | | $ 9.5 | | $ 63.4 | | $ 86.5 |
| Grove Operating exp | $ - | | | $ - | | | | | $ - | | |
| Consultants | $ 1.1 | | | $ 1.1 | | | | | $ - | | |
| Equip Rentals | $ - | | $ 2.3 | $ 2.3 | | | $ 1.5 | | $ 1.5 | | |
| Other Vendors/exp | $ 12.6 | $ 1.6 | $ 1.3 | $ 15.5 | $ 6.3 | $ 6.3 | $ 6.3 | $ 6.3 | $ 25.0 | | $ 40.? |
| **Monthly Expenses** | $ 1,108.6 | $ 306.8 | $ 82.9 | $ 1,498.3 | $ 466.2 | $ 112.6 | $ 314.3 | $ 122.6 | $ 1,015.7 | $ 486.6 | $ 3,006.7 |
| **Ending Cash** | $ 134.7 | $ 60.9 | $ 73.8 | $ 73.8 | $ 51.9 | $ 51.9 | $ 51.9 | $ 51.9 | $ 51.9 | $ 16.5 | $ 16.5 |

February 20, 2014

Xtreme Power Confidential Information
© 2013 All Rights Reserved

1

# Legal and Other Estate Professional Fees

**Legal and Other Estate Professional Fees**

| Period | Jan 21-26 | Jan 27-Feb 2 | Feb 3-9 | Feb 10-16 | Feb 17-23 | Feb 24-28 | Jan/Feb | Mar 1-9 | Mar 10-16 | Mar 17-23 | Mar 24-31 | March | Apr 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jordan | $ 90,000 | $ 60,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 290,000 | $ 62,500 | $ 62,500 | $ 62,500 | $ 62,500 | $ 250,000 | $ 62,500 |
| Baker Botts | $ 15,000 | $ 12,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 63,000 | $ 6,750 | $ 6,750 | $ 6,750 | $ 6,750 | $ 27,000 | $ 10,000 |
| K&L Gates | | | | $ 50,000 | | | | | | | | | $ 18,750 |
| Fish and Richardson | | | | | | | | $ 6,250 | $ 6,250 | $ 6,250 | $ 6,250 | $ 25,000 | |
| Bracewell Guliiani | | | | | | | | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 35,000 | |
| **Total Legal Fees** | $ 105,000 | $ 72,000 | $ 44,000 | $ 94,000 | $ 44,000 | $ 44,000 | $ 353,000 | $ 84,250 | $ 84,250 | $ 84,250 | $ 84,250 | $ 337,000 | $ 91,250 |
| | | | | | | | | | | | | | |
| **Other Estate Professionals** | | | | | | | | | | | | | |
| Creditor Committee Fees | | | | | $ 50,000 | $ 25,000 | $ 75,000 | $ 21,250 | $ 21,250 | $ 21,250 | $ 21,250 | $ 85,000 | $ 10,000 |
| US Trustee Fees | | | | | $ - | $ - | $ - | | | | $ 10,000 | $ 10,000 | |
| **Total Other Estate Prof's** | $ - | $ - | $ - | $ - | $ 50,000 | $ 25,000 | $ 75,000 | $ 21,250 | $ 21,250 | $ 21,250 | $ 31,250 | $ 95,000 | $ 10,000 |

February 20, 2014

Xtreme Power Confidential Information
© 2013 All Rights Reserved

**<u>Exhibit B</u>**

[Term Sheet]

**GENERAL (AMENDED AND RESTATED) TERM SHEET**
**FOR POST PETITION,**
**DEBTOR-IN-POSSESSION FINANCING**

**TO**

**XTREME POWER INC. ("XPI"),**
**XTREME POWER GROVE LLC ("XPG"), and**
**XTREME POWER SYSTEMS LLC ("XPS" and, together with XPG and XPI, the**
**"Borrowers" or the "Debtors")**

**FROM**

**HORIZON TECHNOLOGY FINANCE CORPORATION, as sole lender and as**
**collateral agent and administrative agent**
**(together with its successors and assigns, the "Lender")**

**February __, 2014**

This General (Amended and Restated) Term Sheet for Post Petition, Debtor-in-Possession Financing ("Term Sheet") is **not** intended to be and should not be construed as an offer, a commitment, nor agreement to lend, nor should it be construed as an attempt to establish all of the terms and conditions relating to the Loan (hereinafter defined). It is intended only to be indicative of certain terms and conditions around which credit approval may be sought, and if approved, how the loan documents might be structured, and shall not preclude negotiations within the general scope of these terms and conditions. No person or entity shall have any obligation to commence or thereafter continue any negotiations to enter into any definitive, binding agreement with respect to the Loan, and no person or entity should rely on an eventual formation of any agreement. Any party may freely enter into negotiations with any other person or entity, and nothing herein shall preclude any party from entering into a binding agreement with any other person or entity. The foregoing shall apply to this Term Sheet, as well as to any prior and subsequent communications between the Borrowers and Lender with respect to the Loan, and only a definitive, written agreement, executed by both Borrowers and Lender, shall be binding on Borrowers and Lender with respect to the Loan. Further, all terms set forth herein are subject to the following:

1.  Certain conditions precedent;

2.  The receipt by the Lender of formal internal approval for the proposed financing from its credit committee;

3.  The negotiation and execution of the definitive documents defined below as the DIP Loan Documents; and

4.  The approval by the Lender of an Approved Budget (as amended) (the "Approved Budget") showing projected weekly cash receipts, cash

**disbursements, and other financial information required by the Lender for each week from the Petition Date (hereinafter defined) through April 4, 2014.**

**THE LENDER DOES NOT WAIVE, AND EXPRESSLY RESERVES, ALL DEFAULTS UNDER THE EXISTING PRE-PETITION DOCUMENTATION AND ALL RIGHTS TO ENFORCE THE TERMS OF SUCH DOCUMENTATION. BORROWERS' OBLIGATIONS TO COMPLY STRICTLY WITH THE TERMS THEREOF ARE NOT ALTERED IN ANY WAY AND CONTINUE IN FULL FORCE AND EFFECT.**

All terms used but not defined herein or otherwise defined in other post-petition loan documents shall have the meanings ascribed to them in that certain Venture Loan and Security Agreement, dated as of September 28, 2012 (as amended, the "Loan Agreement"), by and among, on the one hand, the Lender, and the Borrowers, on the other hand, as amended or supplemented by that (a) First Amendment and Waiver to Venture Loan and Security Agreement, dated as of May 10, 2013, by and among the Lender and the Borrowers; (b) Second Amendment to Venture Loan and Security Agreement and Amendment of Secured Promissory Note, effective as of November 8, 2013, by and among Horizon Funding Trust 2013-1 and the Borrowers; (c) Consent and Forbearance Agreement, effective as of December 18, 2013, by and among Horizon Funding Trust 2013-1 and the Borrowers.

| | |
|---|---|
| Borrowers: | (i) XPI, (ii) XPS, and (iii) XPG. |
| Commitment Amount: | A debtor-in-possession credit facility (the "DIP Credit Facility") to Borrowers, upon the conditions set forth below, to provide funding in accordance with the Approved Budget for the period from the Petition Date through February 21, 2014 (the date of the final hearing on debtor in possession financing ("Final DIP Hearing")) and, if the terms of the DIP Credit Facility are approved at the Final DIP Hearing, then through April 4, 2014, for a total amount of up to $2,892,806.45 (the "DIP Availability"), in connection with financing the Borrowers during their bankruptcy proceedings. The Borrowers shall be limited to weekly draws against the amount established under the terms of the Approved Budget. Any advances under the DIP Credit Facility are expressly conditioned upon the entry of the Interim Financing Order (which has not been stayed) and entry of the Final Financing Order (which has not been stayed), as the case may be, each in a form and substance acceptable to the Lender. |
| Use of Proceeds: | To (i) fund working capital and other expenses of Borrowers in accordance with the Approved Budget, and (ii) provide financing to facilitate the sale of all or portions of the Borrowers' business on a going concern basis, or in the alternative, the orderly liquidation of the Borrowers' assets, or a combination thereof depending upon the facts and circumstances. |

(a) For the period from the entry of the Interim Financing Order until the date of the Final DIP Hearing, the Borrowers may borrow from the Lender up to $1,383,900 and no additional amounts shall be available unless and until the Final Financing Order has been entered; and

(b) Upon the entry of the Final Financing Order, the Borrowers may borrow from the Lender up to the remaining DIP Availability pursuant to the terms of the DIP Loan Documents.

