**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| In re | § | |
| XTREME POWER INC., | § | CASE NO. 14-10096 |
| XTREME POWER SYSTEMS, LLC, and | § | CASE NO. 14-10095 |
| XTREME POWER GROVE, LLC | § | CASE NO. 14-10097 |
| Jointly Administered Debtors. | § | CHAPTER 11 |
| | § | (Jointly Administered Under |
| | § | CASE NO. 14-10096) |

**EXPEDITED SECOND MOTION OF DEBTORS TO SELL ASSETS LOCATED IN MAINLAND CHINA ('CHINA UNIT") FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS UNDER 11 U.S.C. § 363**

Xtreme Power Inc. ("**XPI**"), Xtreme Power Grove, LLC ("**XPG**"), and Xtreme Power Systems, LLC ("**XPS**" together the "**Debtors**"), debtors and debtors in possession in the above-captioned jointly administered Chapter 11 case hereby file this Expedited Second[1] Motion To Sell Assets Located in Mainland China ("**China Unit**") Free And Clear Of Liens, Claims, Encumbrances And Interests Under 11 U.S.C. § 363 ("**Motion**").

**I. JURISDICTION AND PROCEDURAL BACKGROUND**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. The Court's consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The grounds for relief include sections 105, 363, 365, 503, and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, Rules 2002, 6003, 6004, 6006, 9008,and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 6004(b) of the Local Bankruptcy Court for the Western District of Texas.

2. On January 22, 2014, the Debtors commenced the above-captioned chapter 11 cases by each filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in

---

[1] Debtors' prior motion to approve a sale of the China Unit was withdrawn.

Second Motion to Sell China Unit                 1

the United States Bankruptcy Court for the Western District of Texas.

3. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official Committee of Unsecured Creditors of XPS was formed and retained counsel who are active in these cases. No trustee or examiner has been appointed in these Chapter 11 Cases.

## II. CASE HISTORY

4. By order dated April 11, 2014, the Court approved a sale of substantially of the assets of XPI and XPS, and the assignment of certain contracts, to Younicos Inc., for $14 million in cash. The transaction closed effective April 14, 2014. Subsequently, the Debtors rejected most of their non-assigned contracts. Debtor XPG has been involved in extended negotiations to try and close on a contract to sell its assets located in Oklahoma to Horizon Battery, however due to Horizon's breach, Debtor currently has an auction sale of those assets scheduled for November 7. The Debtors, the Committee, and several significant creditors have reached a mediation agreement that resolves the allocation of the Younicos sale proceeds among the estates, and other related issues, subject to confirmation of a plan that incorporates its terms. The Debtors expect to file a plan and disclosure statement on or before the Court's deadline of October 31, 2014.

## III. GENERAL BACKGROUND

5. A detailed description of the Debtors' former businesses and the reasons for filing these Chapter 11 Cases is set forth in the Declaration of Ken Hashman in Support of Chapter 11 Petitions and First Day Motions and Applications, which is incorporated herein by reference.

6. The Debtors designed, engineered, installed, and monitored integrated energy

storage systems for Power Generators, Grid Operators and Commercial & Industrial End Users, among others. The company's technology, coupled with its expert team of engineers was able to address the most complex grid challenges with effective and reliable solutions. The Company had 12 projects in operation with 60 MW of grid-scale installations ranging from 1MW up to 36MW. The Company's operational experience included more than 36,000 MWh charged and discharged and over 498,000 hours of integrated power unit operation. While the Debtors' biggest projects were integrated with renewable generation, they also delivered economic solutions to mainstream grid problems that have traditionally been filled by conventional generators using fossil-fired equipment.

### IV. THE DEBTORS' BATTERY BUSINESS

7. Affiliate Debtor Xtreme Power Grove, LLC ("**XPG**"), had a license from Horizon Batteries, LLC, to manufacture an advanced lead acid battery that XPS used in some of its energy storage systems and also sold to third parties. XPS purchased the batteries from XPG and held them in inventory or sold them to customers. However, XPG shut down its battery manufacturing operations in early 2013 and no longer manufactured or sold them after that date. XPG had manufactured the batteries at a leased facility near the city of Grove, Oklahoma. The facility has been surrendered as part of a global compromise between the Debtors and Horizon Batteries that the Court approved by order dated March 19, 2014.