(c) Borrowers shall use any funds advanced under the DIP Credit Facility only for the purposes and in the amounts set forth in the Approved Budget.

<u>Term</u>:     The DIP Loan shall mature and be immediately due and payable in full, and the Lender shall have no further obligation to make advances under the DIP Credit Facility and except for the Carve Out the Borrowers shall have no further use of Cash Collateral or the DIP Credit Facility or any funds previously advanced thereunder, upon the earliest to occur of the following events, at Lender's sole election:

(a)     the occurrence of a Default or an Event of Default (as defined in the DIP Loan Documents);

(b)     the indefeasible payment in full of the Obligations owing to the Lender;

(c)     March 20, 2014, if no Auction[1] shall have occurred on or prior to that date;

(d)     March 31, 2014, if no Prevailing Bidder Sale Hearing shall have occurred on or prior to that date;

(e)     the sale of Borrowers, collectively or individually, to any purchaser; or

(f)     April 4, 2014.

Upon the expiration of the Term, all outstanding principal and interest incurred or advanced post-petition and pre-petition shall be due and payable.

<u>Collateral</u>:     Subject to the Carve Out (defined below), notwithstanding existing, valid, prior, and otherwise unavoidable, perfected consensual liens and security interests (and valid, prior ad valorem

---

[1] Any capitalized term not defined herein shall have the meaning set forth in the Bidding Procedures Order and the attachments thereto, or, if not defined within the Bidding Procedures Order, then as set forth in the Interim Financing Order.

**DIP CREDIT FACILITY TERM SHEET** - Page 3

liens of taxing authorities), Section 364(d) first priority, priming, and post-petition security interests in and liens on all of the properties and assets of the Borrowers, real and personal, including, but not limited to, the "Collateral" and all other assets described in the Loan Documents, the Interim Financing Order, Final Financing Order and hereafter acquired real and personal property of the Borrowers, and their bankruptcy estates (exclusive of causes of action), whether acquired prior to or after the Petition Date, whether now owned and existing or hereafter acquired, created or arising, and all products and proceeds thereof (including without limitation, claims of the Borrowers against third parties for loss or damage to such property), including all accessions thereto, substitutions and replacements thereof, and wherever located; provided however that the 364(d) lien will not prime ad valorem tax liens; and provided further that the 364(d) lien will not prime SVB's interest in a certain cash deposit held by SVB as collateral for a letter of credit issued for the benefit of Duke Energy nor shall the 364(d) lien prime a deed of trust held by Zuniga on the Debtors' Kyle, Texas facility; provided further that Lender shall have a section 364(c)(3) junior lien on the Kyle, Texas facility.

The term "Carve Out" shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6), and (b) allowed fees and expenses incurred by Court-approved estate professionals retained pursuant to sections 327, 328, and 1103 of the

Bankruptcy Code; provided, however, for each weekly advance by the Lender under the DIP Credit Facility, the Carve-Out for professional fees shall be reduced (dollar for dollar) by the amount of legal and professional fees and expenses funded pursuant to the amounts set forth in the Approved Budget for the week corresponding to such advance;  provided, further that the Carve Out shall continue to apply to funds advanced to the Debtors for purposes of paying professional fees under the Approved Budget, but which have not yet been disbursed.   Nothing herein shall be construed to affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described above.  Following an Event of Default, the Lender shall advance up to  $100,000.00 for professional fees incurred by Court-approved estate professionals retained pursuant to sections 327, 328 and 1103 of  the Bankruptcy Code  after such Event of Default, but only to the extent that amounts previously advanced by Lender for the purpose of paying budgeted legal or professional fees together with retainers previously paid are insufficient to satisfy the allowed amount of such post default fees.

**DIP CREDIT FACILITY TERM SHEET** - Page 4

In addition, notwithstanding anything to the contrary contained in the Interim Financing Order, and irrespective of existing retainers, in no event shall Lender be obligated to fund any budgeted expense, including any claim to surcharge the collateral under 11 U.S.C. § 506(c) and including legal or other professional fees except at such time and in such amounts as are set forth in the Approved Budget, provided that in no event shall Lender be obligated to fund any expense if doing so would, when combined with the amounts advanced by the Lender under the DIP Credit Facility, exceed the aggregate principal amount of the DIP Credit Facility.

Interest Rate:

Interest shall accrue in respect of all Obligations (as defined in the Loan Agreement) at the Interest Rate of fifteen percent (15%) and, following the occurrence of an Event of Default, eighteen percent (18%).

Commitment Fee:

Borrowers shall pay to Lender a fee in an amount equal to the lesser of (i) $75,000.00; or (ii) the maximum amount which, when aggregated with all other amounts constituting interest on the Obligations, does not exceed the amount of interest that would be allowed on the Obligations if interest were calculated at the Maximum Legal Rate. Fifty percent (50%) of the foregoing commitment fee shall be earned and paid upon the entry of the Interim Financing Order, and fifty percent (50%) of the foregoing commitment fee shall be earned and paid upon the entry of the Final Financing Order.

Expenses:

All costs incurred by the Lender in connection with examinations of the Collateral and the Borrowers' books and records pertaining thereto; all of Lender's out-of-pocket expenses associated with the Loan, including, but not limited to, the reasonable fees and expenses of its financial advisor Sherwood Partners, LLC, legal fees and expenses of its counsel K&L Gates LLP, and all costs associated with an appraisal, report or review. To the extent Lender provides any of these services internally, Borrowers will reimburse Lender for these costs at market rates. Payment by Borrower of such expenses shall be made regardless of whether the Loan closes.

Covenants:

Covenants governing the DIP Credit Facility will include customary performance, loan and reporting covenants and will also include, without limitation, the following:

(a)    The Borrowers shall be in compliance with the following financial covenant:  (i) Borrowers' actual cash receipts for any period are not less than ninety percent (90%) of the projected cash

receipts for such period, as set forth in the then-current Approved Budget; (ii) Borrowers' <u>actual</u> disbursements for any period on the Approved Budget are not more than one hundred ten percent (110%) of the <u>projected</u> disbursements for such period as set forth in the then-current Approved Budget. The foregoing calculation shall be tested weekly beginning two (2) weeks following the Petition Date of January 22, 2014.

<u>Sale and/or Orderly Liquidation of Borrowers' Assets:</u>

Borrowers agree that they will continue to use best efforts to conduct a going concern sale of their assets in accordance with the Interim Financing Order and in the Bidding Procedures Order, and as summarized below:

(a) All Qualified Bids are due by the Bid Deadline of March 18, 2014, at 4:00 pm prevailing Central time;

(b) On or before March 20, 2014, the Borrowers shall complete the Auction, if applicable, among the Qualified Bidders.

(c) At the conclusion of the Auction, the Borrowers will select the Prevailing Bid as well as the Back-Up Bid and shall promptly seek bankruptcy court approval for a sale to the Prevailing Bidder and entry of the Prevailing Bidder Sale Order.