### V. THE CHINA UNIT

8. XPS had a venture agreement with a Chinese company, Sieyuan Electric Co., under which XPS designed and manufactured a demonstration battery array that that XP refers to as the China Unit. The China Unit is currently located at Sieyuan Electric's facility in the Minhang district of Shanghai, China. The facility address is No. 3399 Huaning Road, Minhang

District, Shanghai City, China 201108.[2] The current contact person for Sieyuan and his contact information is believed to be[3]

> Zhou Zehao
> Siyuan Qingneng Electric and Electronic Co. Ltd.
> Dongduan, 4/F, Building C, No.2, Xinxi Road
> Shangdi, Haidian Di
> Beijing, Beijing, 100085 China
> +86-1062988592

9. Photographs of the China Unit are attached hereto as **Exhibits A & B**.[4] The China Unit is a fully-assembled array of lead acid PowerCells that were manufactured by XP Grove at the plant in Oklahoma, all 6.5 versions.[5] The China Unit includes 1,200 batteries bussed in a 1,000 VDC pack inside the container, with an additional 120 batteries as spares that are being kept in Sieyuan Electric's facility. However, they are not being maintained, so they may be scrap. The China Unit also includes an older model Eaton invertor. The China Unit is carried on XPS's books as having an acquisition date of October 1, 2012, and a fully-depreciated cost of $1,349,191.34.

10. Younicos had stated that it is currently able to access the China Unit's user interface using the proprietary software it purchased from the Debtors in April. However, Younicos also states that its access does not go beyond the user interface; that they have no ability to remotely access the main control components, which are not communicating, most likely because they are not powered. Thus Younicos asserts it has no visibility into the system

---

[2] Approximate GPS coordinates are: 31°03'38.9"N 121°22'34.8"E
[3] This contact information was obtained online from Hoovers. The address in the Debtors records is Sieyuan Electric Co., Ltd., Attn: Legal Department, 3399 Huaning Road, Minhang District, Shanghai, China 201108.
[4] The photographs were taken around May, 2014, and are the most recent photographs of the China Unit available to either Younicos or Extreme Power.
[5] In April of this year, XP sold 6.5 series PowerCells to First Wind and Duke for $400 each, although those were all either new or were certified as good as new on the Arbin cycler.

Second Motion to Sell China Unit                    4

itself, and is unable to determine the present state of charge or health of any of the batteries, or the condition of any control systems, HVAC, the cooling skid, or any other sub-assemblies, all of which might have value only as scrap.

11. The China Unit has been unsupported and not properly maintained since the last Xtreme Power employee was on site in December, 2012. Sieyuan shut down their energy storage department in early 2013.

12. The China Unit includes the following equipment:

- IE 1.5MW Inverter (Power Conversion System) older 60HZ configuration
- 5 ton HVAC system
- XP control system (control cabinet-NOT BEING SOLD)
- Pump skid for external inverter cooling loop
- Small Heat Exchanger for external inverter cooling loop
- Large Heat Exchanger for external inverter cooling loop
- Tools and Safety Equipment

13. The China Unit contains certain intellectual property—software, and hardware configurations including the Xtreme Power control system—that Xtreme Power previously sold to Younicos. The Debtors do not seek authority by this Motion to sell such property of Younicos to any other party. As such, any third-party that may be interested in offering a higher price should consider that they will not be purchasing any intellectual property or the embodiment thereof that may be part of the China Unit but which belongs to Younicos. Debtors expect Younicos will vigorously protect its intellectual property rights.

14. The China Unit is listed on XPS's bankruptcy Schedule B (list of assets) as a "container" at zero value, due to the remote location, it has been sitting idle, and there were no interested customers in China. At the time, Debtors expected the China Unit would eventually be abandoned. The venture agreement with Sieyuan Electric is not listed on the XPS bankruptcy Schedule G (list of executory contracts), but it was listed on the later-prepared listing of

executory agreements that is part of the Disclosure Schedules for the Younicos sale, as follows:

>Excluded Agreements:
>
>(hh) Electric Energy Storage Co., Ltd. Demo Standard Container DPR System Cooperation Agreement by and between Shanghai Sieyuan Electric Energy Storage Co., Ltd. and Xtreme Power Systems, LLC, dated May 7, 2012.