(d) Should Borrowers not receive a Qualified Bid by the Bid Deadline or should the Back Up Transaction be determined to be the Prevailing Bid at the Auction, then the Borrowers shall seek approval of the sale of substantially all of the Borrower's Assets at the Sale Hearing to Lender or its nominee for a purchase price in an amount equal to a credit bid of (A) all amounts advanced under the DIP Credit Facility plus (B) all of its pre-petition indebtedness, plus (C) the payment to SVB of cash sufficient to pay secured indebtedness owed to SVB (in the approximate amount of $500,0000 at closing) (the "<u>Back Up Transaction</u>"), with a closing date of no later than April 4, 2014. The asset purchase agreement, other agreements, and all pleadings related to the Back Up Transaction shall be in a form and substance acceptable to Lender.

(e) Any objections to Sale Motion, other than to Designated Agreements and proposed Cure Costs, as defined in the Bidding Procedures Order, must be emailed to counsel for Borrowers, Lender, and the Official Committee of

Unsecured Creditors on or before the Objection Deadline of March 24, 2014, at 12:00 p.m. prevailing Central time.

(f)     On or before the March 31, 2014, the Borrowers shall receive the approval of the Bankruptcy Court for the Sale Transaction to the Prevailing Bidder and the resulting Prevailing Bidder Sale Order shall be in form and substance agreed to by the Lender, including providing for the payment at closing of the sales proceeds to the Lender and to SVB in reduction of all outstanding pre and post-bankruptcy indebtedness owed by Borrowers to Lender.

Events of Default:     Each of the following shall be an "Event of Default" under the Loan Agreement and other documents set forth above, and the other documents to be executed to effect the transactions described herein (collectively, the "DIP Loan Documents"):

(a)     failure by the Borrowers to pay any amount as and when due under the DIP Loan Documents;

(b)     failure by the Borrowers to perform or comply with the covenants contained in the DIP Loan Documents, the Interim Financing Order, the Final Financing Order, the Bidding Procedures Order, or the Prevailing Bidder Sale Order;

(c)     the entry of an order that stays, modifies, or reverses the Interim Financing Order, the Final Financing Order, the Bidding Procedures Order, or the Prevailing Bidder Sale Order or that appoints either (i) a trustee under Chapter 11 of the Bankruptcy Code in a Chapter 11 case for the Borrowers, collectively or individually, or (ii) an examiner having expanded powers to operate all or any part of Borrowers' business, which powers exceed those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code;

(d)     the conversion of any Chapter 11 case of any Borrower to a case under Chapter 7 of the Bankruptcy Code;

(e)     the Borrowers' breach of their obligations to comply with the financial covenants set forth above; or

(f)     the Borrowers' failure to meet their obligations with respect to the sale and/or orderly liquidation of the Borrowers' assets as set forth above.

Exercise of Remedies:     Upon the occurrence of an Event of Default,

     (1)    the Lender has no further obligation to make advances under the DIP Credit Facility, and except for the Carve Out, the Borrowers shall have no use of Lender's Cash Collateral or the DIP Credit Facility or any funds previously advanced thereunder;

     (2)    after five (5) business days' notice, served by overnight delivery service or email upon the Borrowers, the Borrowers' counsel, any official committee (or, if applicable, their counsel), and the United States Trustee (the "Required Notice"), all of the indebtedness (including without limitation, the Pre-Petition Lender Debt and the amount of the DIP Availability advanced to the Debtors) to the Lender and all amounts owed to SVB shall become immediately due and payable;

     (3)    after the Required Notice, the Automatic Stay of Section 362 of the Code shall be automatically and completely vacated as to the Lender and SVB without further order of the Bankruptcy Court, and

     (4)    after the Required Notice, the Lender and SVB, without further notice, hearing, or approval of the Bankruptcy Court, shall be authorized, at its option, to take any and all actions, and remedies that the Lender and/or SVB may deem appropriate to proceed against, take possession of, protect, and realize upon the collateral and any other property of the estates of the Borrowers upon which the Lender has been or may hereafter be granted liens and security interests to obtain repayment of the indebtedness to the Lender.

The Lender and SVB shall have the relief set forth above unless the Borrowers, or other party in interest, contest the occurrence of an Event of Default and the Bankruptcy Court determines the same prior to the expiration of the five (5) business days after the Required Notice.

Governing Law:     Connecticut.

DIP Loan Documents
And APA     The DIP Loan Documents, including the Interim Financing Order and the Final Financing Order, and any asset purchase agreement, including the Bidding Procedures Order and the Prevailing Bidder Sale Order, shall be in form and substance agreed to by counsel for the Lender.

**DIP CREDIT FACILITY TERM SHEET** - Page 8

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be effective, executed, accepted and delivered by their proper and duly authorized officers as of the date set forth above.

**XTREME POWER INC.**

By: _____

Title:_____


**XTREME POWER GROVE LLC**

By: _____

Title:_____


**XTREME POWER SYSTEMS LLC**

By: _____

Title:_____


**HORIZON TECHNOLOGY FINANCE CORPORATION**

By: _____

Title:_____

**Exhibit C**

[DIP Financing Agreement]

*EXECUTION COPY*

## AMENDED AND RESTATED POSTPETITION FINANCING AND SECURITY AGREEMENT

**AMENDED AND RESTATED POSTPETITION FINANCING AND SECURITY AGREEMENT**, dated as of February \_\_\_, 2014 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), by and among Xtreme Power Inc. ("XPI"), a Xtreme Power Grove LLC ("XPG"), and Xtreme Power Systems LLC ("XPS" and, together with XPI and XPG, the ("Debtors" or "Companies" or "Borrowers"), and Horizon Technology Finance Corporation, a Delaware corporation, or its successor, assign, or designee (the "Lender").

### BACKGROUND

A.      Lender and the Companies are parties to that certain Venture Loan and Security Agreement, dated as of September 28, 2012, by and among, on the one hand, the Lender, and the Companies, on the other hand, as amended or supplemented by that (a) First Amendment and Waiver to Venture Loan and Security Agreement, dated as of May 10, 2013, by and among the Lender and the Companies; (b) Second Amendment to Venture Loan and Security Agreement and Amendment of Secured Promissory Note, effective as of November 8, 2013, by and among Horizon Funding Trust 2013-1 and the Companies; (c) Consent and Forbearance Agreement, effective as of December 18, 2013, by and among Horizon Funding Trust 2013-1 and the Companies (as further amended hereby, the "Prepetition Loan and Security Agreement"), pursuant to which Lender has a security interest in substantially all of the Companies' assets, junior only the loan and liens of Silicon Valley Bank ("SVB").

B.      On January 22, 2014, XPI, XPS, and XPG each filed a voluntary case under Chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court.

C.      The Companies, as debtors in possession, intend to seek Bankruptcy Court approval of a sale of substantially all of the Companies' assets (the "Sale") pursuant to Section 363 of the Bankruptcy Code.

D.      Pursuant to that certain Asset Purchase Agreement to be entered into between the Lender and the Companies (the "Asset Purchase Agreement"), the Lender has agreed to serve as an initial stalking horse bidder with respect to the Sale.

E.      The Companies wish to receive, and the Lender wishes to provide, postpetition loans, advances, and other financial accommodations to allow for the preservation of the Companies' assets and to seek Bankruptcy Court approval of the Sale.

**NOW, THEREFORE,** in consideration of the mutual covenants and undertakings herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.        Definitions

**Auction** shall mean the public auction of substantially all of the assets of the Companies, no later than March 20, 2014, in accordance with the requirements and terms of the Bidding Procedures Order.

**Approved Budget** shall mean the budget of projected operating fees and expenses of the Companies, and Postpetition Loans to be made, as set forth on Schedule 1.