A copy of the venture agreement between XPS and Sieyuan Electric is attached hereto as **Exhibit C**.

15.     In early August, Younicos informed XPS that it had remotely accessed the China Unit and that it believes some of the batteries might be salvageable, and so the China Unit might be economically viable after all; and that it had begun considering the possibility of sending a team to China to dissemble the China Unit and ship the batteries back to Texas to be refurbished and resold. Younicos indicated a willingness to purchase the China Unit from XPS and discussions of that possibility commenced.[6]

## VI.  THE PROPOSED TRANSACTION

16.     The Debtors and Younicos have entered into a purchase agreement for the purchase and sale of the China Unit (the "**Purchase Agreement**"). A copy of the Purchase Agreement is attached as **Exhibit "D"** and the Debtors seek approval of the Purchase Agreement pursuant to this motion.

17.     The key terms of the Purchase Agreement include:

---

[6] Younicos made an initial proposal that was considered by XPI's board of directors, which accepted the proposal but imposed certain conditions. Subsequently, XPI's board reconsidered and dropped one of the sale conditions. Dr. Alan Gotcher, who is a member of XPI's board and who also works for Younicos, attended the XPI board meetings where the sale terms were approved but did not participate in the XPI board's deliberations on the proposal and did not vote on the question. Further, because Dr. Gotcher is not disinterested with respect to this transaction, XPI's board has designated one of its disinterested members as the person with authority to take all actions or to not take any action with respect to the transaction as he shall deem necessary or desirable in his reasonable business judgment as may be necessary or convenient to effectuate the purpose of the board-approved transaction.

    a. The China Unit will be sold free and clear of all liens, claims, encumbrances and interests.

    b. Younicos is purchasing the China Unit "as is, where is, and with all faults."

    c. Younicos will not assume or be deemed to assume any liabilities of the Debtors.

    d. The Purchase Price is $80,000, payable in cash at closing.

    e. Younicos will pay for all costs of retrieving the China Unit from its current location in China and as well as any costs that may be incurred for the disposal of any related portion of the Assets that Buyer subsequently decides after purchase it does not want.

    f. Younicos' purchase is subject to higher and better bids submitted at or prior to the hearing on approval of this Motion.

18. The Board of Directors of XPI has agreed to the offer embodied in the Purchase Agreement, subject to bankruptcy court approval after reasonable notice and a hearing, at which hearing anyone else would be entitled to offer a higher price, potentially triggering an auction. If a competing bid is made, the Debtors will request the Court conduct the auction in the courtroom at the hearing.

19. XPS has no current ability to monetize the China Unit, and is unaware of any competing offers, although at least one person has expressed possible interest and has indicated he is investigating the possibility of making a bid. Nevertheless, XPS believes that without the Younicos sale, the China Unit likely has no value to XPS.

## VII. RELIEF REQUESTED

20. Debtors seek entry of an order substantially in the form submitted with this Motion (the "**Sale Order**") authorizing it to sell the China Unit free and clear of liens, claims, encumbrances and interests, if any, to Younicos pursuant to the Purchase Agreement.

## VIII. GROUNDS FOR RELIEF

### A. Sale of Property Free and Clear of Liens, Claims, Encumbrances and Interests

21. The statutory authority for sale of property of the estate outside the ordinary course of business is found in section 363(b) and (f) of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

22. The Fifth Circuit has set forth the standard for the authorization of sales pursuant to section 363 in *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines Inc.* (*In re Continental Air Lines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986). To begin with, the assets to be sold must be property of the debtor's estate. *See id*. Additionally, there must exist a valid "business justification" for the sale. *Id*. In determining whether there is sufficient business justification for the sale, the bankruptcy judge

> should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis–a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and,

> most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Id*. (quoting *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp*.), 722 F.2d 1063, 1071 (2d Cir. 1983)).

23.     The Fifth Circuit recognizes that approval of a proposed sale of property is appropriate if the court finds that it is good business judgment for the debtor to enter into the transaction. *See Continental Airlines,* 780 F.2d at 1226. The Debtor believes that the proposed sale of the China Unit to the Younicos is supported by sound business justification.