**Asset Purchase Agreement** shall have the meaning set forth in the recitals.

**Assumed Agreements** shall have the meaning set forth in the Asset Purchase Agreement.

**Avoidance Actions** shall mean the claims and actions of the Companies arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

**Back Up Transaction** shall mean that transaction contemplated and described in the Asset Purchase Agreement and the Bidding Procedures Order pursuant to which the Companies would sell substantially all of the Companies' Assets to Lender or its nominee for (i) a purchase price in an amount equal to a credit bid of (A) all amounts advanced under the DIP Credit Facility plus (B) all of its pre-petition indebtedness, plus  (C) the payment of cash sufficient to pay secured indebtedness owed to SVB (in the approximate amount of $500,0000 at closing), and (ii) a closing date of no later than April 4, 2014. The Asset Purchase Agreement, other agreements, and all pleadings related to the Back Up Transaction shall be in a form and substance acceptable to Lender.

**Bankruptcy Case(s)** shall mean the case(s), individually or jointly, of the Companies under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Western District of Texas, Austin Division, case numbers 14-10095-tmd, 14-10096-tmd, and 14-10097-tmd.

**Bankruptcy Code** shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified, or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

**Bankruptcy Court** shall mean the United States Bankruptcy Court for the Western District of Texas.

**Bidding Procedures** shall have the meaning set forth in the Bidding Procedures Order.

**Bidding Procedures Order** shall mean the Order entered by the Bankruptcy Court on February 7, 2014, (A)(I) Approving Bidding Procedures in Connection with the Sale of the Companies' Assets and, if Applicable, by Public Auction; (2) Scheduling a Hearing to Consider the Sale of Assets; and (III) Approving Form and Manner of Notice Thereof; and (B) Granting Related Relief.

RA-3118965 v12

**Borrowing Notice** shall have the meaning set forth therefor in Section 2.3 and be in the form of Exhibit D.

**Business Day** shall mean any day on which banks in the State of Connecticut are open for business.

**Carve-Out Amount** shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6), and (b) allowed fees and expenses incurred by Court-approved estate professionals retained pursuant to sections 327, 328 and 1103 of the Bankruptcy Code; provided, however, for each weekly advance by the Lender under the DIP Credit Facility, the Carve-Out for professional fees shall be reduced (dollar for dollar) by the amount of legal and professional fees and expenses funded pursuant to the amounts set forth in the Approved Budget for the week corresponding to such advance;  provided, further that the Carve Out shall continue to apply to funds advanced to the Companies for purposes of paying professional fees under the Approved Budget, but which have not yet been disbursed. Nothing herein shall be construed to affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described above.  Following an  Event        of Default, the Lender shall advance up to $100,000.00 for professional fees incurred by Court-approved estate professionals retained pursuant to sections 327, 328 and 1103 of the Bankruptcy Code after such Event of Default, but only to the extent that amounts previously advanced by Lender for the purpose of paying budgeted legal or professional fees together with retainers previously paid are insufficient to satisfy the allowed amount of such post default fees.

In addition, notwithstanding anything to the contrary contained in the Interim Order, and irrespective of existing retainers, in no event shall Lender be obligated to fund any budgeted expense, including any claim to surcharge the collateral under 11 U.S.C. § 506(c) and including legal or other professional fees except at such time and in such amounts as are set forth in the Approved Budget, provided that in no event shall Lender be obligated to fund any expense if doing so would, when combined with the amounts advanced by the Lender under the DIP Credit Facility, exceed the aggregate principal amount of the DIP Credit Facility.

**Collateral** shall mean (i) the "Collateral" (as defined in the Prepetition Loan and Security Agreement and the Final Order), and (ii) all accounts receivable or other assets created, acquired or arising after the Petition Date, including all royalties payable to the Companies under Section 365(n) of the Bankruptcy Code. Notwithstanding the foregoing, the term "Collateral" shall not include any causes of action of the Companies, whether arising pre- or postpetition.

**Commitment** shall mean a debtor-in-possession credit facility (the "DIP Credit Facility") to Companies, upon the conditions set forth below, to provide initial funding (the "Initial DIP Availability") in accordance with the Approved Budget for the period from the Petition Date through February 21, 2014 (the date of the final hearing on debtor in possession financing ("Final DIP Hearing")) and, if the terms of the DIP Credit Facility are approved at the Final DIP Hearing, then subsequent funding through March 31, 2014, for a total amount of up to $2,892,806.45 (the "DIP Availability"), in connection with financing the Companies during their bankruptcy proceedings. The Companies shall be limited to weekly draws against the amount established under the terms of the Approved Budget. Any advances under the DIP Credit Facility

are expressly conditioned upon the entry of the Interim Order (which has not been stayed) and entry of the Final Order (which has not been stayed), as the case may be, each in a form and substance acceptable to the Lender.

**Companies** shall have the meaning set forth in the preamble of this Agreement.

**Default** shall mean any event specified in SECTION 7 hereof, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, event or act, has been satisfied.

**Event(s) of Default** shall have the meaning provided for in SECTION 7 of this Agreement.

**Final Order** shall mean a final financing order, entered by the Bankruptcy Court prior to the expiration of the Interim Order, acceptable to the Lender in its sole discretion, authorizing the financing on terms and conditions set forth in this Agreement, in the form attached hereto as Exhibit B.

**Financing Order** shall mean the Interim Order, the Final Order, and such other orders relating thereto or authorizing the granting of credit by the Lender to the Companies pursuant to this Agreement and as ratified, assumed and adopted by the Companies pursuant to the terms thereof, on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Bankruptcy Case.

**Interim Order** shall mean that Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 632, 363, 364, and 507 (A) Authorizing Post-Petition Financing, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Related Relief entered by the Bankruptcy Court on January 24, 2014, a true and accurate copy of which is attached hereto as Exhibit B.

**Maturity Date** shall mean the earlier of date on which the Postpetition Loans become due and payable pursuant to Section 7.2 or April 4, 2014.

**Person** shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

**Petition Date** shall mean January 22, 2014.

**Postpetition Loan Documents** shall mean this Agreement, the Postpetition Notes, the other closing documents, and any patent security agreements or other ancillary security agreements or documents executed from time to time in connection with this Agreement, all as may be renewed, amended, extended, increased or supplemented from time to time.

**Postpetition Loan Obligations** shall mean all loans, advances and extensions of credit made or to be made by the Lender to the Companies or to others for the Companies' account pursuant to this Agreement (including, without limitation, all Postpetition Loans) or any Postpetition Loan Document, whether now in existence or incurred by the Companies from time to time hereafter; whether principal, interest, fees, costs, expenses or otherwise; whether such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect and whether the Companies are liable to the Lender for such indebtedness as principal, surety, endorser,

guarantor, or otherwise. For the avoidance of doubt, Postpetition Loan Obligations shall include (i) all indebtedness and obligations owing to the Lender and/or any affiliate thereof by the Companies under any Postpetition Loan Document, and (ii) all fees, costs of collection and expenses of Lender's professionals (including reasonable attorneys' fees) and other expenses paid or incurred by Lender since the Petition Date, as further set forth in Section 5.3.

**Postpetition Loans** shall mean the loans made by the Lender to the Companies pursuant to Section 2.1.

**Postpetition Notes** shall mean the notes, if any, attached hereto as Exhibit C, delivered by the Companies to the Lender to evidence the Postpetition Loans pursuant to, and repayable in accordance with, the provisions of SECTION 5 of this Agreement.

**Prepetition Debt** shall have the meaning set forth in Section 6.1.

**Prepetition Loan** means any loan made to the Companies by Lender pursuant to the Prepetition Loan and Security Agreement prior to the Petition Date.

**Prepetition Loan and Security Agreement** shall have the meaning set forth in the Recitals.

**Prevailing Bidder** shall mean the Person submitting the highest and best offer for any of the assets to be purchased and sold pursuant to the Bidding Procedures, which is then consummated.

**Prevailing Bidder Sale Order** shall mean the order of the Bankruptcy Court approving the results of the Auction to and allowing the Sale of the Companies' assets to the Prevailing Bidder, which order provides for the payment at closing of the sales proceeds to the Lender in reduction of all outstanding pre- and post-bankruptcy indebtedness owed by the Companies to Lender, which Prevailing Bidder Sale Order shall be entered on or before March 31, 2014, in a form a substance agreed to by Lender.