24.     If approved, the sale will generate cash in exchange for assets that the Debtors are unable to access or monetize. Because the unique nature of this asset severely limits the number of potential purchasers, the Debtors respectfully submit that the consideration detailed herein is both fair and reasonable. The consideration is not only fair and reasonable but also supports the Debtors' business justification for the sale.

25.     All creditors and parties in interest will receive adequate notice of the proposed sale. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in the Reorganization Cases, and others whose interests are potentially implicated by the sale. The Debtors submit that such notice is sufficient for entry of the Sale Order and satisfies notice conditions for approval of the sale under section 363(b) of the Bankruptcy Code.

26.     Under these circumstances, sound business reasons exist that justify the sale of the Batteries outside the ordinary course of business.

27.     The Agreement has been negotiated at arms-length and in good faith and therefore Younicos is entitled to the protections of section 363(m) of the Bankruptcy Code. There must be

Second Motion to Sell China Unit                    9

a showing of fraud or collusion between the purchaser and the debtor in possession or trustee in order to demonstrate a lack of good faith. *Bleaufontaine, Inc. v. Roland Int'l (In re Bleaufontaine, Inc.*), 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) ('[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."). *See also Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.*), 111 F.3d 269, 276 (2d Cir. 1997) (same); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (same). No such facts exist here. Accordingly, the Debtor requests that the Court make a finding that the Agreement reached with Younicos was at arms' length and is entitled to the protections of section 363(m) of the Bankruptcy Code.

28. The Debtors request that the Court authorize the sale of the China Unit free and clear of any and all liens, claims, charges, encumbrances and interests (the "**Claims**"), which may be asserted or otherwise exist, with any such Claims to attach to the proceeds of the sale of the China Unit, subject to the rights and defenses of the Debtor, if any, with respect thereto. The Debtors are not aware of any Claims on the China Unit, however, they make no warranty or representations regarding the rights or claims or any person in China who may assert a claim or rights against the China Unit, for example, claims of Sieyuan Electric for storage charges, etc. Similarly, the Debtors' sale of the China Unit is as is, where is, with all faults.

29. Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim or interest in such property if:

    a. applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    b. such entity consents;

    c. such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

    d. such interest is in bona fide dispute; or

    e. such entity could be compelled, in a legal or equitable proceeding to accept money satisfaction of such interest.

11 U.S.C. § 363(f).

    30. Because section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of property free and clear of liens, claims, encumbrances and other interest. *See* 11 U.S.C. § 363(f). In this instance, the requirements of section 363(f) of the Bankruptcy Code are satisfied because the proposed Sale Order provides for all Claims to attach to the proceeds from the sale of the China Unit in the order of their priority and with the same validity, priority, force and effect which such Claims now have against the China Unit, subject to the rights, claims, defenses and other objections, if any, of the Debtors and parties in interest with respect to such Claims. Accordingly, the Debtors submit that the sale of the China Unit free and clear of the Claims satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

**B.    Effectiveness of the Sale Order**

    31. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). The Debtors request that the Sale Order be effective immediately by providing that the 14-day stay is inapplicable and waived, so that they may proceed as expeditiously as possible with the sale.

    WHEREFORE, the Debtors respectfully request that the Court enter the attached order granting the relief requested herein and such other and further relief as is just and proper.

Respectfully submitted,

***JORDAN, HYDEN, WOMBLE, CULBRETH & HOLZER, P.C.***

*/s/ Nathaniel Peter Holzer*
Shelby A. Jordan
Texas Bar No. 11016700
Nathaniel Peter Holzer
Texas Bar No. 00793971
Antonio Ortiz
Texas Bar No. 24074839
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX 78401-0341
Telephone:   (361) 884-5678
Facsimile:    (361) 888-5555
sjordan@jhwclaw.com
pholzer@jhwclaw.com
aortiz@jhwclaw.com
**ATTORNEYS FOR DEBTORS-IN-POSSESSION**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system or by US First Class Mail, postage prepaid, as shown on the attached service list, on October 8, 2014.

*/s/ Nathaniel Peter Holzer*
Nathaniel Peter Holzer