**Security Interest** shall have the meaning set forth in Section 9.

**Uniform Commercial Code** shall mean the Connecticut Uniform Commercial Code, as in effect from time to time.

SECTION 2.        Postpetition Loans

2.1        Amendment to Prepetition Loan and Security Agreement:  The Prepetition Loan and Security Agreement is hereby amended by inserting the below as a new Section 17.

"17.   Postpetition Advances:   Lender may, in its sole and absolute discretion, make additional loans to Borrower (or any court appointed trustee of Borrower) pursuant to this Agreement after Borrower commences a voluntary case under any applicable bankruptcy law.   Any such postpetition loan (each a "Postpetition Loan") shall be deemed to be a Loan under this Agreement.   Borrower's obligations with respect to any Postpetition Loan shall be set forth in separate agreements ("Postpetition Loan Documents") between Lender and Borrower (or any court appointed trustee of the estate of Borrower) including, but not limited to, that certain Postpetition Financing and Security Agreement, dated as of

the date hereof, and the repayment and other terms thereof may vary from Borrowers' obligations with respect to any other Loan.  With regard to Postpetition Loans, in the event of any inconsistency between the Postpetition Loan Documents and this Agreement, the terms of the Postpetition Loan Documents shall control."

2.2　　<u>Advances</u>:　The Lender may, subject to the terms and conditions of this Agreement, from time to time make Postpetition Loans at the request of the Companies; <u>provided</u>, <u>however</u>, that the aggregate outstanding principal amount of such Postpetition Loans shall not exceed the Commitment. Subject to the terms and conditions of this Agreement, including but not limited to Section 3:

(a)　　the Companies shall provide a written reconciliation, on a weekly basis, of the prior week's expenditures against the Approved Budget and shall make a request for funding for the week following, consistent with the Approved Budget;

2.3　　<u>Borrowing Notice</u>:　Whenever the Companies desire the Lender to make a Postpetition Loan pursuant to this <u>Section 2</u>, the Companies shall give the Lender notice in writing substantially in the form of borrowing notice attached hereto as <u>Exhibit D</u> (the "<u>Borrowing Notice</u>") specifying (i) the amount to be borrowed, (ii) the requested borrowing date (which shall be a Business Day and shall be prior to the Maturity Date, and prior to any effective termination date of this Agreement, all as further set forth herein), and (iii) the other matters set forth in the Borrowing Notice. All Borrowing Notices must be received by an officer of the Lender no later than 1:00 p.m. prevailing Eastern time two Business Days prior to the borrowing date. Requests for Postpetition Loans must be made no more than once every seven calendar days. So long as the amount of the Postpetition Loan requested by the Companies is in accordance with the Approved Budget, no Event of Default has occurred and is continuing, and the conditions to funding set forth in <u>SECTION 3</u> are satisfied, the Lender shall be deemed to have approved such request. The Lender shall make loans and advances to such account as shall be notified by the Companies to the Lender in writing.

2.4　　<u>Postpetition Note</u>:　The Postpetition Loan Obligations hereunder are evidenced by an amended and restated Postpetition Note in the form of <u>Exhibit C</u> attached hereto, and (ii) the Companies shall execute financing statements, patent security agreements and other collateral documentation reasonably requested to evidence or perfect security interests granted hereunder; provided, however, that the terms of the Final Order and the Interim Order shall permit, but not require, such additional acts of perfection of Lender's security interests.

SECTION 3.　　Conditions to Funding.

3.1　　The Lender shall not be obligated to make any advance hereunder unless all of the following conditions are satisfied to the Lender's satisfaction in its sole discretion:

(a)　　In respect of the Initial DIP Availability, the Interim Order shall have been entered by the Bankruptcy Court, be in full force and effect (except to the extent superseded by the Final Order), and not have been reversed, vacated, or stayed, and the Bidding Procedures Order shall be timely entered on February 7, 2014 and shall not have been reversed, vacated, or stayed and the Final Order shall be timely entered on or before February 21, 2014;

6

(b)      In respect of the entire DIP Availability, the Final Order and the Bidding Procedures Order shall have been entered, with all such orders in full force and effect, and shall not have been reversed, vacated, or stayed.

(c)      There shall exist no Default or Event of Default under the Postpetition Loan Documents, the Asset Purchase Agreement, the Bidding Procedures Order, the Interim Order or the Final Order, as the case may be;

(d)      Such borrowing shall not violate any requirement of applicable law or be enjoined;

(e)      The Companies shall have executed and delivered to the Lender this Agreement and the Asset Purchase Agreement in form and substance satisfactory in all respects to the Lender;

(f)      The Auction, if applicable, shall have occurred not later than March 20, 2014;

(g)      The Prevailing Bidder Sale Hearing, as defined in the Bidding Procedures Order, shall have occurred not later than March 31, 2014;

SECTION 4.   Representations, Warranties and Covenants

4.1      _Approved Budget; Weekly Reporting_:  The Postpetition Loans shall be used in accordance with the Approved Budget, except as the lender may have otherwise agreed in writing.

4.2      _Conduct of Business_:   During the period commencing on the date of this Agreement and continuing until the termination of this Agreement in accordance with its terms, the Companies shall, except as required by any order of the Bankruptcy Court (or as reasonably necessary in connection with the Bankruptcy Case) or applicable law, as contemplated or required by the terms of any Postpetition Loan Document, or as otherwise consented to in writing by the Lender (such consent not to be unreasonably withheld or delayed); (i) use commercially reasonable efforts to preserve in all material respects the Collateral, including by not permitting rejection or deemed rejection of Assumed Agreements; and (ii) confer with the Lender at Lender's request concerning the status of the Collateral.

4.3      _Financial Covenants_:

(a)      The Companies shall be in compliance with the following financial covenant:  (i) the Companies' _actual_ cash receipts for any period are not less than ninety percent (90%) of the _projected_ cash receipts for such period, as set forth in the then-current Approved Budget; (ii) the Companies' _actual_ disbursements for any period on the Approved Budget are not more than one hundred ten percent (110%) of the _projected_ disbursements for such period as set forth in the then-current Approved Budget. The foregoing calculation shall be tested weekly beginning two (2) weeks following the Petition Date, and measured on a cumulative basis for the period beginning on the date hereof through any date of determination.

4.4    Sale. The Companies shall in good faith seek (i) Bankruptcy Court approval of the Sale, and, if subsequently requested by Lender, (ii) an order of the Bankruptcy Court authorizing Lender to provide notice of the Sale as a public sale under § 9-610 of the Uniform Commercial Code, it being understood that the sale shall remain subject to Bankruptcy Court approval.

4.5    Negative Covenants by Companies: Until termination of this Agreement and payment and satisfaction of all Postpetition Loan Obligations or deemed repayment and waiver of any deficiency claim in respect of the Postpetition Loans as provided in Section 6.2(a) hereof, the Companies agree that, without the prior written consent of the Lender, except as otherwise herein provided, the Companies will not:

(a)    Sell, lease, assign, transfer or otherwise dispose of the Companies' assets except as otherwise permitted by this Agreement or as part of the Sale; and

(b)    Merge, consolidate, amalgamate or otherwise alter or modify their organizational name, principal place of business, structure, or existence, reincorporate or re-organize, or enter into or engage in any operation or activity materially different from that presently being conducted by the Companies.

4.6    Companies' Representations:  The Companies hereby represent and warrant to the Lender that, subject to the applicable provisions of the Interim Order or Final Order, the Companies have all authority necessary to execute and deliver this Agreement and the other Postpetition Loan Documents to which they are a party and, upon entry and effectiveness of the Interim Order or Final Order, will have all other authority necessary to consummate the transactions contemplated hereby and thereby.

SECTION 5.    Repayment, Interest, and Fees

5.1    Interest Rate:  Interest on the Postpetition Loans shall be payable at the Maturity Date. Postpetition Loans shall bear interest at a fixed rate per annum equal to 15%. The rate hereunder for Postpetition Loans shall be calculated based on a 360-day year and actual days elapsed. The Default rate is 18%.

5.2    Repayment:  The Companies hereby agree to pay to the Lender, on or before the Maturity Date, the entire unpaid principal of and interest on all Postpetition Loan Obligations prior to the payment of any other of the Companies' or the Companies' estates' obligations. Upon (1) Lender's acquisition of substantially all of the Companies' or the Companies' estates' assets if the Back Up Transaction proceeds to closing, or (2) Lender's receipt of cash proceeds of a sale in excess of the Postpetition Loan Obligations and Pre-Petition Loan Obligations, or (3) if the Companies are not in default under the Asset Purchase Agreement and the Companies have cooperated in granting Lender relief from the automatic stay, Lender's consummation of an Article 9 Sale, the Postpetition Loan Obligations shall be paid or deemed repaid as provided in Sections 5.4 or 6.2.

5.3    Reimbursement Obligations.   On the Maturity Date, the Companies shall reimburse Lender for all costs incurred by the Lender in connection with examinations of the Collateral and the Companies' books and records pertaining thereto; all of Lender's out-of-pocket expenses associated with all Prepetition Loans or Postpetition Loans, including, but not

limited to, the reasonable fees and expenses of its financial advisor Sherwood Partners, LLC, legal fees and expenses of its counsel K&L Gates LLP, and all costs associated with an appraisal, report, or review. To the extent Lender provides any of these services internally, the Companies will reimburse Lender for these costs at market rates. Payment by the Companies of such expenses shall be made regardless of whether any Postpetition Loan closes. All amounts chargeable to the Companies under this <u>Section 5.3</u> shall constitute Postpetition Loan Obligations that are secured by all of the Collateral (as set forth in <u>Section 9</u>).

5.4    <u>Application of Proceeds</u>:  Any Proceeds received upon liquidation of Collateral or enforcement of the Lender's rights hereunder shall be applied:

(a)    First, to the Carve-Out Amount;

(b)    Second, to accrued interest, attorneys' fees, and other reimbursable expenses constituting the Postpetition Loan Obligations;

(c)    Third, to principal and any other Postpetition Loan Obligations until the obligations under the Postpetition Note, including accrued and unpaid interest, and all other Postpetition Loan Obligations have been paid in full;

(d)    Fourth, to the Companies' obligations to SVB;

(e)    Fifth, the Companies' Obligations under the Prepetition Loan and Security Agreement (other than the Postpetition Loan Obligations), to be applied in accordance with Section 9.7 of the Prepetition Loan and Security Agreement; and

(f)    Sixth, to the Companies' estates' to be held for the benefit of creditors of the Companies, in such priority as to which they may be entitled under the bankruptcy code and applicable law.

5.5    <u>Form of Payment</u>:  Notwithstanding any provision of this Agreement to the contrary, all payments by the Companies under this Agreement, whether for principal, interest, fees, costs, indemnities, expenses or otherwise, shall be payable in United States dollars at the Lender's office specified in <u>Section 10.6</u> of this Agreement without setoff, counterclaim, or other deduction of any kind.

SECTION 6.    Settlement

6.1    <u>Existing Claims</u>:  The Companies acknowledge and agree that:

(a)    As of the Petition Date, Lender has a valid claim for the principal, interest, late fees and other charges owed to Lender by the Companies pursuant to the Prepetition Loan and Security Agreement in the amount of $6,861,125. Lender has a valid claim for postpetition interest, attorneys' fees and costs as provided under the terms of the loan documents (collectively with the amount describe above, the "<u>Prepetition Debt</u>"); and

(b)    The Prepetition Debt is secured by substantially all of the assets of the Companies and is not subject to defense, set off, subordination or counterclaims.

9

(c)     Upon consummation of the Sale, Lender shall retain an allowed unsecured deficiency claim in the amount equal to the Prepetition Debt less (1) the amount of any cash proceeds of the Sale that are actually paid to the Lender in respect of the Prepetition Loans, and (2) if the Lender is the Prevailing Bidder, the amount of Lender's credit bid of secured debt related to the Prepetition Loans.

(d)     The Companies have no claims or causes of action against the Lender (or Lender's affiliates who are Lender's predecessors in interest, Horizon Credit II LLC and Horizon Funding Trust 2013-1) with respect to events prior to the Petition Date, including any Avoidance Actions.

6.2     <u>Termination and Release</u>:  If Lender acquires substantially all of the Companies' assets at closing of the Sale or, if the Companies are not in default under the Asset Purchase Agreement and the Companies have cooperated in granting Lender relief from the automatic stay, upon Lender's consummation of an Article 9 Sale, the Postpetition Loan Obligations shall be deemed paid in full.

6.3     <u>Release Acknowledgement</u>:  The Companies understand, acknowledge, and agree that the acknowledgements, agreements, and releases set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit, or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases. The Companies agree that no fact, event, circumstance, evidence, or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth when made herein.

SECTION 7.     Events of Default and Remedies

7.1     <u>Events of Default</u>:  Notwithstanding anything herein to the contrary, each of the following shall constitute an "<u>Event of Default</u>":

(a)     failure by the Companies to pay any amount as and when due under this Agreement or any other document executed in connection with the transactions contemplated herein (the "<u>DIP Loan Documents</u>");

(b)     failure by the Companies to perform or comply with the covenants contained in the DIP Loan Documents, the Interim Order, the Final Order, the Bidding Procedures Order, or the Prevailing Bidder Sale Order;

(c)     the entry of an order that stays, modifies, or reverses the Interim Order (except as modified by the Final Order), the Final Order, the Bidding Procedures Order, or the Prevailing Sale Order or that appoints either (i) a trustee under Chapter 11 of the Bankruptcy Code in a Chapter 11 case for the Companies, collectively or individually, or (ii) an examiner having expanded powers to operate all or any part of the Companies' business;

(d)     the conversion of any Chapter 11 case of any of the Companies to a case under Chapter 7 of the Bankruptcy Code;

RA-3118965 v12

(e)      the Companies' breach of their obligations to comply with the financial covenants set forth above;  or

(f)      the Companies' failure to meet their obligations with respect to the Sale and/or orderly liquidation of the Companies' assets as set forth above.

7.2      <u>Acceleration</u>:   Upon the occurrence and during the continuance of an Event of Default that has not been waived by the Lender, the Lender may declare to the Companies by written notice that the Lender shall make no further Postpetition Loans unless such Default or Event of Default is waived in writing by Lender or cured to the satisfaction of the Lender.  Upon the occurrence of an Event of Default, the Lender may (a) declare that all Postpetition Loan Obligations are immediately due and payable; and (b) immediately terminate this Agreement upon notice to the Companies. The exercise of any option is not exclusive of any other option, which may be exercised at any time by the Lender in its discretion, and is in addition to any other rights granted to the Lender under any other agreement.

7.3      <u>Remedies</u>:   Upon the occurrence and during the continuance of an Event of Default and to the extent permitted by applicable law:

(a)      the Lender has no further obligation to make advances under the DIP Credit Facility and, except for the Carve Out, the Companies shall have no use of cash collateral or the DIP Credit Facility or any funds previously advanced thereunder;

(b)      after five (5) business days' notice, served by overnight delivery service or email upon the Companies, the Companies' counsel, the Creditors' Committee counsel and the United States Trustee (the "<u>Required Notice</u>"), all of the indebtedness (including without limitation, the Pre-Petition Lender Debt, and the Post-Petition Lender Debt, and the "Obligations" (as defined in the Prepetition Loan and Security Agreement or to be defined in the DIP Loan Documents)) to the Lender shall become immediately due and payable;

(c)      after the Required Notice, the Automatic Stay of Section 362 of the Code shall be automatically and completely vacated as to the Lender without further order of the Bankruptcy Court unless a timely objection to the Required Notice is asserted and the Bankruptcy Court determines that there is no default prior to the expiration of the five (5) business days after the Required Notice, and

(d)      after the Required Notice, the Lender, without further notice, hearing, or approval of the Bankruptcy Court unless a timely objection to the Required Notice is asserted and the Bankruptcy Court determines that there is no default prior to the expiration of the five (5) business days after the Required Notice shall be authorized, at its option, to take any and all actions, and remedies that the Lender may deem appropriate to proceed against, take possession of, protect, and realize upon the collateral and any other property of the estates of the Companies upon which the Lender has been or may hereafter be granted liens and security interests to obtain repayment of the indebtedness to the Lender.

(e)      The Lender shall have the relief set forth above unless the Companies contest the occurrence of an Event of Default and the Bankruptcy Court determines the same prior to the expiration of the five (5) business days after the Required Notice.

7.4     Remedies Cumulative:  Each right, power, and remedy of Lender as provided for in this Agreement or in the other Postpetition Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement or in the other Postpetition Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Lender, of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other rights, powers, or remedies.

SECTION 8.     Termination

8.1     Notwithstanding any other provision herein to the contrary, the Lender may terminate this Agreement (a) immediately upon the occurrence of an Event of Default, (b) on the Maturity Date, or (c) if the Lender is a Prevailing Bidder, upon the consummation of the transactions contemplated in the Asset Purchase Agreement.

8.2     Subject to Section 5.2, all Postpetition Loan Obligations shall become due and payable as of any termination of this Agreement, whether under this Section 8 or Section 7 hereof.

8.3     In the event of Lender's termination of this Agreement prior to advance of the Postpetition Loans, Lender shall advance sufficient funds to pay in full all fees and expenses incurred in accordance with the Approved Budget through the date on which such termination occurs, provided that funds advanced pursuant to this Section 8.3 together with Postpetition Loans previously advanced, shall not exceed the Commitment.

SECTION 9.     Security Interest

9.1     Grant of Security:  As security for the payment in full of principal, interest and performance of the Postpetition Loan Obligations, the Companies hereby grant to the Lender a security interest in the Collateral and all Proceeds arising therefrom (the "Security Interest"). The Companies agree that none of the following events, either alone or together, will affect Lender's interest in the property: (i) if Lender agrees to changes in the terms of any secured obligation such as extending the time for repayment or increasing the interest rate; or (ii) if Lender releases or accepts substitutions for any other collateral that serves as security for the secured obligation.

9.2     Priority:  To the extent permitted by applicable law, the Security Interest, the priority of the Security Interest, and the administrative priorities and other rights and remedies granted to Lender pursuant to this Agreement, the Interim Order, the Final Order and the other Postpetition Loan Documents (specifically including but not limited to the existence, validity, enforceability, extent, perfection and priority of the Security Interest) and the administrative priority provided herein and therein shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Companies or the Trustee (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal of the Bankruptcy Case, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission, to the extent permitted by applicable law:

RA-3118965 v12

(a)     upon entry of the Interim Order the Security Interest shall constitute valid, binding, continuing, enforceable and fully-perfected liens on the Collateral and (i) shall be *pari passu* with the liens granted to Lender pursuant to the Prepetition Loan and Security Agreement, and (ii) shall be prior to all other liens and interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; provided however that the 364(d) lien will not prime ad valorem tax liens, SVB's interest in a certain cash deposit held by SVB as collateral for a letter of credit issued for the benefit of Duke Energy nor shall the 364(d) lien prime a deed of trust held by Zuniga on the Companies' Kyle, Texas facility; provided further that Lender shall have a section 364(c)(3) junior lien on the Kyle, Texas facility.

(b)     Lender shall not be required to marshal the Collateral,; and

(c)     the Security Interest shall continue to be valid, binding, continuing, enforceable and fully-perfected without the necessity for Lender to file any financing statements or to otherwise perfect the Security Interest under applicable non-bankruptcy law or to take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, the Interim Order, the Final Order or any other Postpetition Loan Document.

9.3     To the extent permitted by applicable law, the Companies hereby agree that (A) the Postpetition Loan Obligations shall constitute allowed administrative expenses in the Bankruptcy Case having priority over all administrative expenses of and unsecured claims against the Companies now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, except budgeted expenses actually incurred and the Carve-Out and (B) the Security Interest shall not be subject to Section 551 of the Bankruptcy Code.

9.4     <u>Cumulative Grants</u>:  The Security Interest and the administrative priority granted by and pursuant to this Agreement hereof may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Interim Order, the Final Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Agent hereunder and thereunder are cumulative.

9.5     <u>Future Obligations</u>:  The Security Interest will also apply to any additional Obligations entered into hereafter which are called "Future Obligations."  Future Obligations shall be subject to all terms of this Agreement.

9.6     <u>Termination of Security Interest</u>:  The Security Interest granted to Lender under this Agreement shall not terminate unless and until all Postpetition Loan Obligations have been fully paid or performed (pursuant to Section 5.2 or otherwise).

SECTION 10.     Miscellaneous

10.1     No delay or omission of the Lender to exercise any right or remedy hereunder, whether before or after the happening of any Event of Default, shall impair any such right or shall operate as a waiver thereof or as a waiver of any such Event of Default. No single or partial exercise by the Lender of any right or remedy precludes any other or further exercise thereof, or precludes any other right or remedy.

13

10.2    This Agreement and the Postpetition Loan Documents executed and delivered in connection therewith can be waived or changed only by a writing signed by each party hereto or thereto, and shall bind and benefit each party hereto or thereto and their respective successors and assigns, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

10.3    In no event shall the Companies, upon demand by the Lender for payment of any Postpetition Loan Obligations, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law. Regardless of any provision herein or in any agreement made in connection herewith, the Lender shall never be entitled to receive, charge or apply, as interest on any Postpetition Loan Obligations, any amount in excess of the maximum amount of interest permissible under applicable law. If the Lender ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such; and if principal is paid in full, any remaining excess shall be refunded to the Companies. This paragraph shall control every other provision hereof, the Postpetition Loan Documents and of any other agreement made in connection with the Postpetition Loans.

10.4    If any provision hereof or of any other agreement made in connection herewith is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

10.5    **THE COMPANIES AND THE LENDER EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF THE POSTPETITION LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREUNDER. THE COMPANIES HEREBY IRREVOCABLY WAIVE PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED. IN NO EVENT WILL THE LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES. THE COMPANIES AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF TEXAS TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR THE POSTPETITION LOAN DOCUMENTS OR TO ANY MATTER ARISING THEREFROM. THE COMPANIES HERETO EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURT.**

10.6    Except as otherwise herein provided, any notice or other communication required hereunder shall be in writing (provided that, any electronic communications from the Companies with respect to any request, transmission, document, electronic signature, electronic mail or facsimile transmission shall be deemed binding on the Companies for purposes of this Agreement, provided further that any such transmission shall not relieve the Companies from any other obligation hereunder to communicate further in writing), and shall be deemed to have

14

been validly served, given or delivered when hand delivered or one Business Day after deposit with a nationally recognized overnight delivery service, or three Business Days after deposit in the United States mails, with proper first class postage prepaid, return receipt requested, and addressed to the party to be notified or to such other address as any party hereto may designate for itself by like notice, as follows:

(A)     if to the Companies, at:

Xtreme Power Inc.
1120 Goforth Road
Kyle, TX 78640

Xtreme Power Grove LLC
1120 Goforth Road
Kyle, TX 78640

Xtreme Power Systems LLC
1120 Goforth Road
Kyle, TX 78640

Shelby A. Jordan
Jordan Hyden Womble Culbreth & Holzer PC
100 Congress Ave., Suite 2109
Austin, TX 78701
Telephone:     (512) 469-3537
Facsimile:     (361) 888-5555

(B)     if to the Lender, at:

Horizon Technology Finance Corporation
312 Farmington Avenue
Farmington, CT 06032
Phone:  (860) 676-8654
Facsimile:  (860) 676-8655
Attention:  Dan Devorsetz

with copies to:

K&L Gates LLP
4350 Lassiter at North Hills Avenue, Suite 300
PO Box 17047
Raleigh, NC 27609 (27619)
Phone:  (919) 743-7306
Facsimile:  (919) 516-2006
Email address:  lee.hogewood@klgates.com
Attention: Lee Hogewood

provided, however, that notices shall not be deemed given until received.

RA-3118965 v12

10.7     **THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER POSTPETITION LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CONNECTICUT, EXCEPT TO THE EXTENT THAT ANY OTHER POSTPETITION LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE LAWS OF ANOTHER JURISDICTION, AND EXCEPT TO THE EXTENT THAT THE PROVISIONS OF THE BANKRUPTCY CODE ARE APPLICABLE AND SPECIFICALLY CONFLICT WITH THE FOREGOING.**

10.8     In the event of any inconsistency between the terms of the Financing Orders, on the one hand, and this Agreement and the other Postpetition Loan Documents, on the other hand, the terms of the Financing Orders shall control.

[SIGNATURE PAGES FOLLOW]

16

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be effective, executed, accepted and delivered by their proper and duly authorized officers as of the date set forth above.

XTREME POWER INC.

By: _____

Title: _____

XTREME POWER GROVE LLC

By: _____

Title: _____

XTREME POWER SYSTEMS LLC

By: _____

Title: _____

**HORIZON TECHNOLOGY FINANCE CORPORATION**

By: _____

Title: _____

## Schedule 1

[Approved Budget]

**<u>EXHIBIT A</u>**

<u>Interim Order (as entered)</u>

**<u>EXHIBIT B</u>**

<u>Form of Final Order</u>

# **EXHIBIT C**

Amended and Restated Postpetition Loan Note

(with copy as executed on January 27, 2014 to be attached)

## AMENDED AND RESTATED POSTPETITION LOAN NOTE

Dated as of
February 21, 2014

$2,892,806.45

FOR VALUE RECEIVED, the undersigned trustee on behalf of Xtreme Power Inc., Xtreme Power Grove LLC, and Xtreme Power Systems LLC (collectively, the "Companies"), hereby promise to pay to Horizon Technology Finance Corporation and its registered assigns (hereinafter "Lender") at the offices of Lender located at 312 Farmington Avenue, Farmington, CT 06032 in lawful money of the United States of America and in immediately available funds, the principal amount of Two Million Hundred Ninety-two Thousand Dollars Eight Hundred and Six and 45/100 dollars ($2,892,806.45), or if different from such amount, the unpaid principal balance of Postpetition Loans advanced by Lender pursuant to Section 2.1 of the Postpetition Financing and Security Agreement (as herein defined) as may be due and owing from time to time under the Postpetition Financing and Security Agreement, as set forth in Section 5 thereof. Subject to Section 5.2 of the Postpetition Financing Agreement, a final balloon payment in an amount equal to the outstanding aggregate balance of principal and interest remaining unpaid, if any, under this Note as shown on the books and records of the Lender shall be due and payable on the termination of the Postpetition Financing Agreement, as set forth in SECTION 7 and SECTION 8 thereof.

The Companies further absolutely and unconditionally promise to pay to the order of the Lender and its registered assigns at said office of the Lender, interest, in like money, on the unpaid principal amount owing hereunder from time to time from the date hereof on the dates and at the rates specified in SECTION 5 of the Postpetition Financing and Security Agreement.

If any payment on this Note becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day, and with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension. All payments hereunder shall be made without setoff, counterclaim or deduction of any kind.

This Amended and Restated Note is the Promissory Note referred to in the Amended and Restated Postpetition Financing and Security Agreement, dated or about February 21, 2014 as the same may be amended, restated, supplemented or otherwise modified and in effect from time to time, among the Companies and the Lender (the "Postpetition Financing and Security Agreement"), and is subject to, and entitled to, all of the terms, provisions and benefits thereof and is subject to optional and mandatory prepayment, in whole or in part, as provided therein. All capitalized terms used herein shall have the meaning provided therefor in the Postpetition Financing and Security Agreement, unless otherwise defined herein.

The Companies confirm that any amount received by or paid to the Lender in connection with the Postpetition Financing and Security Agreement and/or any balances standing to its credit on

any of its or their accounts on the Lender's books under the Postpetition Financing and Security Agreement may in accordance with the terms of the Postpetition Financing and Security Agreement be applied in reduction of this Note, but no balance or amounts shall be deemed to effect payment in whole or in part of this Note unless the Lender shall have actually charged such account or accounts for the purposes of such reduction or payment of this Postpetition Note.

Upon the occurrence of any one or more of the Events of Default specified in the Postpetition Financing and Security Agreement or upon termination of the Postpetition Financing and Security Agreement, all amounts then remaining unpaid on this Note may become, or be declared to be, immediately due and payable as provided in the Postpetition Financing and Security Agreement.

XTREME POWER INC.

_____

By: _____
Title: _____

XTREME POWER GROVE LLC

_____

By: _____
Title: _____

XTREME POWER SYSTEMS LLC

_____

By: _____
Title: _____

## **EXHIBIT D**

Form of Borrowing Notice

<u>Form of Borrowing Notice</u>

_____, 2014

Horizon Technology Finance Corporation
312 Farmington Avenue
Farmington, CT 06032
Phone: (860) 676-8654
Facsimile:  (860) 676-8655
Attention:  Dan Devorsetz

Ladies and Gentlemen:

The undersigned companies (the "<u>Companies</u>") refers to the Postpetition Financing and Security Agreement dated as of January 27, 2014 (as amended, supplemented or otherwise modified from time to time, the "<u>Postpetition Financing and Security Agreement</u>"; capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Postpetition Financing and Security Agreement), and hereby gives you irrevocable notice, pursuant to <u>Section 2.3</u> of the Postpetition Financing and Security Agreement, that the Companies hereby request a Postpetition Loan as set forth below.

1.      <u>Requested Postpetition Loan</u>.

(a)      The undersigned Companies request that the requested Postpetition Loan be in the aggregate amount of $_____.

(b)      The undersigned Companies request that the requested Postpetition Loan be made on the following Business Day:_____, 2014, which day is at least two Business Days following the date of this notice.

2.      <u>Certifications</u>.  The undersigned Companies hereby certify to the Lender that the following statements will be true and correct on the date that the requested Postpetition Loan is made:

(a)      All Postpetition Loans previously requested by the  have been applied in accordance with the Approved Budget and uses for such Postpetition Loans previously presented to the Lender.

(b)      The Postpetition Loans requested in this Borrowing Notice shall be used in accordance with the Approved Budget and uses set forth on the attached Schedule 1.

(c)      The representations and warranties contained in the Postpetition Financing Agreement and the other Postpetition Loan Documents are true and correct in all material respects, other than representations and warranties that expressly relate solely to an earlier date (in which case they were true and correct on and as of such earlier date).

(d)      No Default or Event of Default has occurred and is continuing or would result from the requested Postpetition Loan.

RA-3118965 v12

The undersigned understands that the Lender is relying on the foregoing certification in making the requested Postpetition Loan to the Companies and to induce the Lender to make the requested Postpetition Loan.  In addition, the undersigned understands that the Lender has sole discretion in deciding whether to make all or any portion of the requested Postpetition Loan as set forth in the Postpetition Financing and Security Agreement, and the making of the request and certification above by the Companies does not obligate the Lender to make the requested Postpetition Loan.

XTREME POWER INC.

_____

By: _____

Title: _____

XTREME POWER GROVE LLC

_____

By: _____

Title: _____

XTREME POWER SYSTEMS LLC

_____

By: _____

Title: _____